# <u>Transcript of the Testimony of</u>

# **Kristine A. DuPont**

**_____**

**Date:** May 22, 2017

**Case:** Kristine DuPont v. Active Plumbing Supply Co.

EXHIBIT "B"

**Waters Reporting Services**
**(440) 269-1980**
**lk@watersreporting.com**

## Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

KRISTINE DuPONT,

        Plaintiff,

        -vs-

ACTIVE PLUMBING SUPPLY CO.,

        Defendant.

        JUDGE NUGENT

        CASE NO. 1:16CV2363

- - - -

Deposition of KRISTINE A. DuPONT, taken as if upon cross-examination before Lynn A. Konitsky, a Certified Realtime Reporter and Notary Public within and for the State of Ohio, at the offices of Dworken & Bernstein, 1468 West 9th Street, suite 135, Cleveland, Ohio, at 10:05 a.m. on Monday, May 22, 2017, pursuant to notice and/or stipulations of counsel, on behalf of the Defendant in this cause.

- - - -

WATERS REPORTING SERVICES
Court Reporters
38385 Wood Road
Willoughby, Ohio 44094
(440) 269-198022

## Page 2

1  APPEARANCES:
2      Chastity L. Christy, Esq.
       The Lazzaro Law Firm, LLC
3      920 Rockefeller Building
       614 W. Superior Avenue
4      Cleveland, Ohio  44113
       (216) 696-5000,
5      chastity@lazzarolawfirm.com
6
           On behalf of the Plaintiff;
7
8      Richard Selby, Esq.
       Jo A. Tatarko, Esq.
9      Dworken & Bernstein Co., L.P.A.
       1468 W. 9th Street
10     Suite 135
       Cleveland, Ohio  44113
11     (216) 861-4211,
       rselby@dworkenlaw.com
12     jtatarko@dworkenlaw.com
13
           On behalf of the Defendant.
14
   ALSO PRESENT:
15     Cynthia Barber
16
17
18
19
20
21
22
23
24
25

## Page 3

1
2          W I T N E S S   I N D E X
3                              PAGE
4  CROSS-EXAMINATION
   KRISTINE A. DuPONT
5  BY MR. SELBY                  4
6
           E X H I B I T   I N D E X
7
   EXHIBIT                      MARKED
8
   Defendant's Exhibit 1, offer of      18
9  employment, 5/22/14,
10 Defendant's Exhibit 2, pay document   83
   for k.dupont,
11
   Defendant's Exhibit 3, work schedule  88
12 for k.dupont,
13 Defendant's Exhibit 4, email, 5/22/15  92
   from c.barber to multiple people,
14
   Defendant's Exhibit 5, email, 5/26/15  94
15 from c.barber to k.dupont,
16 Defendant's Exhibit 6, email same as    101
   exh.5 without k.dupont response,
17
   Defendant's Exhibit 7, email, 6/8/15    108
18 from c.barber to showroom,
19 Defendant's Exhibit 8, email, 8/31/15   113
   from c.barber to showroom,
20
   Defendant's Exhibit 9, email, 3/4/16    115
21 from b.barber to multiple people,
22
23
24
25

## Page 4

1      KRISTINE A. DuPONT, of lawful age, called
2  by the Defendant for the purpose of
3  cross-examination, as provided by the Rules of
4  Civil Procedure, being by me first duly sworn, as
5  hereinafter certified, deposed and said as
6  follows:
7      CROSS-EXAMINATION OF KRISTINE A. DuPONT
8  BY MR. SELBY:
9  Q.  Can you please state your name for the record.
10 A.  Kristine A. DuPont.
11 Q.  Ms. DuPont, my name is Ric Selby.  I'm an
12     attorney for Active Plumbing.  The purpose of
13     having you here today is to give me the
14     opportunity to take your deposition in connection
15     with a lawsuit you filed in Federal Court.
16         Before we get started I'm going to go over a
17     few ground rules that hopefully will make things
18     go a little smoothly.
19         The first is, you can see we have a court
20     reporter here transcribing everything, therefore,
21     it's important, when you answer my questions,
22     that you do so verbally as opposed to a head nod
23     or a shrug.  And try to avoid things like uhm-hum
24     or huh-huh and stay with yes or no.
25         Sometimes it's easy to fall into during

**Page 5**

1   normal conversation, so your attorney or I may
2   remind you, but if you could be conscious of
3   that, it's helpful.
4       The second is, I want to make sure that you
5   and I are on the same page.  So if you don't
6   understand one of my questions, or you didn't
7   hear it, or you want me to repeat it or rephrase
8   it, just say so.
9       I want to make sure the answers you're giving
10  are to the questions I'm asking, so if you're not
11  sure what I'm asking, please speak up.
12      We can take a break whenever you need, this
13  is not an endurance contest or a marathon.
14      The only thing I would ask though, is that if
15  there's a question pending, that you answer that
16  question before we take a break and then we can
17  take a break for the restroom, just a break,
18  whatever.
19      We have some water over there, if you'd like
20  some coffee, we can have some made.
21      And then finally, is there anything that
22  would interfere with your ability to give a
23  deposition today; an illness, medication,
24  anything that would affect your memory or your
25  ability to give a deposition today?

**Page 6**

1   A.  No.
2   Q.  Okay.  What's your current address?
3   A.  327 Tiffin, T-i-f-f-i-n, Avenue, Huron, Ohio.
4   Q.  And how long are you resided there?
5   A.  A year-and-a-half.
6   Q.  I want to go through a little bit; what's your
7       educational background?
8   A.  I have completed high school.  I have some
9       college and I have specialized training in areas
10      of my field.
11  Q.  Let's talk first about, where did you graduate
12      from high school?
13  A.  Edison High School in Milan.
14  Q.  And what college do you have?
15  A.  I attended Bowling Green and I attended Remington
16      School For Dentistry assisting, many years ago.
17  Q.  And did you obtain a degree from either one of
18      those?
19  A.  I did not.
20  Q.  How long did you go to Bowling Green?
21  A.  A year.
22  Q.  You said you had some specialized training aside
23      from college.  What's that training in?
24  A.  I have three levels of 2020 design training.
25  Q.  So what is 2020 design training?

**Page 7**

1   A.  It is a CAD program for interior design.
2   Q.  And when did you obtain that training?
3   A.  I don't recall the exact date.  It was -- I'm
4       going to say, close to two years ago.
5   Q.  And where did you obtain that training from?
6   A.  Pittsburgh, Pennsylvania.
7   Q.  And was it a course, an organization; who offered
8       the training?
9   A.  Tom Pajewski (sic).
10  Q.  And who is Tom Pajewski?
11  A.  He's a software writer and consultant for 2020.
12  Q.  Is 2020 a company?
13  A.  It is the design program itself, the company,
14      yes.
15  Q.  Did you obtain this training through employment?
16      In other words, did you have an employer who
17      paid for this training or provided it to you or
18      did you pay for it or do this on your own?
19  A.  I paid for it on my own.
20  Q.  You said you had three levels.  How many levels
21      are there?
22  A.  Three.
23  Q.  And how long was this training?
24  A.  It spanned over the course of years.
25  Q.  When did you start taking this training?

**Page 8**

1   A.  2000 was my first introduction to 2020.
2   Q.  When was the last time you took any training?
3   A.  To the best of my recollection, I think that was
4       a couple years ago, what we just spoke about.
5   Q.  And so how often was this training and how long
6       would it last when you would do it?
7   A.  The training is in accordance with upgrades to
8       the software, so it would go according to keeping
9       up with the software's progress and where your
10      needs could be enhanced.
11  Q.  So whenever the software was upgraded, you would
12      get new training on those updates?
13  A.  Yes, or I would choose areas of specialty that I
14      wanted to train in within the software's
15      upgrades.
16  Q.  So when you did the initial training with the
17      program, how long was that training?
18  A.  I don't recall exactly, I know it was several
19      days in a hotel somewhere.
20  Q.  When you do the periodic updates, how long would
21      these updates be?
22  A.  The answer varies.
23      There are offers of online enhancements or
24      there are offers of going and staying and doing a
25      few days of enhancements; I do the few days.

Page 9

1  Q. I assume, with some of the online courses, it
2     might be just a couple of hours?
3  A. Yeah.
4  Q. And then if you go and naturally do the training
5     seminars, where you're there in person, those are
6     going to last a couple of days?
7  A. Yes.
8  Q. Fine. Are there any certifications that come
9     with that?
10 A. You get a certificate that you completed that.
11 Q. A certification of completion?
12 A. Correct.
13 Q. Do you have any licenses, professional licenses
14    or anything like that?
15 A. Just certifications.
16 Q. What certifications do you have?
17 A. I attended the Progress Lighting Institute.
18 Q. Any others?
19 A. Not completed.
20 Q. When did you complete the Progress Lighting
21    Institute?
22 A. To the best of my recollection, it was probably
23    ten years ago.
24 Q. And what is the Progress Lighting Institute?
25 A. It is a coursework to educate you completely in

Page 10

1     the areas of lighting design, lighting theory,
2     electrical loads, to be able to design lighting
3     layouts effectively.
4  Q. Who offered this?
5  A. Progress Lighting. It was taught by Joe
6     Rey-Barreau. He's the design professor for the
7     University of Kentucky.
8  Q. And where was this offered?
9  A. I went to Greenville, South Carolina. Possibly
10    North Carolina.
11 Q. One of the Carolinas?
12 A. One of the Carolinas.
13 Q. Fair enough.
14    Let's go through your employment history.
15    Let's start currently and we'll work backwards.
16    Where are you currently employed?
17 A. I work for myself.
18 Q. And does your business have a name?
19 A. Kristine DuPont Designs.
20 Q. Is it set up as an LLC?
21 A. Sole proprietorship.
22 Q. And what type of work does Kristine DuPont
23    Designs do?
24 A. I do interior design consulting.
25 Q. Do you have an office or location, or do you work

Page 11

1     out of your home?
2  A. I work out of my home.
3  Q. What type of interior design consulting do you
4     do; residential, commercial, both?
5  A. Residential, hospitality, light commercial, as in
6     office work.
7  Q. What would be considered hospitality?
8  A. Restaurants. Dining rooms, particularly.
9  Q. Okay.
10 A. And exterior designing actually.
11 Q. Are you working anywhere else right now?
12 A. No.
13 Q. How many hours a week are you working as part of
14    Kristine DuPont Designs?
15 A. It varies from the jobs and the workload from
16    week-to-week.
17 Q. Let's try to get the ranges.
18    What would be a slow week, what would be a
19    heavy week and what would be a typical week?
20 A. A slow week would be 30 to 40 hours. A heavy
21    week could be 60 plus.
22 Q. What's typical, closer to the slow week or closer
23    to the heavy week?
24 A. I'd say about 40 to 50 hours would be an average,
25    if you could say there was an average.

Page 12

1  Q. How long have you been doing work with Kristine
2     DuPont Designs?
3  A. Years.
4  Q. How long?
5  A. I've been working as an independent designer or
6     as a designer, I'm going to say, from the late
7     nineties, maybe 2000.
8  Q. And you've been doing that continuously even
9     while you've had some other jobs?
10 A. Oh, yes.
11 Q. When was the last time that you worked anywhere
12    other than just for yourself?
13 A. For Active Plumbing.
14 Q. That was for Active Plumbing?
15 A. Yes.
16 Q. While you were working for Active Plumbing, how
17    many hours a week were you typically working on
18    your own business outside of Active Plumbing?
19 A. During that time I did not do my business
20    full-time.
21 Q. Okay.
22 A. It would be impossible.
23 Q. What was --
24 A. I took on maybe one or two jobs during that time.
25    There were weeks when I didn't do any work for

3 (Pages 9 to 12)

Page 13

1  Kristine DuPont Designs. It wasn't my source of
2  income, let's put it that way.
3  **Q. But you were still doing it?**
4  A. Correct.
5  **Q. Did you keep any records during that time that**
6     **would show the work you were doing or the**
7     **projects that you were doing during that time?**
8  A. I could look back and find them, off the top of
9     my head, I don't recall --
10 **Q. Okay.**
11 A. -- exact details.
12 **Q. With respect to your tax returns, how would**
13    **income from Kristine DuPont Designs be reflected**
14    **in your tax returns?**
15 A. I take my business income and the income from
16    when I was working with someone, combine it
17    together, take the write-offs against -- if
18    any -- the business and then pay whatever taxes
19    are needed to be paid, if there were any.
20 **Q. I understand. Like, did you pay yourself a W-2**
21    **or would you just have, like, you know, the**
22    **income statements -- like you didn't pay yourself**
23    **as an employee, correct?**
24 A. No.
25 **Q. So there wouldn't be a W-2 statement --**

Page 14

1  A. Correct.
2  **Q. -- or anything like that?**
3     **You would just have, as part of your tax**
4     **records, you would have the income that was**
5     **generated and then you would have all your**
6     **write-offs and then you would also, as a separate**
7     **matter have, you would have received a W-2 from**
8     **Active Plumbing?**
9  A. Yes.
10 **Q. Do you have a recollection of, while you were**
11    **working for Active Plumbing, what type of income**
12    **you were generating for yourself from Kristine**
13    **DuPont Designs?**
14 A. Not -- not that I can recall at this minute.
15 **Q. Do you keep -- like, when you do a job for**
16    **Active -- I mean, for Kristine DuPont Designs,**
17    **would you have a separate file for each job?**
18 A. Yes.
19 **Q. So you would be able to go back and would you**
20    **still have those records from the time you were**
21    **employed at Active Plumbing?**
22 A. I can't answer that for sure right now.
23 **Q. Okay. You'd have at least some?**
24 A. I'm sure I do.
25 **Q. So you'd be able to go back and put together a**

Page 15

1  **list of all of the jobs you did for Kristine**
2     **DuPont Designs during the time that you were**
3     **working for Active Plumbing, with some**
4     **description of what that job was, correct?**
5  A. Possibly, yes.
6  **Q. Did you keep any records or maintain any records**
7     **with respect to Kristine DuPont Designs that**
8     **would establish how many hours you were working**
9     **or what you were doing, any type of records like**
10    **that?**
11 A. Not specifically.
12 **Q. What type of work was Kristine DuPont**
13    **Designs doing while you were with Active**
14    **Plumbing?**
15 A. Very little.
16 **Q. Would it be the same type of things you were**
17    **doing for Active Plumbing or would it be things**
18    **that Active Plumbing didn't offer?**
19 A. Things that Active Plumbing did not offer.
20 **Q. Were you doing those things for customers you**
21    **found through Active Plumbing, through just**
22    **totally separate customers or some combination of**
23    **the two?**
24 A. That would be two questions.
25 **Q. Let me ask you, did you do work for Active**

Page 16

1  **Plumbing customers?**
2  A. I was approached by an Active Plumbing customer
3     to meet his customer to help with lighting and
4     sizes of logs to build their log cabin.
5  **Q. Okay.**
6  A. I was approached by that customer to also, on the
7     Active Plumbing part, do all of the plumbing
8     through Active and it was very clear that all of
9     those outside services were not part of that
10    thing and they approached me, to meet their
11    client.
12 **Q. Okay. That's fine. What customer was that?**
13 A. Jim Wilson was the plumber.
14 **Q. And was that just one job?**
15 A. Yes.
16 **Q. So there was only one occasion where you were**
17    **doing additional work for Kristine DuPont**
18    **Designs, through a customer that you were also**
19    **doing Active Plumbing work for?**
20 A. Those did not happen at the same time.
21 **Q. Okay. Those were at separate times?**
22 A. Correct.
23 **Q. So all of the other work you would have done for**
24    **Kristine DuPont Designs, would have been done**
25    **with customers completely unrelated to Active**

4 (Pages 13 to 16)

Page 17

1    Plumbing?
2  A.  Absolutely.
3  Q.  Let's talk about -- we're still going backwards
4      in your employment history, and I'll occasionally
5      get sidetracked on matters, but when were you
6      first employed by Active Plumbing?
7  A.  I believe it was May or June of 2014.
8  Q.  How did you learn of the opportunity at Active
9      Plumbing?
10 A.  If I am correct, I believe it was online and I
11     was contacted.
12 Q.  There was an online advertisement?
13 A.  I believe it was online, absolutely, yeah.
14 Q.  And you would have sent in a resume or somehow
15     responded to that?
16 A.  I think that's how that came about, I'm not
17     exactly sure.
18 Q.  Do you recall who you would have interviewed
19     with?
20 A.  Margie Puchalski.
21 Q.  And anybody else?
22 A.  After the first interview, there were courses of
23     people, through the company, that I had to go
24     through interviews with.
25 Q.  Who were all the people that you interviewed

Page 18

1      with?
2  A.  Cindy Barber, I believe.  I met many people at a
3      table and had an interview.
4  Q.  I understand.  Do you recall any of the other
5      people who were there?
6  A.  I believe Chuck Rathburn was there.  Tracy
7      Smearman.  I feel like there were more, but I
8      don't recall exactly who it was.
9  Q.  And do you recall who it was, who offered you a
10     job?
11 A.  There were several people.  Verbally, my first
12     point of contact, Marjorie offered, yes, the job.
13     I received a written offer from the company,
14     generated probably as a combination of Tracy
15     Smearman and Cindy and the people that were in
16     charge of making the offers.  I don't know
17     exactly who contributed.
18         MR. SELBY:  Mark this as
19         Defendant's Exhibit 1.
20                - - - -
21     (Thereupon, Defendant's Exhibit 1, offer of
22     employment, 5/22/14, was marked for purposes of
23     identification.)
24                - - - -
25     BY MR. SELBY:

Page 19

1  Q.  Take a look at what I have marked as Defendant's
2      Exhibit 1.  This appears to be a May 22nd, 2014
3      offer of employment.  Go ahead and read through
4      this and let me know when you're done doing it.
5         Is this the written offer of employment that
6      you received from Active Plumbing?
7  A.  It appears to be.
8  Q.  And is that your signature on the second page?
9  A.  Yes, it is.
10 Q.  So you would have signed and dated this on June
11     3rd, 2014?
12 A.  Yes, sir.
13 Q.  Looking through this, does this appear to
14     properly reflect your, I guess, the terms and
15     conditions of your employment as you recall them
16     when you were first hired?
17 A.  It is an outline of the terms and conditions --
18 Q.  Okay.
19 A.  -- of which I was hired.
20 Q.  And what's outlined here appears, to you, to
21     accurately reflect what in fact those terms and
22     conditions were when you were hired?
23 A.  Accurately?
24 Q.  Yeah.
25 A.  The base salary, the commission structure is what

Page 20

1      they set out to follow.
2  Q.  Right.
3  A.  The structure for the expenses.  The benefits, to
4      my recollection, are not the same as what came to
5      fruition.
6  Q.  How were they different?
7  A.  I don't recall seeing a life insurance policy
8      equal to my annual salary.
9  Q.  Okay.
10 A.  And when I questioned it, I was told no one had
11     that.
12 Q.  Who did you question regarding that?
13 A.  The branch manager, Greg Taylor, and some other
14     employees, I can't recall who, but --
15 Q.  Okay.  Any other differences in the benefits?
16 A.  To my recollection, they seem to be in line.  I
17     would have to look at the nine paid holidays, but
18     other than that, I feel like I'm seeing what was
19     the structure, yes.
20 Q.  Did any of these terms and conditions, as
21     outlined in this letter, change from the time you
22     were hired until the end of your employment?
23 A.  Yes.
24 Q.  Which ones changed?
25 A.  The typical work week is 40 hours, occasional

Page 21

1    overtime is expected but generally does not
2    exceed five hours per week.
3  Q.  You're indicating that you worked more than that,
4    or less than that?
5  A.  I'm indicating that I worked more than that on
6    many occasions and was told that I was an exempt
7    employee and not entitled to overtime and
8    throughout the course of my employment, it was
9    questioned on many occasions.
10 Q.  And who told you that?
11 A.  Who told me what?
12 Q.  That you were an exempt employee not entitled to
13   overtime?
14 A.  I got an e-mail from the head of HR stating that.
15 Q.  Who is that?
16 A.  I'm sorry, that would be Tracy Smearman.
17 Q.  Okay.  When was that?
18 A.  I can't recall the exact date.
19 Q.  Okay.
20 A.  It is in the paperwork that was requested by
21   you --
22 Q.  Okay.
23 A.  -- for evidence.
24 Q.  Okay.
25 A.  I had questioned, on the phone and verbally with

Page 22

1    Bryce Barber, over being paid hours that I wasn't
2    being paid for.
3  Q.  How many times did you have those conversations
4    with Bryce Barber?
5  A.  Three or four, to the best of my recollection,
6    probably more.
7  Q.  What did Bryce tell you in response to that?
8  A.  There were several responses.
9        On a phone conversation, the response was,
10   Well, everybody should be getting paid what they
11   work.  This is when he had just come in to
12   working with the company in his respect of
13   leadership, I'm going to say that, but I'm not
14   sure what his exact title was, but I was to talk
15   to him about things.  And then he would check
16   into it.
17       When we got our yearly explanation of our
18   sales goals --
19 Q.  Right.
20 A.  -- it would explain how we were going to work
21   that, explanation of sales goals, and one stated
22   that overtime hours will be paid at a rate of
23   one-and-a-half --
24 Q.  Right.
25 A.  Whatever that rate was, I don't recall the exact

Page 23

1    wording; I asked him about it then.
2        The very next day, Cindy Barber came to my
3    branch and said that that was written on there,
4    but that didn't necessarily apply.
5        And then the exempt employee thing came up on
6    so many phone conversations, but I do have
7    e-mails where it came up as well.
8  Q.  Who else did you have those -- when you say
9    "exempt employees," I want to back up a little
10   bit.
11       So Bryce gave you something in writing as
12   part of your sales goals, telling you that you
13   would be entitled to time and a half?
14 A.  The company produced a yearly sales goal paper.
15 Q.  Right.
16 A.  That explained what your expectations were, what
17   their goals were for the year.  And then it
18   explained, it went into overtime hours will be
19   paid at one-and-a-half and that's when I asked --
20   after I learned that several designers were
21   hourly, because they had issues with overtime
22   when they were considered salary.
23 Q.  Okay.  So you had been provided that in writing
24   and that is something that Bryce had given you?
25 A.  At that point in time, I think it may have come

Page 24

1    across through an intercompany mail transfer.
2  Q.  Okay.
3  A.  But it was created and drafted from the ownership
4    or the powers that make those -- these things.
5  Q.  Okay.  How far into your employment was that,
6    that you were given that?
7  A.  I would think it would have been a year, if I'm
8    correct about that.  It was an annual type thing.
9  Q.  When you were first employed, when you started --
10 A.  Yes.
11 Q.  -- were you told whether or not you would be
12   receiving overtime for hours worked in excess of
13   40 hours per week?
14 A.  On this offer.
15 Q.  Okay.
16 A.  It states that overtime --
17 Q.  I understand.
18       What was your experience?  In other words,
19   when you started, were you being paid overtime
20   for hours worked in excess of 40?
21 A.  No.
22 Q.  That never happened?
23 A.  I did not say that.
24 Q.  How long was it before you worked a week in which
25   you worked more than 40 hours per week?

6 (Pages 21 to 24)

## Page 25

1  A. I'm unable to pinpoint that without proper
2  records of the calendars and the appointment
3  calendars held by the company, in their system.
4  Q. An estimate.
5  Did you work one week, one month, one year;
6  how long was it until you worked a period of
7  time, as far as you can recall?
8  A. Within the first month.
9  Q. So during that first month, when you worked more
10  than 40 hours, correct?  And you had been told --
11  when you were hired -- that you would be paid for
12  overtime?
13  A. I just went by this, yes.
14  Q. So did you communicate with anybody about how you
15  were going to be paid or whether you would get
16  paid or what, you know, what to do with your
17  overtime, that first time that it happened?
18  A. Marjorie was acting manager for the showrooms --
19  Marjorie Puchalski -- at that time, and I had
20  several conversation about the hours that I was
21  putting in and not being paid overtime.
22  Q. Okay.
23  A. She left shortly after I started.  There were a
24  lot of leadership changes.
25  Q. Let's talk, first, about Marjorie.

## Page 26

1  So within the first month you're there, you
2  have a week where you work more than 40 hours per
3  week, correct?
4  You go to Marjorie.  Did you ask her, What am
5  I supposed to do with these overtime hours?  What
6  was the substance of that communication?
7  A. The substance was that it's a battle to get paid
8  overtime.
9  I can't tell you specific words that were
10  used, however, there was an ongoing dispute about
11  hours I was working and getting paid for them.
12  Q. Did she describe to you a process of how you were
13  supposed to submit those hours?
14  A. I don't recall.  I really don't.
15  Q. Was there a process by which you could submit
16  hours at Active Plumbing to have them considered
17  for overtime?
18  A. Yes.  Eventually I was shown a way to submit
19  hours for overtime.
20  Q. What was that way of how you were supposed to do
21  that?
22  A. They had a form that they had a person fill out.
23  It was very vague.  I was told -- how can I word
24  this right?
25  There were times when overtime would be

## Page 27

1  considered okay -- very seldom times.  And they
2  were picked as to when I was allowed to submit
3  them.
4  And then I got ahold of HR, after being
5  really upset about not getting paid for all this
6  time, and I got the e-mail back from Tracy that
7  said, I am exempt; according to the laws there is
8  no way for them to track my overtime, for me to
9  be paid by it.
10  Q. I want to back up here.
11  You said there was a form that was eventually
12  given to you to fill out, correct?
13  A. Yes.
14  Q. Who gave you that form?
15  A. A designer that came to work at my branch,
16  Kelsey.
17  Q. What's Kelsey's last name?
18  A. Sizemore.  Showed me an overtime form that was on
19  a shared drive.
20  Q. How long into your employment was this?
21  A. I honestly can't tell you.
22  Q. First month, first year?
23  A. Not the first month.  I can't give you a correct
24  answer at this time.
25  Q. So you don't know when that happened, but at some

## Page 28

1  point, you had that form, correct?
2  Is that a "yes"?
3  A. Yes.  It was not a form that I was allowed to use
4  every week to report with.
5  Q. I'll get to that.
6  Prior to this form, was there any way to turn
7  in or submit overtime hours?
8  A. Not that I was given, no.
9  Q. Would you report them verbally?
10  A. Yes.
11  Q. Who would you report them to?
12  A. I spoke to Marjorie Puchalski who was the manager
13  at the time.  I spoke with Brenda Schultz, who
14  was the manager after Marjorie Puchalski.  I
15  communicated to Greg Taylor, who was the branch
16  manager.
17  Q. Anybody else?
18  A. Kelsey Sizemore.  I communicated with her about
19  overtime that wasn't paid.
20  Q. Anybody else?
21  A. Quinton Patrick, I spoke with him about overtime
22  I was working and not getting paid.
23  Q. Who was Quinton Patrick?
24  A. He's another person that worked at the Avon
25  branch that I worked at.

7 (Pages 25 to 28)

Page 29

1  Q. Anybody else?
2  A.  Obviously I communicated with Tracy Smearman,
3     Bryce Barber, Cindy Barber, and possibly others
4     that I don't recall at this moment.
5  Q. Nobody else you can recall?
6  A.  Not specifically at this very second.
7  Q. What would you have communicated with Marjorie
8     Puchalski regarding overtime?
9  A.  Statements would be made like, I can't believe I
10    can't get paid for the hours that I'm working.
11 Q. Okay.  Let me stop you.
12       Were you keeping track of how many hours you
13    were working?
14 A.  The company calendar for appointments shows
15    off-hour appointments.
16 Q. And were you then submitting to Marjorie
17    Puchalski, "I worked X number of hours over 40
18    hours, I would like to be paid for those"?
19 A.  I would have conversations to that exact point
20    and I would get responses like, I don't know,
21    they're not going to do it.  She couldn't do
22    anything about it basically.
23 Q. So --
24 A.  Go ahead.
25 Q. Were these -- and I guess, I'm trying to

Page 30

1     understand.
2        So you'd have these hours.  Would you tell
3     Marjorie, I worked these hours and then Marjorie
4     would say, No, the company's not paying them?
5        You say, I couldn't get paid for these
6     overtime hours I'm working.  I'm trying to
7     understand how you communicated, to the company,
8     the overtime hours that you were working.
9  A.  I spoke with Marjorie Puchalski about it, Brenda
10    Schultz, Greg, Quinton, several others, because
11    it was consistent and was told that's just how
12    the company is --
13 Q. Okay.
14 A.  -- and that it would be basically rattling some
15    cages.
16 Q. So all of these hours were verbal?  All of these
17    requests, for overtime hours, were verbal?
18 A.  Then I sent an e-mail to HR to verify that.
19 Q. I'm trying to do this systematically.
20 A.  Correct.
21 Q. So it's helpful if you could just respond to the
22    questions I'm asking.
23 A.  Okay.
24 Q. So with Marjorie Puchalski --
25 A.  Yes.

Page 31

1  Q. -- all of your requests for specific amounts of
2     overtime were verbal to her?
3  A.  Yes.
4  Q. With respect to Brenda Schultz, all of your
5     requests for a specific amount of overtime were
6     verbal to her?
7  A.  Yes.
8  Q. And with respect to Greg Taylor, all your
9     requests for a specific amount of overtime would
10    have been verbal to him?
11 A.  No.
12 Q. You would have submitted written overtime
13    requests to Greg Taylor?
14 A.  No.
15 Q. You would not have submitted any overtime
16    requests to Greg Taylor?
17 A.  Yes.
18 Q. So you never submitted any overtime requests to
19    Greg Taylor?
20 A.  He was not in a position to be in that role for
21    me to have requested overtime.
22 Q. So would the people that you would have requested
23    the overtime from, been your immediate
24    supervisors, Marge Puchalski and Brenda Schultz?
25 A.  At those time periods, yes.

Page 32

1  Q. When you say, "at those time periods," what time
2     periods are you talking about?
3  A.  During the course of their employment.
4  Q. Marge was your first immediate supervisor,
5     correct?
6  A.  Yes.
7  Q. And then Brenda would have been your second?
8  A.  Yes.
9  Q. Who was your immediate supervisor after Brenda
10    left?
11 A.  It changed so often, it could possibly have been
12    Cindy or Bryce or Greg.
13 Q. And when Brenda or Marjorie weren't there and you
14    had specific overtime hours, who did you
15    communicate the request for those hours to?
16 A.  I had several conversations of complaint with
17    Tracy and got the e-mail back saying that I was
18    exempt and there was no way to report that.
19 Q. So I want to understand this.
20       Your communications with Tracy, were never
21    Here are my hours, I'd like to get paid; they
22    were more, I've been trying to get overtime hours
23    from my managers, why can't I get these paid?  Or
24    were there times that you were submitting the
25    hours that you were requesting directly to Tracy?

8 (Pages 29 to 32)

Page 33

1  A. My questions to Tracy were geared towards why
2     can't I get paid overtime.
3  **Q. She was not one of the people you were**
4     **specifically submitting overtime hours to?**
5  A. I can't answer that question.
6  **Q. Okay.**
7  A. I don't know who reviews the forms and they get
8     submitted to.
9  **Q. But with respect to Marjorie and Brenda, you**
10    **identified conversations where you specifically**
11    **said, I have worked these overtime hours, I would**
12    **like to get paid for them, correct?**
13 A. Yes.
14 **Q. Did you ever have that conversation with Tracy**
15    **where you were submitting specific hours to her,**
16    **I worked these hours, I'd like to get paid for**
17    **them?**
18 A. We did discuss the amount of hours I had been
19    working.
20 **Q. Okay.**
21 A. She responded back by saying, no one disputes all
22    the hours that you worked, but it is not -- you
23    are salary exempted, there's FLSA laws -- this
24    may not be a correct quoting --and there's no way
25    to keep track of your hours and --

Page 34

1  **Q. You worked off-site a lot, correct?**
2  A. Part of my job description was to measure and to
3     go to jobs to help recommend things for clients.
4  **Q. Right.  So they would be at the location,**
5     **correct?**
6  A. Correct.
7  **Q. And so not all of your hours were in the**
8     **showroom, correct?**
9  A. Correct.
10 **Q. So when you worked hours outside of the showroom,**
11    **there would have to be some way for you to**
12    **communicate those to the company, in order for**
13    **the company to know what those hours were,**
14    **correct?**
15 A. There was a company calendar that everyone kept
16    their appointments on.
17 **Q. Okay.**
18 A. As far as time recordkeeping, some people got to
19    punch in and out, some people did not.  I did
20    not.
21 **Q. But that's not what I asked you.**
22 A. Then I don't understand your question.
23 **Q. When you were out at a location, and for the**
24    **company to know whether you were there for half**
25    **an hour or three hours; you would have to**

Page 35

1     **communicate that to the company, correct?**
2  A. What I would do is post -- no.
3     To answer your question; there was a
4     calendar.  We would post the appointments on it,
5     that we had, so everybody knew where we were.
6     So, perhaps, if the store closed at five,
7     because I had to man the store, I was the only
8     designer in there, and try to keep appointments
9     as well; so let's say I had a 5:30 in Elyria,
10    that would be on the calendar, it would last
11    however long it lasted, and then I would go.
12 **Q. Well, would you put that in the calendar before**
13    **you went or after you went?**
14 A. I would put it in the calendar before.  You
15    booked appointments before you would go to them.
16 **Q. So before you went, you wouldn't know whether you**
17    **were going to be there a half an hour or three**
18    **hours?**
19 A. Correct.
20 **Q. So was there a process by which, if I was only**
21    **there a half hour, I would report I was there**
22    **only a half hour; if I was there three hours, I**
23    **was there three hours?**
24 A. I would go back to the company calendar, to just
25    keep track of what I was doing, and if I got done

Page 36

1     at 8:30, let's say, I would go and make it the
2     ending time of that appointment at 8:30.
3  **Q. Okay.**
4  A. Because there is no way to know, when you go out,
5     how long you will be there, that's correct.
6  **Q. What was the company calendar?  Was there a name**
7     **of the software program?**
8  A. I don't recall what the exact name of it is.
9     It's a shared calendar throughout the entire
10    company.
11 **Q. That would show everybody's appointments?**
12 A. Correct.
13 **Q. You indicated there was a form that you could**
14    **fill out.  But you said you weren't allowed to**
15    **use that form?**
16 A. When I complained more about my hours, my work
17    environment got less comfortable.  So I was told
18    that I was exempt and not to report hours and
19    then I was told some hours would be paid as
20    bonus.  It changed constantly.
21 **Q. Who told you that some hours would be paid as a**
22    **bonus?**
23 A. Cindy Barber.
24 **Q. Now, I didn't ask you any of those things.**
25    **You said there was a form, that you said you**

9 (Pages 33 to 36)

Page 37

1  were not allowed to fill out.  Do you recall
2  saying that?
3  A.  Yes.
4  Q.  Who told you, you weren't allowed to submit that
5      form?
6  A.  I was told there's no way to keep track of the
7      hours and that I was exempt, by Tracy.
8  Q.  Okay.  Again, you've said that.
9          But with respect --
10 A.  I was told we don't pay overtime, so --
11 Q.  But you said you were told you were not allowed
12     to turn in that form.
13         Was there a time that you tried to give that
14     form to somebody and somebody said, No, we won't
15     accept that?
16 A.  No.
17 Q.  So you took, from Tracy Smearman's comments, that
18     you weren't allowed to turn those forms in?
19 A.  And from a visit from Cindy Barber that said,
20     even though the paperwork for the structure of
21     2015 says you will be paid overtime, that is not
22     necessarily applicable.
23 Q.  So you said this was, this conversation with
24     Cindy is in relation, you got some written
25     document from the company that spelled out sort

Page 38

1  of the compensation commission schedules and
2  goals and it said in there that you'll receive
3  time and a half for all hours worked in excess of
4  40, correct?
5  A.  Uhm-hum.
6  Q.  And you believe that was approximately a year
7      into your employment?
8  A.  To the best of my knowledge, it was the
9      compensation goal setting paperwork for 2015.
10 Q.  And the next day after you got that, Cindy came
11     to your location and said, No, that's not true,
12     you won't necessarily get paid for all of those
13     hours?
14 A.  Yes.
15 Q.  Did she describe to you when or how they would
16     determine what hours you were to be paid for?
17 A.  No.
18 Q.  Did you ask that?
19 A.  No.  The situation was very awkward and
20     uncomfortable and I knew to drop it.
21 Q.  So you didn't ask any follow-up questions or ask
22     that?
23 A.  I had been asking for over a year, so.
24 Q.  Had you had any prior communications with Cindy
25     prior to this time, when she came in?

Page 39

1  A.  Yes.
2  Q.  When was the first time you had talked to Cindy
3      about overtime?
4  A.  To the best of my recollection, it was early on
5      when I had started questioning why I wasn't
6      eligible for overtime and I believe I spoke to
7      her after a conversation with Tracy on the phone.
8          I believe that I had gotten a call from Cindy
9      subsequently to that.  I cannot recall the exact
10     time and date, but that is the order of those
11     phone conversations.
12 Q.  What did you and Cindy discuss on that occasion
13     on that phone conference?
14 A.  Overtime hours and the company's policy.
15 Q.  And what did Cindy tell you was the company's
16     policy?
17 A.  That we were exempt and that they were not
18     eligible, I was not an eligible overtime
19     employee.
20 Q.  Were you ever paid any overtime hours during the
21     time that you worked there?
22 A.  There were times I was paid overtime hours, but I
23     was told it was paid to me as a bonus for extra
24     work.  It wasn't necessarily tracked overtime
25     hours, nor does that show up anywhere on my

Page 40

1  paycheck.
2  Q.  Who told you that?
3  A.  Cindy.
4  Q.  When did she tell you that?
5  A.  I can't honestly say what conversation, there
6      were many.
7  Q.  How many times did Cindy tell you that you
8      weren't entitled to overtime, but that it would
9      occasionally be given to you as a bonus?
10 A.  I'm going to say in excess of four.
11 Q.  The first time, would that have been the time you
12     had identified after you had the communication
13     with Tracy?
14 A.  Possibly.  I can't recall exactly at this time.
15 Q.  Would all of these have been in person or over
16     the phone?
17 A.  One was in person, that I can recall
18     specifically.  I'm going to say it's possible the
19     other three were on the phone verbally.
20 Q.  Okay.  The one in person, where did that happen
21     at?
22 A.  At my desk in the Avon branch.
23 Q.  And was that the time that she came out to the
24     store, after you had received that memo that we
25     had talked about earlier?

10 (Pages 37 to 40)

Page 41

1  A. Yes.
2  **Q. Was anybody else present?**
3  A. Bryce Barber.
4  **Q. Anybody besides Bryce and Cindy?**
5  A. To the best of my recollection, no.
6  **Q. When are the other occasions that you can recall**
7  **discussing this with Cindy?**
8  A. There were phone conversations, I honestly can't
9  give you exact dates as to when those happened,
10  it was over the course of my employment.
11  **Q. Was there anything else or different communicated**
12  **during those, any of those conversations, than**
13  **what you've described to this point?**
14  A. Could you please clarify that?
15  **Q. Yeah.**
16  **I mean, you've indicated that Cindy told you**
17  **that you were exempt, that you weren't entitled**
18  **to it, that it would occasionally be given to you**
19  **as a bonus, correct?**
20  A. Yes.
21  **Q. During any of those other conversations, you**
22  **know, you can't recall the exact date, was there**
23  **anything in addition to those things or different**
24  **from those things that she told you about**
25  **overtime or was that the consistent message that**

Page 42

1  **you heard in all --**
2  A. That was the consistent message.
3  **Q. Okay. You also indicated that you spoke to Greg**
4  **Taylor about overtime. When would you have**
5  **spoken to him?**
6  A. During the course of my employment, regularly.
7  We all worked in the same building together.
8  **Q. And what would Greg have told you regarding**
9  **overtime hours?**
10  A. Greg's comments were, I don't know, it's an
11  ongoing complaint; some designers are salaried,
12  some get changed to hourly. There's nothing I
13  can do about it; I know.
14  That's pretty much close to being an exact
15  quote.
16  **Q. What was his position?**
17  A. Manager of the branch.
18  **Q. With respect to Kelsey Sizemore, what was her**
19  **position?**
20  A. Designer.
21  **Q. What discussions did you have with her?**
22  A. Conversations related to the hours that I was
23  working and being salary and, you know, the fact
24  that she was hourly because of that. And some
25  people got changed to hourly, some were salary

Page 43

1  and I did not understand the inconsistency.
2  **Q. Did you ever ask anybody to explain why some**
3  **people were hourly and some people were salaried?**
4  A. I asked Greg Taylor.
5  **Q. Did you ever ask -- what was Greg's response?**
6  A. He said he couldn't answer. He did not know why.
7  **Q. Did you ever ask Cindy Barber to be changed to**
8  **hourly?**
9  A. I did not.
10  **Q. Did you ever ask Bryce Barber to be changed to**
11  **hourly?**
12  A. I had mentioned that I did not understand why
13  some were hourly and why some were salary.
14  **Q. To Bryce?**
15  A. Yes.
16  **Q. And what was Bryce's response?**
17  A. He usually would talk to Cindy and get back.
18  **Q. And did he ever get back to you with an**
19  **explanation?**
20  A. I don't recall. I do not think he did.
21  **Q. Did you ever ask Marjorie Puchalski why some**
22  **people were hourly and some were salaried,**
23  **exempt?**
24  A. At that time, I was not aware of that being a
25  policy. As my complaints kind of spread through

Page 44

1  amongst staff members, then I was made aware --
2  from staff members -- that some designers had had
3  that problem and been changed to hourly and some
4  weren't.
5  **Q. How about Brenda Schultz?**
6  A. Brenda Schultz, I was not aware of the policy
7  that some designers were paid differently than
8  others.
9  **Q. Did you ever ask Tracy Smearman why some were**
10  **salaried exempt and some were hourly?**
11  A. This was not my knowledge during Tracy's
12  employment, it was after she left the company.
13  **Q. What communications did you have with Quinton?**
14  **And what was Quinton's last name?**
15  A. Patrick.
16  **Q. Patrick. I can't read my own handwriting.**
17  **What communications did you have with Quinton**
18  **Patrick regarding overtime?**
19  A. General comradery employee conversations, similar
20  to Kelsey. I did not understand the
21  inconsistency and the whole process of deciding
22  when and if someone got paid overtime.
23  **Q. You indicated, you had referred back to that form**
24  **that you had identified.**
25  **Were there ever occasions where you filled**

11 (Pages 41 to 44)

Page 45

1   out the form and submitted it, where you were not
2   paid overtime?
3   A. I can't answer that without reviewing all the
4     forms and my paychecks.
5   Q. How did you determine when you were going to fill
6     out a form and submit it and when you were not?
7   A. At one point closer to the end of my employment,
8     I was told it was okay to start submitting
9     overtime requests.
10  Q. Who told you that?
11  A. I can't recall exactly who.  It was none of the
12    people in my branch, it was someone from the main
13    branch.
14  Q. So from that time forward, did you submit
15    overtime requests when you worked them?
16  A. I did, when I was able to.
17  Q. When you say "you were able to," what would have
18    kept you from doing it?
19  A. At one point, our payroll changed days and my
20    schedule was Tuesday through Saturday.
21  Q. Right.
22  A. And the payroll -- to the best of my
23    recollection, we had to have everything turned in
24    by the end of the day Monday.  The payroll ran
25    through that Saturday though, so if I had a

Page 46

1   Saturday appointment after 1:00, that would have
2   been part of that week's hours.
3       And then another time we got an e-mail saying
4   that we had to turn in our hours -- within the
5   hour -- to so and so to calculate payroll because
6   he was going on vacation or something.
7       I wasn't in the office then and didn't get
8   the opportunity to turn in the stuff so I just
9   didn't make a big stink because I didn't want to
10  have bad times at work.
11  Q. Your schedule was you were off on Mondays,
12    correct?
13  A. Yes.
14  Q. So if you didn't get to it by Monday, you just
15    wouldn't turn it in?
16  A. Correct.
17  Q. Nobody ever told you, you weren't allowed to, you
18    just did that because you didn't want to rock the
19    boat?
20  A. I was advised not to -- if I hadn't turned in the
21    hours for the week on time, then what I got paid,
22    I got paid.
23  Q. Who advised you of that?
24  A. Bryce.
25  Q. Why wouldn't you turn in the hours on time?

Page 47

1   A. I lived 40 minutes away from work and I did not
2     have the ability to remotely turn in my hours or
3     to get into the notes that I would need to --
4     that I kept on the computer -- to turn in the
5     hours, unless, of course, if I drove up on
6     Monday, when I was off, I suppose, yes, I could
7     have done it.
8   Q. Did you ever talk to anybody and say, Look, this
9     is tough for me to do because I'm off on Mondays,
10    to try to work out a different system?
11  A. Yes.
12  Q. Who did you talk to about that?
13  A. I talked to Bryce about it.  I talked to Brenda
14    Schultz about it.
15  Q. And what did they tell you?
16  A. The cutoff is the cutoff.
17  Q. So this would only relate to, if you had an
18    appointment after you left the office on
19    Saturday, correct?  And it had to be in by
20    Monday?
21  A. Not at all times, but mainly, yes.
22  Q. Did you turn in these sheets every two weeks,
23    every week?
24  A. I can't recall.  It could have been every two
25    weeks.

Page 48

1   Q. But if you, for example, had worked the overtime
2     on a Wednesday, the Wednesday the week before
3     they were due, there would have been nothing
4     preventing you from having all of that time done
5     and submitted by the time you left the office on
6     Saturday, correct?
7   A. I can't recall if it was weekly or every two
8     weeks.  The pay period ran Monday through
9     Saturday.
10  Q. Regardless.
11      And your schedule, you worked Tuesday through
12    Saturday, correct?
13  A. Yes.
14  Q. So if the time reports were due by Monday, you
15    would have to submit them by the time you left
16    the office on Saturday?
17  A. That's correct.
18  Q. So any overtime you would have worked, prior to
19    that Saturday, you would have been able to fill
20    out a form and complete it and submit it by the
21    end of that day Saturday, correct?
22  A. You fill out the form at the end of the week and
23    you sent it over Monday.
24  Q. You could have sent it Saturday?
25  A. Saturday's part of that pay period that I have to

12 (Pages 45 to 48)

**Page 49**

1 report.
2 Q. I understand.
3     But at the end of the day you're leaving,
4 correct?
5 A. Not necessarily, no.
6 Q. You might be going to another job?
7 A. Or if someone came in and the showroom stayed
8 open later.
9 Q. But at some point your day ends, correct?
10 A. Correct.
11 Q. At the end of that day, when you're leaving, you
12 could have submitted that time form, correct?
13 A. Not necessarily --
14 Q. Why not?
15 A. -- no.
16     There were times when the computers were
17 being maintained and being shut down, at certain
18 times during the weekends, to be updated.
19 Q. How many times did that happen?
20 A. Over the course of a year? More than once or
21 twice, I can't say exactly how many.
22 Q. Did you leave the handwritten form for whoever
23 was working Monday, with a note, Please make sure
24 this gets turned in?
25 A. No. There wasn't anyone to hand it off to to do

**Page 50**

1 that. I was the single person in the showroom.
2 Q. Nobody worked on Monday, the showroom was closed?
3 A. Someone would work on Monday, yes. I was not
4 instructed to give it to anyone.
5 Q. Who worked on Monday? Did you ever offer to do
6 that?
7 A. No, I did not.
8 Q. Did anybody tell you you weren't allowed to do
9 that?
10 A. I was never told that was a process.
11 Q. Okay. Were you ever told you were not allowed to
12 do that?
13 A. Are you asking was I told I was not allowed to
14 hand off a form to another person?
15 Q. Well, if, for example -- you say these were
16 e-mailed in, correct? How did you deliver these?
17     I'm assuming they were e-mailed because you
18 said sometimes there was a problem because the
19 computer system was down.
20 A. I can't recall if we scanned them in or if we
21 wrote things. Or if they went over in the
22 intercompany mail memo that got carted back and
23 forth. I can't tell you exactly how they went
24 from point A and point B.
25 Q. So if they were in the interoffice mail, then the

**Page 51**

1 fact that the computer system was down, wouldn't
2 have, in any way, inhibited your ability to turn
3 those in?
4 A. If they were in the interoffice mail, by theory,
5 yes, you're correct.
6 Q. On the occasions that -- if they were done by
7 e-mail -- on the occasions the e-mail system
8 might have been down, did anybody tell you, you
9 know, you can just leave these with somebody,
10 make sure they get in?
11 A. No, I was never told that.
12 Q. Did you ever tell anybody, I wasn't able to get
13 my time sheet in because the computer system was
14 down?
15 A. I said I was unable to report my time on a couple
16 of occasions, yes.
17 Q. Who did you tell that to?
18 A. I mentioned it to Greg Taylor, Kelsey Sizemore
19 and Quinton Patrick.
20 Q. None of those people were responsible for
21 actually paying you?
22 A. Correct.
23 Q. Okay. Did you communicate that you had not been
24 able to turn your form in, because the computer
25 was down, to anybody who was actually responsible

**Page 52**

1 for paying those hours?
2 A. During conversations about reporting hours,
3 whether I was allowed or not allowed or that type
4 of conversation, at one point I mentioned the
5 Monday cutoff for the forms being in, and I think
6 one of the backlash responses was, Then we'll
7 change your schedule so you'll work Monday
8 through Friday and then work Saturday overtime
9 every week, nine to one; instead of my schedule,
10 which was 40 hours consisting of Tuesday through
11 Saturday, being off Sunday to Monday, which I was
12 hired under.
13 Q. And that's the schedule you requested?
14 A. That was the agreement upon my hiring.
15 Q. But was that a request you had made?
16 A. That was the agreement I got hired under.
17 Q. I understand they agreed to it.
18     My question is: Did they come to you and say
19 this is the schedule we want you to work or was
20 that the schedule that you had requested?
21 A. They came to me with the hours available for the
22 Avon showroom and I said to them I am willing to
23 work this schedule.
24 Q. So you were the one who wanted to work the
25 Tuesday through Saturday, with Monday off?

13 (Pages 49 to 52)

Page 53

1  A.  Without knowledge of how it would affect payroll,
2      yes.
3  Q.  So going back to the issue.  By the time Saturday
4      got there, the payroll had to be turned in on
5      Mondays.  You knew by Saturday if you had worked
6      extra hours on any of those days in the payroll
7      period before that, correct?
8  A.  Yes.
9  Q.  And you could have made sure that you turned in
10     all of those hours on Saturday?
11 A.  Not necessarily, no.
12 Q.  Why not?
13 A.  There were days I worked on Sundays, too.
14 Q.  I'm not -- I understand.
15 A.  In order to --
16 Q.  Wait.  Let me finish.
17 A.  Okay.
18 Q.  I understand you're saying there may have been
19     times where I worked on Saturday or Sunday, where
20     I wouldn't have known that I was going to work
21     those hours yet, or how many they were.
22 A.  Okay.
23 Q.  I'm asking, as of Saturday, okay, you would have
24     known that, in the days leading up to that
25     payroll period, that you would have worked extra

Page 54

1      hours, correct?
2  A.  Correct.
3  Q.  As of Saturday, with respect to those extra hours
4      that you had worked, you knew you had worked
5      them, you could have turned them in on Saturday,
6      correct?
7  A.  If I would have chose to drive back to the store
8      and go in and unlock it and do all of that, yes,
9      I suppose I could have done that.
10 Q.  Weren't you in the store on Saturdays?  I thought
11     you said you worked in the showrooms on
12     Saturdays.
13 A.  Until 1:00.
14 Q.  So you would have been there till one.
15 A.  And then I would go to a client's house after
16     that because we were not allowed to have
17     appointments outside before one.
18 Q.  I am not asking you about -- I'm asking you
19     about, specifically, hours that you would have
20     worked before that Saturday.
21 A.  Okay.
22 Q.  Okay?  For example, if on Thursday, you had an
23     appointment after hours --
24 A.  Yes.
25 Q.  -- when you got there on Saturday, you would have

Page 55

1      known, I worked those extra hours on Thursday,
2      correct?
3  A.  Yes.
4  Q.  You could have turned those hours in?
5  A.  That would not have been my complete hours for
6      the week.
7  Q.  So you couldn't say here are my hours up to this,
8      I have some extra appointments on Saturday, and
9      as soon as I figure out how long they are, I will
10     get them to you?
11 A.  Oh, absolutely not.  Yeah, you're correct.
12 Q.  Who told you you weren't allowed to do that?
13 A.  Payroll had to be turned in and complete and
14     there were no alterations.
15 Q.  Who told you you weren't allowed to do that?
16 A.  I had conversations with Bryce about not being
17     able to turn in my complete hours.
18 Q.  And -- okay.  When was the first time you
19     discussed, with Bryce, that you couldn't turn in
20     all of your complete hours because of your
21     schedule?
22 A.  I can't recall exactly when.  There were a couple
23     of them.
24 Q.  And Bryce told you, I'm sorry, we can make no
25     accommodations for you whatsoever?

Page 56

1  A.  Correct.
2  Q.  Okay.  How many times did he tell you that?
3  A.  In those terms, once.  Not exactly in those
4      words, a couple of other times.
5  Q.  Were any of those communications in writing or
6      was that all verbal?
7  A.  Those were verbal.
8  Q.  Did anybody else tell you that we can't make any
9      other accommodations to the payroll system on how
10     hours are turned in?
11 A.  Cindy sent out e-mails saying that the cutoffs
12     for the payrolls were at specific times.
13 Q.  And did you ever respond to any of those e-mails
14     and say, Look, I don't work on Monday, I've got
15     some hours on Sunday and I'm not going to know
16     what they are --
17 A.  Yes.
18 Q.  -- how do you want me to handle that?
19     And you responded to that in writing?
20 A.  No.  Verbally.
21 Q.  You responded to that verbally?
22 A.  Yes.
23 Q.  So you would not have responded to any of those
24     in writing?
25 A.  To the best of my recollection, they were all

14  (Pages 53 to 56)

Page 57

1    verbal.
2    Q.  So when you would then follow-up on those
3        verbally, what would Cindy tell you?
4    A.  I received an e-mail back that indicated that my
5        schedule would be changed just to be -- I think
6        it was from Bryce actually, that my schedule
7        would be changed to work Monday through Friday,
8        and nine to one on Saturday.
9    Q.  Okay.
10   A.  Quote unquote like everybody else.
11   Q.  Okay.  We'll get to that.
12       I asked you when you had the verbal
13       discussion with Cindy, when she would send out an
14       e-mail to you and say, this is the deadline for
15       getting in your hours; you indicated that you
16       would then have a verbal communication with her
17       and say, I can't get my hours in by that time
18       because of my schedule.
19       What was her response to that when you would
20       have those verbal communications?
21   A.  There was no way to accommodate any change in the
22       deadlines for turning in your hours.
23   Q.  And so you were just told you weren't allowed to
24       turn in any of those overtime hours?
25   A.  In words very close to that, yes.

Page 58

1              MR. SELBY:  Can we take a break?
2              MS. CHRISTY:  That would be
3        fantastic.  I was sitting here wondering
4        when you were going to say that.
5              - - - -
6              (Off the record.)
7              - - - -
8              MR. SELBY:  We can go back on the
9        record.
10   BY MR. SELBY:
11   Q.  Kristine DuPont Designs, do you have a specific
12       bank account just related to that business?
13   A.  Yes.
14   Q.  What bank is that with?
15   A.  First Federal of Lakewood.
16   Q.  And that was true during the time that you were
17       employed with Active Plumbing as well?
18   A.  Yes.
19   Q.  Did you have remote e-mail access?
20   A.  I was -- during the course of one project -- set
21       up to be able to do quoting from my house,
22       because of the work necessary to do this project
23       that I was involved in.
24   Q.  Was that a specific software package?
25   A.  It was their corporate system.

Page 59

1    Q.  Okay.
2    A.  And their computer guy -- actually it was my
3        laptop in their office.  So he came into my
4        laptop and did whatever he needed to do so that I
5        could do what it took to get this project done
6        and still man the showroom, as there was one
7        showroom attendant for that showroom.
8    Q.  So you were able to remotely access the software
9        that you used to put together quotes?
10   A.  Correct.
11   Q.  How often did you do that?
12   A.  It was basically set up for this specific project
13       that was very, very large.  So that was when I
14       used that to get that project done.
15   Q.  What project was that?
16   A.  The sunset -- Our Sunset Place Bed & Breakfast in
17       Catawba Island.
18   Q.  So other than that project, you would not have
19       worked remotely using that software?
20   A.  Correct.
21   Q.  How about e-mails?  Could you get company e-mails
22       and send company e-mails, like, for example, on
23       your phone or a computer or at a time when you
24       weren't in the office?
25   A.  I don't believe I could.  My computer was the --

Page 60

1    I don't believe I could.
2    Q.  So you never did, you never sent e-mails
3        remotely?
4    A.  I can't say I never did, but it wasn't a regular
5        practice.  It was a while ago, so I apologize if
6        I'm vague.
7    Q.  On the times that you did send e-mails when you
8        were not in the office, where would you have sent
9        them from, how would you have done that?
10   A.  The time I remember working remotely was actually
11       to quote in to the system, so I wasn't really
12       sending e-mails.
13   Q.  Okay.
14   A.  I was formulating this huge project quote to get
15       this job for the company.
16   Q.  Okay.  So you didn't get your e-mails on your
17       phone?
18   A.  No.  I don't believe I had my work e-mails on my
19       phone.
20   Q.  Did you have any type of laptop computer and so
21       forth that you would take back and forth with you
22       from work?
23   A.  When I started at Active, my laptop, my personal
24       laptop, my software --
25   Q.  Okay.

15 (Pages 57 to 60)

Page 61

1   A. -- is what they used for that branch.
2   Q. Okay. So you used --
3   A. But I have Gmail. The company had some Outlook
4      or something like that, which is not even on my
5      computer, no.
6   Q. When the company could e-mail with you, would
7      they e-mail to your Gmail account, or did you
8      have an Active Plumbing e-mail account?
9   A. They had an Active Plumbing account for me.
10  Q. And you got that on that computer that you used
11     that was yours that you used as the computer for
12     that?
13  A. Until they replaced it with a company computer
14     and they supplied updated software.
15  Q. Did you ever take that computer back and forth
16     from work with you?
17  A. The company computer?
18  Q. Yes.
19  A. No, sir.
20  Q. It always stayed in the office?
21  A. Correct.
22  Q. So I want to go back through your employment
23     history, that's where we sort of got sidetracked.
24        When did your employment with Active Plumbing
25     end?

Page 62

1   A. I believe it was the first week of June.
2   Q. Describe how your employment ended.
3   A. I came in to work and was met by Greg Taylor and
4      Bryce Barber and there was a short meeting and I
5      was let go.
6   Q. What were you told?
7   A. I don't recall the exact words, it was kind of,
8      "it's not working out."
9   Q. Besides Active Plumbing and Kristine DuPont
10     Designs, where was the last job you had before
11     Active Plumbing?
12  A. I was a designer for Litts Kitchens and Baths.
13  Q. Where was that located?
14  A. Parma.
15  Q. How long did you work there?
16  A. I don't recall. My father got very ill and I had
17     to quit.
18  Q. Do you recall the time period when it was?
19  A. 2013 maybe. 2012, 2013. Maybe 2011, 2012.
20     Somewhere in there.
21  Q. When did you start there?
22  A. I don't recall.
23  Q. Okay. I mean, was this a job that you had for
24     years?
25  A. No.

Page 63

1   Q. A couple months?
2   A. No. No.
3   Q. It was a relatively short-term job?
4   A. Correct.
5   Q. How about prior to that?
6   A. I worked for -- directly prior to that, I worked
7      for myself and I think I worked at Edgewater
8      Yacht Club in the summer.
9   Q. What did you do at Edgewater Yacht Club?
10  A. I was a bartender for them.
11  Q. Any other design jobs besides your own company,
12     Active Plumbing and the other short-term one?
13  A. I was a designer for Wolff Brothers Supply in the
14     early 2000s for their kitchen and bath
15     department.
16        Designer jobs?
17  Q. Yeah.
18  A. That's the best I recall right this second.
19  Q. How long did you work at Wolff Brothers?
20  A. Three years, I believe.
21  Q. How were you paid there?
22  A. I was paid hourly plus commission, I believe.
23  Q. Now, you worked at the Avon location, correct?
24  A. Yes.
25  Q. How was that location staffed during the time

Page 64

1      that you worked for the company?
2   A. The majority of the time, I was the only showroom
3      attendant. Towards the end of my employment --
4      and I can't tell you exactly how many months --
5   Q. That's fine.
6   A. -- they had brought in another designer for
7      staffing.
8   Q. Who was that?
9   A. Kelsey Sizemore.
10  Q. Were there any other employees in the Avon
11     location besides you as the showroom attendant?
12  A. As the showroom attendant? No.
13  Q. Were there any other employees?
14  A. Yes.
15  Q. Besides you?
16  A. Yes.
17  Q. Who were the other employees who were at the
18     site?
19  A. In the parts department, in the back of the
20     building, there were Greg Taylor and Quinton
21     Patrick.
22  Q. What was Greg Taylor's job?
23  A. Branch manager.
24  Q. And what was Quinton Patrick's job?
25  A. Employee in the back.

16 (Pages 61 to 64)

Page 65

1  Q. Okay.
2  A. To the best of my knowledge, I'm sorry.
3  Q. That's fine.
4      As a designer, what were your
5  responsibilities?
6  A. I was to staff the showroom during the hours that
7     it was open those days that I was working. I was
8     to greet clients, help them with recommended
9     products.
10     If there was a project, like a kitchen
11    design, then I was to go and measure that and go
12    through the process of reviewing the materials,
13    making sure that it was right; basically, make
14    the sale, follow through with the sale with the
15    assistance that may be needed of questions.
16     It was basically customer service, staffing,
17    following through and making sure that materials
18    are coming in for whatever people had ordered.
19  Q. Were all of the customers that you dealt with --
20    back up. Strike that.
21     How did you identify or find customers?
22  A. Active is a wholesaler, so a majority of the rest
23    of the company's business was professional
24    plumbers sending in their clients to pick out
25    selections. We would actually, in many cases, be

Page 66

1  selling to that plumber and act as a liaison for
2  them.
3     We were also open to the public. So there
4  was the public walk-in business that would happen
5  as well, without the connection of an already
6  existing client of ours, being a professional
7  plumber or whatnot.
8  Q. Right.
9  A. So it was two-fold.
10    And then there were referrals from the public
11   of people that had come in and that was how I
12   tried to grow the business for that branch.
13  Q. Walk me through the process. Somebody's coming
14    in and is doing a remodel of something that
15    Active Plumbing would handle.
16     Just walk me through the process of what you,
17    as the showroom attendant -- sort of from start
18    to finish on a job -- would do with a particular
19    customer.
20  A. There's no straight answer to that.
21     If you were Mrs. Jones and you came in and
22    said we're putting a new shower in and Tom ABC
23    said come in. Then Tom ABC, hopefully, would
24    have called us and said Mrs. Jones needs to look
25    at an acrylic shower, this is where she needs to

Page 67

1  be. And we would show Mrs. Jones selections in
2  what Mr. XYZ Plumbing told us to do.
3  Q. All right.
4  A. Someone may walk in and say "I'm thinking about
5     redoing my kitchen and bathroom."
6      Are you working with a construction
7  remodeling person?
8      Yes, no.
9      Then you kind of just give them a showroom
10    tour, send them on their way and hope that they
11    come back and make an appointment for you to work
12    up a design and start talking with them.
13     Some things you cannot have in an initial
14    conversation about, because you can't design a
15    kitchen when you don't have enough information.
16  Q. I understand.
17  A. So everything varied, honestly.
18  Q. How would you go about assembling all of the
19    information you needed to be able to do the
20    design work that needed to be done?
21  A. First of all, you would have to find out what the
22    needs are and who you're working for.
23     If you're working for a plumber and all he
24    wants you to do is help Mr. Jones pick out a new
25    toilet, then that's all you do.

Page 68

1  If you're working for someone else that's a
2  smaller remodeler and they've sent you in because
3  they know Mrs. Jones will be enamored with the
4  fact that you might actually go over and get the
5  Sherwin-Williams boxes out of the showroom
6  cupboard and say, Well, Mrs. Jones, here's what I
7  recommend for your cabinets, and create a space
8  for her, then that's what you do for her. It's
9  kind of dictated by the client, there's no one
10 answer.
11  Q. What were your regular hours of employment when
12    you were first hired?
13  A. The showroom hours that I was hired to work were
14    eight to five, Tuesday through Friday, nine to
15    one, Saturday.
16  Q. How often would you have to go to a customer's
17    home or business to perform any of your tasks?
18  A. Quite often.
19  Q. What is "quite often"?
20  A. On average, I would say three to four times a
21    week.
22  Q. And when would you schedule those?
23  A. We would schedule whatever I could for them, to
24    bring me information to the showroom, during
25    hours.

Page 69

1    Although you had no control over walk-in
2  business or appointments that could come through
3  the door.
4    Many people were professionals so they would
5  control it and they would want you to come after
6  they get off of work at 5:30 or 6 or whatever or
7  keep the showroom open and close it to the public
8  and have them meet you in there.
9    So it was really trying to accommodate the
10  purchaser's needs, and not leave the showroom
11  without a showroom attendant because that didn't
12  sit well either.
13  Q. So if you had to go to somebody's home, would you
14    typically schedule that during hours you weren't
15    otherwise scheduled to be in the showroom or
16    would you sometimes schedule those during the
17    showroom hours?
18  A. We were very short staffed so I was discouraged
19  from leaving the showroom for appointments during
20  the week, day of operation hours.
21    So I would schedule, first of all, to what
22  the customer needs and what would work with the
23  showroom hours.
24  Q. So did you never schedule during showroom hours
25    or was it just that the majority were during

Page 70

1    non-showroom hours?
2  A. I would say there was a pretty equal balance
3  actually.
4  Q. So half the time when you had an appointment at
5    somebody's house, it would be during business
6    hours, regular showroom hours, and other times it
7    would be outside of those showroom hours?
8  A. That could be fairly accurate.
9  Q. Okay.
10  A. There wasn't a specific agenda.
11  Q. I understand.  I'm just trying to get an idea of
12    what things were like.
13    So how many days, per week, would you have
14    meetings at a customer's home or place of
15    business outside of regular showroom hours when
16    you would have to leave to go to them?
17  A. After closing?
18  Q. Outside of regular showroom hours.  After
19    closing, on a Monday when you were not scheduled
20    to work, on a Sunday when you were not scheduled
21    to work, just outside?
22  A. On average?  On average, probably three to four
23  times.
24  Q. And when you would go to somebody's home, what
25    were the things you had to do in their home when

Page 71

1    you were there?
2  A. When you would go to someone's house it would be
3  for a project that was usually involving a
4  remodeler or a bigger remodel, so I would measure
5  specifically to make sure, obviously, that the
6  cabinets we were going to do were going to fit,
7  to verify where the sink was going to sit was
8  where the drain was, things like that.
9    Check things to make sure that what they were
10  purchasing would work with what they wanted their
11  builder to do or what their builder wanted me to
12  look for.
13  Q. Or what existed in the house?
14  A. Yeah.  Pretty much, yeah.
15  Q. How long would one of those appointments
16    typically last?
17  A. I've had long ones last three, three-and-a-half
18  hours or longer.
19  Q. How often would you have a long one like that?
20  A. Probably once a week or so at least.
21  Q. Well, what was a typical one?
22  A. Average-wise?  Probably three hours, if you want
23  to average them all out.
24  Q. Every time you went to somebody's house, you'd be
25    there for three hours?

Page 72

1  A. You said typically.  I said average.
2  Q. On average, okay.
3  A. Well, if I've got one that's one hour and I got
4  one that's eight hours and one that's three
5  hours, I'm going to say the average is probably
6  three hours.
7  Q. So you had ones that lasted eight hours?
8  A. When I did the Catawba project I worked there
9  almost every Monday and was on-call constantly to
10  be out there.
11  Q. How long did that project last?
12  A. Months.  It's one of the biggest projects that
13  went out of my branch and it was a referral to me
14  directly.
15  Q. What period of time was it?
16  A. I believe it started -- I'm going to say that
17  project lasted seven to eight months.  It started
18  in the winter because of a fire and was done the
19  following --
20  Q. What did the project involve?
21  A. The complete plumbing and all the materials for a
22  complete gutted fire job in a bed and breakfast.
23  The place burned to the ground.
24  Q. Okay.
25  A. So I worked with the general contractors and with

18 (Pages 69 to 72)

Page 73

1    the plumber and they were all my kind of -- like
2    my customers I had to work with on that one, I
3    guess.
4  Q.  Was any of that work done through Kristine DuPont
5    Designs?
6  A.  None.
7  Q.  So all you did was the kitchen, bath and plumbing
8    work?
9  A.  I did -- I picked out the finishes for all the
10    tile -- yes, all the kitchens, the baths, the
11    plumbing work.  She and her daughter would bring
12    to the showroom paint things that they would
13    like, I would say beautiful, that's great.
14  Q.  So there wasn't any nonactive plumbing work that
15    you did in connection with that one?
16  A.  Nope.
17  Q.  And you were out there every Monday for eight
18    hours, for seven to eight months?
19  A.  I would say throughout the typical week I would
20    spend eight hours on that project alone.
21      There were Sundays that I would work three or
22    four hours and Mondays, I would be out there five
23    hours.  But that project, alone, was probably
24    eight to ten hours a week outside of Active
25    hours, easily.

Page 74

1  Q.  So during those eight to ten hours, that were
2    outside of Active Plumbing --
3  A.  Uhm-hum.
4  Q.  -- what were you doing?
5  A.  I would be on site with the plumbers going over
6    questions about how the plumbing was getting laid
7    out versus the drawings.  Same thing with
8    cabinets, all the things that were supplied,
9    reviewing the tile with the tile people, just
10    everything.  It was a huge, huge, huge project.
11      When the truck dropped off pallets of stuff I
12    had to be out there to verify that it was right,
13    sort it, label it for all the rooms, per the
14    plumber's request and the builder's request.
15    Pallets of parts.  This was a huge bed and
16    breakfast.
17  Q.  Who was the customer on this project?
18  A.  The homeowner was Sandy Irwin.  The contractor
19    was Homeworks and the plumber was Jim Wilson.  So
20    they were all customers of Active's on this
21    project.
22  Q.  And again, how long was it that you were going --
23    that you were spending eight to ten hours, per
24    week, outside of Active Plumbing?
25  A.  I believe that project went on for six to eight

Page 75

1    months.  I would have to research exact timelines
2    to say that, but that is a very, to the best of
3    my knowledge, a very good estimation.
4  Q.  Did you ever do any design work with respect to
5    that outside of business hours?
6  A.  Could you clarify that question?
7  Q.  Yeah.  Anything on the computer, any of the CAD,
8    any of the putting together of the quotes?
9  A.  Oh, yeah.  That's the big project that I got the
10    access for to work at home, to get the quotes
11    done because it was mind boggling how much work
12    there was to figure out everything in a burned
13    out building so that the plumbers' parts, that he
14    wanted to sell to his client, would be right.
15  Q.  How long did it take you to put together that
16    quote?
17  A.  To get it finalized and complete with all those
18    products, there's probably 60 to 70 hours worth
19    of quoting done in that.
20  Q.  How much of that time would have been spent
21    during your regular showroom hours and how much
22    of that time would have been spent outside?
23  A.  The majority of it was outside because I couldn't
24    handle the walk-in showroom business and handle
25    that project at the same time.

Page 76

1  Q.  How much did the quote end up ultimately being?
2  A.  I believe Active sold, I'm going to say, a
3    hundred to $130,000 worth of materials at
4    wholesale for that project, possibly even more.
5    I could verify that by looking it up, maybe.  I
6    don't think I have those records available.
7  Q.  Were there any other jobs, you can recall, where
8    you did sort of putting together the quoting,
9    design, CAD work, et cetera, outside of regular
10    hours?
11  A.  Yes.
12  Q.  What jobs would have those been?
13  A.  I believe the Danko project for Pompeii.  The
14    majority of that was done outside.
15      I can't recall all.  I would have to look at
16    the company calendar to tell you.  I worked with
17    a lot of people.
18  Q.  So none others you can recall, off the top of
19    your head?
20  A.  No, not off the top of my head.
21  Q.  There were periods of time, while you worked for
22    the company, that you were paid overtime hours,
23    correct?
24  A.  Sporadically, yes, correct.
25  Q.  And on those occasions, you would submit a

Page 77

1  written documentation showing those extra hours
2  you had worked, correct?
3  A. Correct.
4  Q. Were there any occasions on which you had
5  submitted that written documentation, detailing
6  overtime hours, for which you were not paid for
7  those overtime hours?
8  A. I believe so.
9  Q. Do you recall on how many occasions those
10  happened?
11  A. I do not recall exactly.
12  Q. Do you know what dates those were?
13  A. I can't say exactly without looking in to
14  documentation.
15  Q. What documentation would you need to look at?
16  A. The company calendars and just to look at my
17  paychecks and see. I do think I recall a couple
18  times where I turned in stuff and it did not get
19  paid and that raised questions; to get exact
20  dates, I don't have exact dates, I'm sorry.
21  Q. Do you have the records available where you would
22  be able to identify those dates?
23  A. I can't say at this time.
24  Q. During the times that you submitted sheets
25  indicating that you had worked overtime and then

Page 78

1  were compensated for that overtime, did those
2  sheets reflect the total number of hours that you
3  worked during those pay periods?
4  A. I would say yes.
5  Q. Why were there some occasions when you turned in
6  that paperwork and some occasions when you did
7  not?
8  A. Going back to our previous conversations, I was
9  instructed there is no way to track overtime,
10  you're not getting paid overtime, and we don't
11  pay overtime. And it got to be a little bit
12  uncomfortable and hostile the more I pressed the
13  envelope and I was discouraged to do it, so I
14  didn't.
15    And then when I would fight enough, I would
16  be told "Okay. Do it," and then "No."
17    It would make no sense for me, not to turn in
18  for hours I worked, to get paid on a regular
19  basis.
20    MR. SELBY: Let's go off the
21  record.
22    - - - -
23    (Thereupon, a discussion was had off
24    the record.)
25    - - - -

Page 79

1    MR. SELBY: Back on the record.
2  BY MR. SELBY:
3  Q. Who does Jim Wilson work for?
4  A. I believe he's his own company.
5  Q. His own company? Was it just like Jim Wilson
6  Plumbing?
7  A. I think that's it actually.
8  Q. Do you know where his office is or where he's out
9  of?
10  A. No. I think the Elyria, Avon area.
11  Q. So with respect to the overtime you're seeking in
12  this case, you had indicated that for the periods
13  that you were paid overtime and turned in sheets,
14  that those would have accurately reflected the
15  number of overtime hours you had actually worked
16  during those pay periods, correct?
17  A. I think they could be relatively accurate. I
18  would check against my appointment calendar,
19  honestly, to verify it.
20  Q. Have you gone back to -- you know, there were
21  records produced in connection with this case,
22  and you've produced records.
23    Have you gone back to try to reconstruct any
24  periods of time when you know you would have
25  worked certain hours or figured out how many of

Page 80

1  those hours there are?
2  A. The screen shots of the intercompany calendar
3  that showed everybody's appointments were cut off
4  and that detail would show the appointments I had
5  at clients' houses outside of --
6  Q. So what detail was cut off?
7  A. Everything. It just showed my name and the
8  showroom hours for the day and then after that
9  you would see the appointments that people were
10  on for the day.
11    That calendar is not inclusive of all of the
12  outside work activities, but it does show actual
13  client house visits.
14  Q. Okay. So those records were on those time sheets
15  that were produced, correct?
16  A. Not in completion.
17  Q. Okay. What was incomplete about them?
18  A. The detail of each day.
19  Q. So what was done during --
20  A. The actual appointments that were kept for that
21  day, were not included on it.
22  Q. Ones during the, your regular showroom or outside
23  of the showroom?
24  A. Both.
25  Q. Both?

Page 81

1      Were there ones outside of the showroom hours
2    on there, reflected on there?
3  A. Yes.
4  Q. So you're saying some of the appointments were
5    there, but not all of the appointments?
6  A. It's possible.  Quite possible, yes.
7  Q. Have you used that to go back to calculate the
8    number of hours you believed you were working
9    during each one of these weeks?
10  A. I would need that complete information in order
11    to do so.
12  Q. So "no"?
13  A. Correct.
14  Q. You have not done it?
15  A. I have not done it.  Yes, I'm sorry.
16  Q. So what makes you believe that that is
17    incomplete?
18  A. It is incomplete.  By looking at it, I viewed it
19    and I saw it to be incomplete.
20  Q. You know of appointments that you had that are
21    not reflected on there?
22  A. Yes.
23  Q. And you know, like on this specific day, I know I
24    was on this appointment?
25  A. In some cases, but not in all.  It would take

Page 82

1    that calendar to correlate appointments as well.
2      It's the equivalent of me handing you this
3    piece of paper, like this, without the full sheet
4    of paper with the details.
5  Q. I understand.
6  A. Okay.
7  Q. When you say it's incomplete, is it because the
8    information isn't in the system or because the
9    printouts were cut off and that that information
10    is there and can be retrieved?
11  A. Correct.  Because the printouts are cut off.
12  Q. That was an either or and you answered "correct."
13  A. Your last statement, the information was in the
14    system.  The printouts are not the complete
15    printouts.
16  Q. So there's additional information, you believe,
17    in the system, that would allow that?
18  A. Yes, sir.
19  Q. Okay.  And that additional information would be
20    the detail?
21  A. Correct.  My mileage sheets also reflect
22    appointments on days that I got paid mileage for
23    that were outside of working hour days as well.
24      MR. SELBY:  Let's go ahead and
25    mark this as Defendant's Exhibit 2.

Page 83

1      - - - -
2      (Thereupon, Defendant's Exhibit 2,
3    pay document for k.dupont, was marked for
4    purposes of identification.)
5      - - - -
6  BY MR. SELBY:
7  Q. This is a document that I believe had been
8    produced to your attorney prior to this lawsuit
9    being filed that set forth all of your gross pay.
10      Have you reviewed this previously?
11  A. This document particularly?  No, sir.
12  Q. Do you know whether this accurately reflects the
13    number of overtime hours you've actually been
14    paid?
15  A. I do not.
16  Q. Do you have any records, yourself, that show the
17    number of overtime hours you've actually been
18    paid?
19  A. On my paycheck stub there is no overtime hours
20    category, so I cannot go by that.  The only thing
21    I can go by is -- no.  Okay.  No would be the
22    answer.
23  Q. You just received paychecks with your gross pay?
24  A. There were paychecks with the gross pay, then
25    there was a category for bonus.

Page 84

1  Q. Okay.
2  A. And another category for commission.
3  Q. Okay.
4  A. And I'm not sure -- there was no overtime
5    category.  I can't speak to every category, but
6    there was bonus, commission, regular hours,
7    vacation, sick -- and I'm sorry, without them in
8    front of me, I can't --
9  Q. Fair enough.
10      Do you have -- I know you've referred to, a
11    number of times, company records you would need
12    to put together to assemble the number of hours
13    that you believe you actually worked.
14      Do you have any records in your possession,
15    that would identify the number of hours you were
16    actually working?
17  A. Not in completion, no.
18  Q. Incompletely?  Like, anything that you have that
19    would show some of the hours that you were
20    working?
21  A. Yes.
22  Q. What documentation do you have that would show
23    some of the hours that you were working?
24  A. The documentation that was supplied to you, my
25    mileage statements that I was paid on, would show

21 (Pages 81 to 84)

Page 85

1  the days of non-working hours where I was on
2  appointments.
3      I don't have access to calendars and old
4  e-mails, so that would be difficult.
5      So in my possession, the mileage records and
6  things of that nature.
7  Q.  Do the mileage records indicate what times that
8      the travel would have been undertaken?
9  A.  Unfortunately, no.  It's the miles and the
10     location and the name of the customer I was at.
11 Q.  So you wouldn't be able to, just from the mileage
12     reports, be able to differentiate between
13     appointments that you kept during business hours
14     and ones you kept outside of showroom hours?
15 A.  Certain ones, yes.  I was off on Mondays and
16     Sundays and I've got mileage for those days.
17     Saturdays after 1:00, I have mileage recorded for
18     those.
19 Q.  But I mean, if it was on a Saturday, you wouldn't
20     know whether it was during showroom hours or --
21 A.  We were told not to have outside appointments
22     during showroom hours, so you had to do them
23     after work.
24 Q.  I thought you said earlier that your appointments
25     were maybe 50/50 during showroom hours and

Page 86

1      outside of showroom hours.
2  A.  That's correct.  There was a memo sent out not to
3      do appointments during Saturdays because of the
4      short staffing and the heavy business.
5  Q.  Okay.
6  A.  And in my situation, I was the only showroom
7      attendant at that branch so I was discouraged to
8      have people from the back cover the showroom
9      while I went on appointments.
10 Q.  Who covered the front when you were out on
11     appointments during regular hours?
12 A.  Before there was a secondary designer, which was
13     brought in towards the end of my employment, men
14     from the back, in the parts department, would
15     come up and cover the showroom if the bell went
16     off and someone had come in or something of that
17     nature.
18 Q.  Who were those people?
19 A.  Quinton or Greg.
20 Q.  Had they ever worked as showroom designers
21     before?
22 A.  I don't know their employment history, but I
23     believe everybody's kind of been cross-trained
24     that's been there for a long, long time.  I can't
25     speak to their exact past titles for the company.

Page 87

1  Q.  So from the records that you have with respect to
2      mileage, have you gone and tried to identify any
3      of the numbers, at least from those mileage, that
4      would indicate any overtime hours?
5      Have you gotten to calculate that?  Have you
6      ever actually done that?
7  A.  I don't have the complete records to do it, but
8      I've begun, yes.
9  Q.  Have you done it with respect to incomplete
10     records?
11 A.  I've looked over the documentation that we
12     provided to you and started to sort out days of
13     the week that they were and started that process
14     a little bit.
15 Q.  Have you put together a list of days?
16 A.  No, I have not yet.
17 Q.  Have you done any actual calculations as to what
18     those days are?
19 A.  The specific days of the week?
20 Q.  Yeah.
21 A.  No.
22 Q.  Is that something that you plan to do?
23 A.  With the documentation of the calendar and
24     e-mails, I would love to do that, yes.
25 Q.  You're going to go back and try to recreate that

Page 88

1      the best you can?
2  A.  Absolutely.
3          MR. SELBY:  Let's mark this as
4      Exhibit 3.
5          - - - -
6          (Thereupon, Defendant's Exhibit 3,
7      work schedule for k.dupont, was marked for
8      purposes of identification.)
9          - - - -
10 BY MR. SELBY:
11 Q.  Have you seen these forms before?
12 A.  Some of them.
13 Q.  Which ones have you not seen?
14 A.  The first page.
15 Q.  Other than the first page, are there any that you
16     have not seen?
17 A.  In completion with notes from both sides, I have
18     not seen the third page.
19     I have not seen the fourth page.
20 Q.  Okay.  Hold on.  Let's slow down.  Third page,
21     what part have you not seen?
22 A.  Cindy's notes, "Overtime but not double time is
23     her choice to work on a holiday."  That note.
24 Q.  Fourth page?
25 A.  Fourth page, this is completely not written by

Page 89

1    me.  It was written, I think, by Chuck, I'm not
2    sure, but that's his name.  And they're both for
3    the same time period, so I don't know.
4    Q.  Who was Chuck?
5    A.  Chuck is someone in the company's upper echelon.
6    Q.  What's the next page, anything that you don't --
7    A.  One, two, three, four.  Page 5 is not my
8        handwriting.
9    Q.  Which one is?
10   A.  Well, my name's on the top, and not my
11       handwriting.
12   Q.  What's it dated?
13   A.  1/22/15, I apologize.  It looks like I filled out
14       the hours and then the "pay 1 day" that's
15       scratched out, was not in my handwriting.
16   Q.  Okay.
17   A.  The next page dated 4/2, the original writing is
18       mine.  The comp. time little note on there is not
19       my handwriting.
20   Q.  And I want to make a comment here with respect to
21       this -- your normal schedule was Tuesday through
22       Saturday, correct?
23   A.  Correct.
24   Q.  Were there some occasions, for example, here,
25       where you worked Monday instead, and then took

Page 90

1        Tuesday off?
2    A.  It appears so, on this sheet.
3    Q.  Okay.  Do you recall ever having done that?
4    A.  I can't name times, no, not off the top of my
5        head, but it appears, on this sheet, that I did.
6    Q.  Okay.
7    A.  The next page dated 4/2, I filled out, it looks
8        like the original writing.
9            The comp. time parentheses bracket is not my
10       handwriting, nor is the X out and the stuff on
11       the right-hand side.
12           The next page dated 4/2, I did not -- the
13       "next pay period" note is not mine or the Xing
14       out is not mine, but the original handwriting is.
15           The next page dated 4/16, the original
16       writing is mine.  The crossed out line of 8 to 5
17       on 4/2 is not mine and the extra day notation is
18       not mine.
19           The bottom part of that page, 3/29, the
20       original handwriting is mine.
21           The crossed out lineage and the circled
22       number at the bottom right, is not mine.  The
23       number is, the circle is not.  Let me correct
24       that.
25           The page dated 4/16, none of this is my

Page 91

1    handwriting.  But it seems to be where time was
2    used as comp. time for a day I was off when I was
3    sick.
4    Q.  When you changed during the week?  In other
5        words, you would work Monday because you had been
6        off another day?
7    A.  I can't speak to those being that day, I would
8        have to look back.  And I don't see that.
9    Q.  Okay.
10   A.  The next page 4/16, I was off sick.  I wrote "off
11       sick."  That looks like my handwriting.  The
12       Monday 8:00 to 3:00 is my handwriting.  This
13       "comp. time" notation, I don't know.  That's not
14       my handwriting.
15   Q.  Okay.
16   A.  The page dated 5/28/15, appears to be my
17       handwriting untouched.
18           The last page, dated 12/10, the grid with the
19       hours written in it, appears to be my
20       handwriting.  And the rest of the notations are
21       not.
22   Q.  Okay.  You had mentioned earlier in your
23       testimony, you had talked about a form where
24       hours could be submitted.
25           Are any of these that form that you were

Page 92

1    talking about?
2    A.  Examples of that are page 2.
3    Q.  This document called change in work hours?
4    A.  That's correct.
5    Q.  Okay.
6            MR. SELBY:  Let's mark this as
7        Exhibit 4.
8            - - - -
9            (Thereupon, Defendant's Exhibit 4,
10       email, 5/22/15 from c.barber to multiple
11       people, was marked for purposes of
12       identification.)
13           - - - -
14           MS. TATARKO:  What is that, Ric?
15           MR. SELBY:  Here are the e-mails.
16   BY MR. SELBY:
17   Q.  So what I've shown you, as Defendant's Exhibit 4,
18       is an e-mail dated Friday, May 22nd, 2015.
19       There's an e-mail from Cindy to a number of
20       people, including to you, and then your response.
21       Correct?
22   A.  There is an e-mail, yes, telling us to have the
23       overtime turned in.  And there's an overtime
24       sheet, yes.
25   Q.  Right.  So I'm looking at, Cindy on Friday, May

                                    23 (Pages 89 to 92)

Page 93

1   22nd, 10:53 a.m., she sent an e-mail, "Do to the
2   holiday on Monday, Bob will be processing the
3   payroll this weekend.  Please have all OT to me
4   by 1 p.m. today."
5  A. Uhm-hum.
6  Q. I assume, because it's May 22nd, the following
7   Monday was going to be Memorial Day weekend?
8  A. I'll assume so.
9  Q. Then you responded, time sheet for week ending
10  5/23 and you enclosed this form with some
11  additional hours, correct?
12 A. Correct.
13 Q. Were you told at any point that it was
14  inappropriate for you to have responded or
15  included this time sheet or submitted it?
16 A. No.  No.
17 Q. And Cindy, you know, when she was sending out to
18  people, to turn in their OT, who are all of the
19  people who are on this list?  Who is Chris
20  wealth?
21 A. These are all the showroom design staff or
22  attendants.
23 Q. And you were included in there on her
24  specifically requesting you to turn in any OT you
25  had, correct?

Page 94

1  A. Correct.
2             - - - -
3          (Thereupon, Defendant's Exhibit 5,
4          email, 5/26/15 from c.barber to k.dupont,
5          was marked for purposes of identification.)
6             - - - -
7   BY MR. SELBY:
8  Q. This appears to be a continuation of that prior
9   e-mail chain, but these e-mails occurred, at the
10  top of the first page, on May 26th, 2015.
11 A. Okay.
12 Q. This is Cindy Barber.  This is an e-mail that she
13  sent to you on Tuesday, May 26th, correct?
14 A. Uhm-hum.
15 Q. And she says, "Please do not work a Monday
16  without my prior OK."
17 A. Uhm-hum.
18 Q. Were you told that if you were going to work
19  hours outside of your regularly scheduled
20  showroom hours, that you had to receive prior
21  approval to those?
22 A. That came up in this e-mail, but, no, that was
23  never a policy.
24 Q. Okay.  So this is the first time that was raised
25  with you?

Page 95

1  A. Uhm-hum.
2  Q. "Yes"?
3  A. Yes.  I'm sorry.
4  Q. That's okay, it's easy to do.
5      Going forward, from this point forward, did
6   you have to get approval to schedule appointments
7   outside of regular showroom hours?
8  A. No.  No designer was ever told to submit approval
9   for prior appointments outside of hours.
10 Q. Well, you were specifically told that here?
11 A. I was told that here.
12 Q. But then going forward, you did not do that?
13 A. That's correct.
14 Q. Did you ever have any discussions with anybody at
15  Active Plumbing -- and from a management point of
16  view, I'm looking at Cindy or Bryce or any of
17  your managers -- that you shouldn't need to
18  schedule as many appointments or do as much work
19  outside showroom hours and that you should be
20  able to get all of that work done during your
21  regularly scheduled showroom hours?
22 A. There were conversations about that and there
23  were conversations about needing more staff.  I
24  was the only single staffed showroom attendant.
25 Q. During those discussions, did they tell you that

Page 96

1   you should be scheduling your appointments during
2   regular work hours as opposed to outside of your
3   regular showroom hours?
4  A. That was mentioned and my question was, do you
5   want me to tell the people -- that need to see me
6   at night -- no?  Do you want me to tell people,
7   that I can't see them?  And I was told No.
8  Q. Okay.  But I think there's two issues here.
9  A. Okay.
10 Q. You have previously said that you were told you
11  weren't allowed to schedule appointments or you
12  were discouraged from scheduling appointments
13  while you were supposed to be in the showroom.
14 A. That's correct.
15 Q. So were you scheduling those appointments outside
16  of those regular business hours to accommodate
17  the customer or to accommodate Active Plumbing's
18  request that you only schedule those during times
19  that you weren't supposed to be scheduled in the
20  showroom?
21 A. It was a combination of the two.
22 Q. Okay.  So after this e-mail, did you continue to
23  schedule appointments on Mondays?
24 A. I would have to look at the calendar to verify
25  that, I don't have the information.

24 (Pages 93 to 96)

Page 97

1  Q.  Okay.
2  A.  I did ask specifically if I should stop seeing
3     these clients on this big job and I was told No.
4        Do you want me to turn down people that can't
5     meet during business hours; and I was told No.
6        And I said then, What do you want me to do?
7  Q.  Well, so, in other words, was going forward the
8     policy that, if you can see them during your
9     regular showroom hours, that is when you should
10    see them and only see them outside of those
11    hours, if those are the only hours that they
12    could meet?
13 A.  My first goal was to try to see them during
14    business hours in the showroom.
15 Q.  Okay.
16 A.  If the environment of what was needed and/or the
17    staffing in the showroom or the customer's needs,
18    needed me to see them outside of normal hours,
19    then that's how it was decided to do that.
20 Q.  And did you have to seek approval or talk to
21    somebody and say, Hey, I need to schedule this
22    one outside of regular hours because of X reason?
23 A.  That was never a company policy, ever.
24 Q.  And that's not something you ever did?
25 A.  Correct.

Page 98

1  Q.  Despite the fact that this e-mail said, not to do
2     it without Cindy's prior OK?
3  A.  That is correct.  This is a reaction to a
4     conversation that I had about all my overtime an
5     not getting compensated for it.
6  Q.  Well, it looks like this is actually going
7     back -- if you look at the beginning, this is the
8     e-mail from -- this is just a follow-up from 4.
9        If you look at the bottom on the first e-mail
10    here, is the one, you know, there's a holiday on
11    Monday, please have all your OT in.
12       And then you responded, time sheet for week
13    ending 5/23, which you turned in and had the time
14    sheet here which showed for these two weeks in
15    question, hours for Mondays.
16       And then in response to getting this, Cindy
17    wrote to you and said "Please do not work a
18    Monday without my prior OK," correct?
19 A.  Correct.
20 Q.  Okay.  So this wasn't in response to your
21    complaint about not being paid hours, this was in
22    response to you submitting a time sheet
23    requesting overtime hours, that hadn't previously
24    been approved, correct?
25       MS. CHRISTY:  Objection.

Page 99

1  A.  That's incorrect.  If you could rephrase that,
2     it's got several layers to it so I just want to
3     make sure I answer you clearly and correctly.
4  Q.  Well, I'm looking at this and Cindy asked you to
5     turn in your overtime sheet.  You turned in your
6     overtime sheet.  That sheet included overtime hours
7     for two different Mondays, correct?
8  A.  That's correct.
9  Q.  And then when you turned that in, on the next
10    Tuesday, at 8:45 a.m., the first thing back in
11    the office after that holiday weekend, she wrote
12    to you and said, "Please do not work a Monday
13    without my prior OK."
14 A.  You're correct there.
15 Q.  Correct?
16       And so this was sent in response to you
17    sending over a time sheet in which you had put
18    down overtime hours for Mondays that you had not
19    received prior approval for, correct?
20       MS. CHRISTY:  Objection.
21 A.  I had not -- I didn't require prior approval to
22    work Mondays.
23 Q.  Had you had any discussions with Cindy regarding
24    payroll or overtime or any issues between the
25    time you sent in your time sheet for the week

Page 100

1     ending 5/23 and her sending you this e-mail about
2     "Please do not work a Monday without my prior
3     OK"?
4  A.  Regarding this project, no.
5        I was told to go ahead and do the Mondays how
6     I needed to, by the other two leaders, which I
7     believe would have been Brenda and Bryce.
8        And the reaction to me sending in the
9     overtime -- which was I was upset about -- to
10    those two, was this, I sent it in: and the
11    reaction back was, not to do this.
12       Although the customer and the project people
13    had already had the expectations that I would be
14    there out on the west side and give them the
15    focus I needed to, on Mondays, because of the
16    size of this project.
17 Q.  So Bryce and Brenda had previously approved you
18    working these Mondays on this particular project?
19 A.  Yes.
20 Q.  Okay.  So when Cindy said "Please do not work a
21    Monday without my prior OK," did you write back
22    to her and say, Bryce and Brenda had already
23    previously approved this?
24 A.  I did not.  I must not have written it back.
25       But I did clearly discuss that the project's

25 (Pages 97 to 100)

Page 101

1   logistics and size required me -- at what we had
2   told the client we could do -- for me to be
3   available to them on Mondays, or I would have to
4   leave the showroom and drive an hour-and-a-half
5   each way, to be out there when I needed to be
6   there, during business hours, and I was a single
7   person covering a showroom.
8   Q. And this is the Catawba project we're talking
9       about?
10  A. This one particularly, yes.
11  Q. Well, did you ever, in response to Cindy, when
12      she said "do not work a prior Monday without my
13      OK," did you tell her -- verbally or in
14      writing -- that Bryce and Brenda had previously
15      approved this working on a Monday?
16  A. Absolutely.
17  Q. Well, why didn't you put that in an e-mail?
18  A. I had no idea I would have to back myself up like
19      this. I was trying to do a good job for a
20      company.
21  Q. Okay.
22              MR. SELBY: Mark this.
23              - - - -
24              (Thereupon, Defendant's Exhibit 6,
25          email same as exh.5 without k.dupont

Page 102

1       response, was marked for purposes of
2       identification.)
3              - - - -
4   BY MR. SELBY:
5   Q. This appears to be the same e-mail as number 5
6       without your response. But it appears you
7       forwarded it on to an e-mail
8       krissydupont01@gmail.com.
9   A. Uhm-hum.
10  Q. Is that your personal e-mail?
11  A. Yeah.
12  Q. Why did you forward this e-mail, this particular
13      e-mail, on to your personal e-mail?
14  A. In case I needed to explain to my client why I
15      would be not making appointments that they were
16      used to seeing and I hoped I didn't have to show
17      anybody that.
18  Q. Did you ever show anybody it?
19  A. No.
20  Q. Did you ever explain to anybody, Look, our policy
21      is we try to schedule these during work hours,
22      and if you can't be available, we can make
23      special arrangements to report it then?
24          Is that essentially what Cindy was telling
25      you the policy should be?

Page 103

1   A. I'm confused.
2          Could you rephrase that, please?
3   Q. Well, wasn't Cindy telling you that, we want you
4       to schedule these during normal work hours --
5   A. Uhm-hum.
6   Q. -- and if you can't, come to me and get approval;
7       if the circumstances dictate, we'll allow it
8       under those circumstances?
9   A. That was never the policy. We have a sign on our
10      door that tells clients that we have after hours
11      appointments available on the front door.
12  Q. I understand.
13  A. So, no, it was not during my training was I told
14      you get pre-approval for appointments, at all.
15          And on this project particularly, the
16      emphasis on me being available to them, because
17      of the size of it, it was a known that I would
18      try not to cut into the showroom hours, since it
19      was a single person manned showroom.
20  Q. You say that was a "known," was that discussed
21      with anybody?
22  A. It was discussed, yes.
23  Q. Who was it discussed with?
24  A. It was discussed with Bryce. It was discussed
25      with Brenda. My objections were made to Cindy.

Page 104

1       It --
2   Q. Well, where, when Cindy says "Don't work without
3       my prior OK," why aren't you saying to her, Well,
4       I had this prior okay, we've discussed this?
5   A. Cindy wasn't my direct supervisor during the
6       start of all this. There was a lot of leadership
7       changes.
8   Q. But Cindy is the one questioning you about it
9       right now.
10  A. Yes, she is.
11  Q. And you didn't offer her the explanation you just
12      offered me.
13  A. When you're an employee, and you know you're
14      making somebody upset about overtime hours, it
15      can get a little intimidating.
16  Q. Well, was she upset or was she just laying out to
17      you what the company's policy was here?
18  A. This wasn't company policy.
19  Q. Well --
20  A. No where is it stated in the handbook for every
21      designer in this company to get prior approval
22      for after hours appointments.
23  Q. Well, Cindy's role with the company was CEO,
24      correct?
25  A. Right.

26 (Pages 101 to 104)

Page 105

1 Q. So if the CEO is telling you this is how I want
2    you to do these things, doesn't that sort of make
3    it company policy?
4         MS. CHRISTY: Objection.
5 A. Since this is only written to me -- no, I don't
6    think it makes it company policy.
7 Q. Did you believe you had to follow the CEO's
8    instructions?
9 A. I believed all the designers had a set of rules
10   that were applied evenly to all of them and when
11   she sent me this letter, I responded by saying I
12   have a lot of clients only available on evenings.
13   I will discourage those. I'm trying to cover the
14   business.
15 Q. So did, in fact, you discourage and did you cut
16    down, after this, on your appointments outside of
17    showroom hours?
18 A. As I tried to do that, people that were knowing
19    that I would be able to stop and see their
20    projects, when they had questions in the evening
21    because they were professionals that worked
22    during the day, I got a lot of complaints about
23    how I wasn't available to them like I told them I
24    would be. So, yes, I tried and it was damaging
25    to me.

Page 106

1 Q. Okay.
2 A. And, yes, I did try to cut back on it.
3 Q. Well, and I look at this, Cindy never told you
4    not to do it, she told you to get prior approval
5    from her.
6         So did you ever, when one of these people
7    said, I need to meet because I'm a professional,
8    I can't during the day, did you ever contact
9    Cindy and say, Hey, this person needs to meet at
10    night, this is why I'm doing this at night, and
11    explain that?
12 A. I did not at any point in time while a customer
13    was sitting in front of me to book an
14    appointment, call Cindy in Florida and say Can I
15    see Mrs. Jones at 5:30 tomorrow? No.
16 Q. Did you do that with Bryce?
17 A. No. It wasn't policy for any of the designers to
18    do that. This came about after I turned in these
19    hours.
20 Q. So you felt that you just did not have to follow
21    this instruction?
22 A. I did not. I did my best to curtail seeing
23    people outside of work hours, as I was
24    instructed. I felt that this was retaliatory.
25 Q. Why do you feel it was retaliatory?

Page 107

1 A. It strongly -- it came across that way because it
2    was something that was directed towards me and
3    not the entire design staff.
4 Q. Well, but you were the one who had -- I mean,
5    this is in response to you turning in a time
6    sheet.
7         This was in response to your time sheet that
8    you had turned in, correct?
9 A. That's correct.
10 Q. And did you ever discuss with any of the other
11    showroom people, what they understood the company
12    policy to be, as to when you were supposed to
13    schedule appointments?
14 A. There was no policy, so there was nothing to
15    discuss.
16 Q. So there was no policy?
17 A. There wasn't a spelled out, we need to get
18    permission to do appointments. We were supposed
19    to give good customer service, and in the
20    handbook, as it says, You may be required to work
21    overtime due to business needs.
22 Q. Okay. And so did you ever discuss with any of
23    the showroom people, when you have to schedule
24    appointments outside of regular showroom hours,
25    do you get approval for that ahead of time or do

Page 108

1    you do it on your own; did you ever have that
2    discussion?
3 A. Yeah.
4 Q. Okay. What did they tell you their understanding
5    of what the process and procedure was?
6 A. No one needed approval.
7 Q. Did you ever discuss with them how often they
8    needed to make appointments outside of regular
9    showroom hours?
10 A. I did not.
11        - - - -
12        (Thereupon, Defendant's Exhibit 7,
13        email, 6/8/15 from c.barber to showroom,
14        was marked for purposes of identification.)
15        - - - -
16 BY MR. SELBY:
17 Q. This is an e-mail dated Monday, June 8th, 2015,
18    from Cindy Barber to all of the showroom people
19    regarding overtime. And it indicates here, "I
20    will need all OT reports before Monday mornings.
21    Payroll will be done 1st thing Monday."
22        What did you understand this e-mail to mean?
23 A. Exactly what it says, that all overtime reports
24    are to be in before Monday morning because
25    payroll will be done first thing on Monday.

27 (Pages 105 to 108)

Case: 1:16-cv-02363-DCN  Doc #: 12-2  Filed: 08/14/17  29 of 74.  PageID #: 89

Page 109

1  Q.  Did you interpret that, that you needed to turn
2      in your overtime reports by the time you left the
3      office on Saturday?
4  A.  I was considered exempt, so I didn't turn them in
5      every time.  When I would win the -- I take that
6      back.
7          No.  I did not think that I was supposed to
8      turn in all overtime reports before payroll on
9      Monday.  It was never clear whether I was
10     eligible for overtime or not, that was the
11     constant issue.
12 Q.  Despite that, this was directed to you?
13 A.  It was directed to all showroom.
14 Q.  And that includes you.  You got this e-mail,
15     correct?
16 A.  I did get the e-mail.
17 Q.  And did you respond to Cindy and say, I'm not
18     sure, should I be turning in all of my overtime,
19     I'm not really sure?  I'm not clear on what my
20     status is?
21 A.  I don't recall.  It was sent on a Monday at 8:37
22     in the morning, so I probably did not read it the
23     very day it was sent.
24 Q.  At any point, did you respond to this e-mail?
25 A.  I don't recall.

Page 110

1  Q.  Did you ever have that discussion with Cindy and
2      say, Cindy, I feel like I'm getting mixed
3      messages, you're telling me to turn in my
4      overtime reports, but I'm being told I'm exempt,
5      what's the position?  I want some clarity.
6  A.  Cindy, herself, told me at one point that
7      overtime didn't apply to me and then at another
8      point, she would get e-mails like this.
9          So, yes, there were very, very mixed
10     messages.  Sometimes if you had overtime, you
11     might be requested, it may be paid in the form of
12     a bonus.
13 Q.  When did Cindy tell you that you were not
14     entitled to overtime?
15 A.  When we signed, I believe -- and this could be
16     not exactly correct -- the 2015 structure for our
17     goals to be met, which stated, all time worked
18     over would be paid one-and-a-half overtime.
19         I spoke to Bryce about it being stated on
20     that piece of paper and the next day, Cindy came
21     in to branch six and stated that that was written
22     on there but it did not necessarily apply.
23 Q.  With respect to those work hour change forms,
24     that we had identified previously, how did you
25     decide when you were submitting one of those and

Page 111

1      when you weren't?
2  A.  If I would speak to somebody and then they would
3      say turn it in; okay.
4          If I would speak to other people and they say
5      you're not salary, it was kind of like a, "if we
6      feel like it, we'll let you turn it in basis."
7          And then when I decided to turn in the
8      Catawba stuff, based on that previous exhibit
9      that needed all the overtime turned in, the
10     reaction was, that, you know, prior approval will
11     be needed, blah, blah, blah.
12         So I didn't work and then decide, flimsy here
13     and there, that I would turn in or not turn in
14     hours.  That would make zero financial sense to
15     anyone.
16 Q.  Well, you turned in hours after this e-mail
17     exchange regarding Catawba, correct?
18 A.  I probably did, yeah.  I would have to see it.
19 Q.  So what made you decide to start sending them
20     again?
21 A.  At one point, I believe it might have been Bryce
22     that made a communication that we were going to
23     start getting overtime hours.
24         Not that he didn't say we were going to
25     start.  He said, yes, I want to see your overtime

Page 112

1      hours turned in, later on in my employment.
2  Q.  And Cindy's e-mail, to be fair, doesn't say, We
3      don't pay you overtime; it was, We want you to
4      get your overtime approved before you work it.
5      Correct?
6  A.  The head of HR was the one that said they don't
7      pay overtime.
8          Cindy verbally told me that overtime didn't
9      apply to me, when I raised the question of the
10     2015 agreement.
11 Q.  But I'm talking about the e-mail that you had
12     referenced earlier.
13 A.  In writing?  No.  She did not put that in writing
14     in this e-mail.
15 Q.  In that e-mail the concern wasn't we don't pay
16     you overtime, it was you need to get approval
17     before you work this overtime.
18 A.  That e-mail says Do not work a Monday without my
19     prior OK.  You need to schedule your appointments
20     during the days you work.  You can change your
21     work schedule to how everyone else has it.
22     Everyone else works Monday through Friday, 40
23     hours with Saturday being overtime four hours.
24         So I would have been working my 40 hours and
25     my overtime was on the Monday that I was off.  So

28 (Pages 109 to 112)

Page 113

1  I'm not sure what the meaning of that -- it's
2  always changing.
3      I'm not trying to be elusive, I'm just trying
4  to figure out how to answer you correctly.
5  Q. Okay.
6          MR. SELBY: Mark this.
7          - - - -
8      (Thereupon, Defendant's Exhibit 8,
9      email, 8/31/15 from c.barber to showroom,
10     was marked for purposes of identification.)
11         - - - -
12 BY MR. SELBY:
13 Q. This is an August 31st, 2015 e-mail from Cindy
14    regarding payroll indicating that now all
15    requests are supposed to go to Bryce instead of
16    her, correct?
17 A. Correct.
18 Q. From that point forward, did you start then
19    submitting, when you did submit them, overtime
20    requests to Bryce?
21 A. I can't say with a hundred percent accuracy, but
22    I assume so, yes.
23 Q. Did you ever have the discussion with Bryce, now
24    that he was the person who was overseeing this,
25    the question regarding the mixed messages and

Page 114

1  whether or not you were entitled to overtime or
2  not?
3  A. Yes.
4  Q. When did you have that discussion with Bryce?
5  A. The day that Brenda Schultz had left.
6      Actually Bryce talked to me on the phone
7  from, I'm going to guess, his car or somewhere, I
8  was at the desk in my office.
9      The showroom was closed. We were done for
10 the day. I think we talked on the phone for at
11 least 45 minutes to an hour.
12     I voiced my complaints. He begged me not to
13 leave. I expressed my concerns about the
14 overtime that's not paid, the constant changing
15 of leadership.
16     He said people should get paid the hours that
17 they work, I'm here to help. Don't leave, et
18 cetera, et cetera, et cetera. That was about an
19 hour of time off the clock, that I didn't even
20 turn in.
21     And then as he fell more into his position,
22 to take over in the leadership of this showroom,
23 the only part that I'm concerned with is, you
24 know, the showroom staffing; then his sense of
25 whether overtime should get paid or not, was a

Page 115

1  little less independent and it started to be a
2  reflection of we don't pay overtime or we do pay
3  overtime.
4      It just -- and then when I would ask too many
5  questions and I couldn't pin him down, like, with
6  the 2015 agreement, Cindy showed up the next day
7  to reiterate what it exactly meant, which meant
8  that it didn't really mean what it said on the
9  paper.
10 Q. So when did you have this discussion with Bryce?
11 A. I believe Brenda left the company in April of
12 2015, maybe three months or so before this
13 e-mail, without exact certainty, but in that part
14 of the year in 2015. I'm pretty sure it was in
15 April. I'd have to check records to verify it.
16 Q. April of 2015?
17 A. I'm almost positive of it.
18         MR. SELBY: Let's mark this.
19         - - - -
20 (Thereupon, Defendant's Exhibit 9, email, 3/4/16
21 from b.barber to multiple people, was marked for
22 purposes of identification.)
23         - - - -
24 BY MR. SELBY:
25 Q. I've presented you an e-mail dated Friday, March

Page 116

1  4th, 2016 at 12:35 p.m. from Bryce Barber and
2  this is to all of the showroom people
3  individually. Correct?
4  A. Yes.
5  Q. And so this is clarifying on when those overtime
6  reports need to be submitted. Correct?
7  A. It appears so, yes.
8  Q. And it says here, if you work on Saturday, then
9  you should send it to him then, correct?
10 A. Yes.
11         MR. SELBY: I think I'm close to
12 being done.
13         Can we take five minutes?
14         MS. CHRISTY: Sure.
15         - - - -
16 (Thereupon, a discussion was had off
17 the record.)
18         - - - -
19 BY MR. SELBY:
20 Q. I have a few follow-up questions. I think you
21 had indicated when you talked about the internal
22 calendar system that kept those records --
23 A. Yes.
24 Q. -- would you be the person who would input all of
25 the stuff in the system regarding your

29 (Pages 113 to 116)

Page 117

1     appointments and so forth?
2  A. No.
3  Q. Who would input all of that information?
4  A. The corporate upper echelon and I'm only saying
5     that because I'm not sure who all had the powers
6     to do this.
7  Q. Right.
8  A. But there were scheduling things put into your
9     calendar by them, occasionally, not on a regular
10    basis.
11 Q. Right.
12 A. But they did have privy to write into other
13    people's calendars.
14    The daily upkeep of your appointments, so
15    that the whole world can see what you're doing,
16    was your responsibility.
17 Q. So if you would schedule, you know, whatever you
18    had on the schedule that day, you know, you would
19    fill that in?
20 A. Correct.
21 Q. And if you were going to, you know, if you had a
22    customer who you were meeting with at 7:00 that
23    night, you would fill in so and so and what other
24    information would you put in to there?
25 A. Typically, it would be, if it was the first

Page 118

1     appointment meeting them at their house for the
2     first time, and hopefully the only time, it would
3     be their name, their address, their phone number,
4     first meeting kitchen designer, something, some
5     kind of thing so that when I looked at it,
6     because I set it last week, I would know, you
7     know.  And then I would kind of estimate how long
8     I would be there and change it, if I needed to,
9     when I got back.
10 Q. So you've indicated here, today, that through the
11    mileage records and through those calendar
12    records, you would be able to, at least partially
13    reconstruct the number of overtime hours you
14    would have, at least as they reflected those
15    particular transactions.
16 A. Yeah, a very fair percentage of it actually.
17 Q. Okay.  I know we had put out an interrogatory
18    where we had specifically asked for those hours
19    and probably your responses came back before we
20    had produced all these documents.
21    But you'd be able to take these records and
22    go through and put together the best
23    reconstruction you could, correct?
24 A. If they were complete, absolutely.
25    MR. SELBY:  What I'd like to ask

Page 119

1     is that that be done.  And I would like to
2     hold open the deposition just to ask her
3     questions about -- I mean, if you're going
4     to have this reconstruction of these
5     specific hours -- which it sounds like she
6     can do -- I want to have the opportunity to
7     ask her about that.  And if it hasn't been
8     done yet, I can't really do that today.
9        MS. CHRISTY:  I have no objection
10    to, once you produce the full records --
11    and if you want an explanation as to why
12    they're incomplete, if you could get them
13    out, we could show you.
14       MR. SELBY:  I don't have them here
15    with me, but we can -- I'll go back and
16    let's you and I talk about it this week.
17       MS. CHRISTY:  It would be best if
18    she were with us, because --
19       MR. SELBY:  Do you have that disk?
20       MS. CHRISTY:  It's not on the
21    disk.  It was papers that you produced.
22       Do you have them -- can we go off
23    the record?
24       MR. SELBY:  We can go off.
25                - - - -

Page 120

1  (Thereupon, a discussion was had off
2   the record.)
3              - - - -
4        MR. SELBY:  We've gone through the
5  records that relate to the calendars that
6  we produced and the expansion of that.
7        I understand the issue you've had.
8  We're going to go back and double-check.
9  We see that there are some expansions there
10 and some things that haven't been expanded.
11       We'll go back and expand every
12 page that we can and we'll resubmit all of
13 those records to you so that you have
14 everything that we have.
15       Then, you know, once you have sort
16 of reconstructed your time and all of those
17 hours, we can reconvene her deposition to
18 give me an opportunity to question on those
19 specific calculations: is that fair?
20       MS. CHRISTY:  That is fair.  We'll
21 agree to reproduce her for limited inquiry
22 with respect to, number one, the hours that
23 she worked, based on those calendaring
24 events and any questions that relate
25 specific to those appointments related to

30 (Pages 117 to 120)

Page 121

1      the calendaring events.
2           MR. SELBY:  Right.
3           MS. CHRISTY:  Beyond that, we will
4      object to any further questioning.
5           Good?
6           MR. SELBY:  I want to make sure,
7      if you're going to do some specific
8      calculation of damages that I can have the
9      opportunity to understand that, because to
10     this point, it's been based on
11     generalities.
12          MS. CHRISTY:  And I will tell you
13     that, in the event that we actually -- that
14     I actually perform calculations with
15     respect to what her damages are based on
16     those records, that I would be happy to
17     share those with you for purposes of
18     attempting to resolve the matter.
19          MR. SELBY:  I understand.  I just
20     want to understand how she is coming to
21     those numbers and supporting all of that.
22          MS. CHRISTY:  And that's fair.
23          MR. SELBY:  Okay.
24          MS. CHRISTY:  Are you done?
25          MR. SELBY:  I'm done for today.

Page 122

1           MS. CHRISTY:  She will read.  So
2      in the event that the deposition is
3      ordered, if you could just let us know and
4      then she can come to your office and
5      review.
6                - - - -
7      (Deposition concluded at 1:50 p.m.)
8                - - - -
9           (Signature Not Waived.)
10
11
12     _____
13          Kristine DuPont
14
15
16
17
18
19
20
21
22
23
24
25

Page 123

1
2           C E R T I F I C A T E
3      The State of Ohio, )  SS:
       County of Lake.)
4
5
6           I, Lynn A. Konitsky, RMR, CRR, Notary
       Public within and for the State of Ohio, duly
       commissioned and qualified to administer oaths
7      and to take and certify depositions, do hereby
       certify that the above-named witness was by me
8      first duly sworn to testify the truth, the whole
       truth, and nothing but the truth: that the
9      testimony as above-set forth was reduced to
       writing by me by means of stenotypy, and was
10     later transcribed into typewriting under my
       direction: that this is a true record of the
11     testimony given by the witness: that said
       deposition was taken at the aforementioned time,
12     date and place, pursuant to notice or
       stipulations of counsel.
13          I further certify I am not a relative or
       employee or attorney of any of the parties,
14     or a relative or employee of such attorney
       or financially interested in this action:
15     that I am not under a contract as defined in
       Civil Rule 28(D).
16
17          IN WITNESS WHEREOF, I have hereunto set my
       hand and seal of office, at Cleveland, Ohio, this
18     8th day of July, A.D. 2017.
19
20
21
22
23     Lynn A. Konitsky, Notary Public/State of Ohio
       Waters Reporting Services
24     38385 Wood Road, Willoughby, Ohio 44094
       My commission expires February 8, 2020
25

5/22/2017

Kristine A. DuPont

Page 124

**A**

**A.D** 123:17
**a.m** 1:15 93:1
  99:10
**ABC** 66:22,23
**ability** 5:22,25
  47:2 51:2
**able** 10:2 14:19
  14:25 45:16,17
  48:19 51:12,24
  55:17 58:21
  59:8 67:19
  77:22 85:11,12
  95:20 105:19
  118:12,21
**above-named**
  123:7
**above-set** 123:9
**absolutely** 17:2
  17:13 55:11
  88:2 101:16
  118:24
**accept** 37:15
**access** 58:19
  59:8 75:10
  85:3
**accommodate**
  57:21 69:9
  96:16,17
**accommodati...**
  55:25 56:9
**account** 58:12
  61:7,8,9
**accuracy** 113:21
**accurate** 70:8
  79:17
**accurately** 19:21
  19:23 79:14
  83:12
**acrylic** 66:25
**act** 66:1
**acting** 25:18
**action** 123:14
**Active** 1:7 4:12
  12:13,14,16,18

14:8,11,16,21
15:3,13,17,18
15:19,21,25
16:2,7,8,19,25
17:6,8 19:6
26:16 58:17
60:23 61:8,9
61:24 62:9,11
63:12 65:22
66:15 73:24
74:2,24 76:2
95:15 96:17
**Active's** 74:20
**activities** 80:12
**actual** 80:12,20
  87:17
**addition** 41:23
**additional** 16:17
  82:16,19 93:11
**address** 6:2
  118:3
**administer**
  123:6
**advertisement**
  17:12
**advised** 46:20
  46:23
**affect** 5:24 53:1
**aforementioned**
  123:11
**age** 4:1
**agenda** 70:10
**ago** 6:16 7:4 8:4
  9:23 60:5
**agree** 120:21
**agreed** 52:17
**agreement** 52:14
  52:16 112:10
  115:6
**ahead** 19:3
  29:24 82:24
  100:5 107:25
**ahold** 27:4
**allow** 82:17
  103:7

**allowed** 27:2
  28:3 36:14
  37:1,4,11,18
  46:17 50:8,11
  50:13 52:3,3
  54:16 55:12,15
  57:23 96:11
**alterations**
  55:14
**amount** 31:5,9
  33:18
**amounts** 31:1
**and/or** 1:16
  97:16
**annual** 20:8
  24:8
**answer** 4:21
  5:15 8:22
  14:22 27:24
  33:5 35:3 43:6
  45:3 66:20
  68:10 83:22
  99:3 113:4
**answered** 82:12
**answers** 5:9
**anybody** 17:21
  25:14 28:17,20
  29:1 41:2,4
  43:2 47:8 50:8
  51:8,12,25
  56:8 95:14
  102:17,18,20
  103:21
**apologize** 60:5
  89:13
**appear** 19:13
**APPEARAN...**
  2:1
**appears** 19:2,7
  19:20 90:2,5
  91:16,19 94:8
  102:5,6 116:7
**applicable** 37:22
**applied** 105:10
**apply** 23:4 110:7

110:22 112:9
**appointment**
  25:2 36:2 46:1
  47:18 54:23
  67:11 70:4
  79:18 81:24
  106:14 118:1
**appointments**
  29:14,15 34:16
  35:4,8,15
  36:11 54:17
  55:8 69:2,19
  71:15 80:3,4,9
  80:20 81:4,5
  81:20 82:1,22
  85:2,13,21,24
  86:3,9,11 95:6
  95:9,18 96:1
  96:11,12,15,23
  102:15 103:11
  103:14 104:22
  105:16 107:13
  107:18,24
  108:8 112:19
  117:1,14
  120:25
**approached**
  16:2,6,10
**approval** 94:21
  95:6,8 97:20
  99:19,21 103:6
  104:21 106:4
  107:25 108:6
  111:10 112:16
**approved** 98:24
  100:17,23
  101:15 112:4
**approximately**
  38:6
**April** 115:11,15
  115:16
**area** 79:10
**areas** 6:9 8:13
  10:1
**arrangements**

102:23
**aside** 6:22
**asked** 23:1,19
  34:21 43:4
  57:12 99:4
  118:18
**asking** 5:10,11
  30:22 38:23
  50:13 53:23
  54:18,18
**assemble** 84:12
**assembling**
  67:18
**assistance** 65:15
**assisting** 6:16
**assume** 9:1 93:6
  93:8 113:22
**assuming** 50:17
**attempting**
  121:18
**attendant** 59:7
  64:3,11,12
  66:17 69:11
  86:7 95:24
**attendants**
  93:22
**attended** 6:15
  6:15 9:17
**attorney** 4:12
  5:1 83:8
  123:13,14
**August** 113:13
**available** 52:21
  76:6 77:21
  101:3 102:22
  103:11,16
  105:12,23
**Avenue** 2:3 6:3
**average** 11:24
  11:25 68:20
  70:22,22 71:23
  72:1,2,5
**Average-wise**
  71:22
**avoid** 4:23

5/22/2017                                    Kristine A. DuPont

**Avon** 28:24
40:22 52:22
63:23 64:10
79:10
**aware** 43:24
44:1,6
**awkward** 38:19

___

**B**

**B** 3:6 50:24
**b.barber** 3:21
115:21
**back** 13:8 14:19
14:25 23:9
27:6,10 32:17
33:21 35:24
43:17,18 44:23
50:22 53:3
54:7 57:4 58:8
60:21 61:15,22
64:19,25 65:20
67:11 78:8
79:1,20,23
81:7 86:8,14
87:25 91:8
98:7 99:10
100:11,21,24
101:18 106:2
109:6 118:9,19
119:15 120:8
120:11
**background** 6:7
**backlash** 52:6
**backwards**
10:15 17:3
**bad** 46:10
**balance** 70:2
**bank** 58:12,14
**Barber** 2:15
18:2 22:1,4
23:2 29:3,3
36:23 37:19
41:3 43:7,10
62:4 94:12
108:18 116:1

**bartender** 63:10
**base** 19:25
**based** 111:8
120:23 121:10
121:15
**basically** 29:22
30:14 59:12
65:13,16
**basis** 78:19
111:6 117:10
**bath** 63:14 73:7
**bathroom** 67:5
**baths** 62:12
73:10
**battle** 26:7
**beautiful** 73:13
**bed** 59:16 72:22
74:15
**begged** 114:12
**beginning** 98:7
**begun** 87:8
**behalf** 1:17 2:6
2:13
**believe** 17:7,10
17:13 18:2,6
29:9 38:6 39:6
39:8 59:25
60:1,18 62:1
63:20,22 72:16
74:25 76:2,13
77:8 79:4
81:16 82:16
83:7 84:13
86:23 100:7
105:7 110:15
111:21 115:11
**believed** 81:8
105:9
**bell** 86:15
**benefits** 20:3,15
**Bernstein** 1:14
2:9
**best** 8:3 9:22
22:5 38:8 39:4
41:5 45:22

56:25 63:18
65:2 75:2 88:1
106:22 118:22
119:17
**Beyond** 121:3
**big** 46:9 75:9
97:3
**bigger** 71:4
**biggest** 72:12
**bit** 6:6 23:10
78:11 87:14
**blah** 111:11,11
111:11
**boat** 46:19
**Bob** 93:2
**boggling** 75:11
**bonus** 36:20,22
39:23 40:9
41:19 83:25
84:6 110:12
**book** 106:13
**booked** 35:15
**bottom** 90:19,22
98:9
**Bowling** 6:15,20
**boxes** 68:5
**bracket** 90:9
**branch** 20:13
23:3 27:15
28:15,25 40:22
42:17 45:12,13
61:1 64:23
66:12 72:13
86:7 110:21
**break** 5:12,16
5:17,17 58:1
**breakfast** 59:16
72:22 74:16
**Brenda** 28:13
30:9 31:4,24
32:7,9,13 33:9
44:5,6 47:13
100:7,17,22
101:14 103:25
114:5 115:11

**bring** 68:24
73:11
**Brothers** 63:13
63:19
**brought** 64:6
86:13
**Bryce** 22:1,4,7
23:11,24 29:3
32:12 41:3,4
43:10,14 46:24
47:13 55:16,19
55:24 57:6
62:4 95:16
100:7,17,22
101:14 103:24
106:16 110:19
111:21 113:15
113:20,23
114:4,6 115:10
116:1
**Bryce's** 43:16
**build** 16:4
**builder** 71:11,11
**builder's** 74:14
**building** 2:3
42:7 64:20
75:13
**burned** 72:23
75:12
**business** 10:18
12:18,19 13:15
13:18 58:12
65:23 66:4,12
68:17 69:2
70:5,15 75:5
75:24 85:13
86:4 96:16
97:5,14 101:6
105:14 107:21

___

**C**

**C** 123:1,1
**c.barber** 3:13,15
3:18,19 92:10
94:4 108:13

113:9
**cabin** 16:4
**cabinets** 68:7
71:6 74:8
**CAD** 7:1 75:7
76:9
**cages** 30:15
**calculate** 46:5
81:7 87:5
**calculation**
121:8
**calculations**
87:17 120:19
121:14
**calendar** 29:14
34:15 35:4,10
35:12,14,24
36:6,9 76:16
79:18 80:2,11
82:1 87:23
96:24 116:22
117:9 118:11
**calendaring**
120:23 121:1
**calendars** 25:2,3
77:16 85:3
117:13 120:5
**call** 39:8 106:14
**called** 4:1 66:24
92:3
**car** 114:7
**Carolina** 10:9
10:10
**Carolinas** 10:11
10:12
**carted** 50:22
**case** 1:6 79:12
79:21 102:14
**cases** 65:25
81:25
**Catawba** 59:17
72:8 101:8
111:8,17
**category** 83:20
83:25 84:2,5,5

cause 1:18
CEO 104:23
  105:1
CEO's 105:7
certain 49:17
  79:25 85:15
certainty 115:13
certificate 9:10
certification
  9:11
certifications
  9:8,15,16
certified 1:12
  4:5
certify 123:7,7
  123:13
cetera 76:9
  114:18,18,18
chain 94:9
change 20:21
  52:7 57:21
  92:3 110:23
  112:20 118:8
changed 20:24
  32:11 36:20
  42:12,25 43:7
  43:10 44:3
  45:19 57:5,7
  91:4
changes 25:24
  104:7
changing 113:2
  114:14
charge 18:16
Chastity 2:2
chastity@lazz...
  2:5
check 22:15 71:9
  79:18 115:15
choice 88:23
choose 8:13
chose 54:7
Chris 93:19
Christy 2:2 58:2
  98:25 99:20

105:4 116:14
119:9,17,20
120:20 121:3
121:12,22,24
122:1
Chuck 18:6 89:1
  89:4,5
Cindy 18:2,15
  23:2 29:3
  32:12 36:23
  37:19,24 38:10
  38:24 39:2,8
  39:12,15 40:3
  40:7 41:4,7,16
  43:7,17 56:11
  57:3,13 92:19
  92:25 93:17
  94:12 95:16
  98:16 99:4,23
  100:20 101:11
  102:24 103:3
  103:25 104:2,5
  104:8 106:3,9
  106:14 108:18
  109:17 110:1,2
  110:6,13,20
  112:8 113:13
  115:6
Cindy's 88:22
  98:2 104:23
  112:2
circle 90:23
circled 90:21
circumstances
  103:7,8
Civil 4:4 123:15
clarify 41:14
  75:6
clarifying 116:5
clarity 110:5
clear 16:8 109:9
  109:19
clearly 99:3
  100:25
Cleveland 1:15

2:4,10 123:17
client 16:11 66:6
  68:9 75:14
  80:13 101:2
  102:14
client's 54:15
clients 34:3 65:8
  65:24 97:3
  103:10 105:12
clients' 80:5
clock 114:19
close 7:4 42:14
  57:25 69:7
  116:11
closed 35:6 50:2
  114:9
closer 11:22,22
  45:7
closing 70:17,19
Club 63:8,9
coffee 5:20
college 6:9,14,23
combination
  15:22 18:14
  96:21
combine 13:16
come 9:8 22:11
  23:25 52:18
  66:11,23 67:11
  69:2,5 86:15
  86:16 103:6
  122:4
comfortable
  36:17
coming 65:18
  66:13 121:20
comment 89:20
comments 37:17
  42:10
commercial 11:4
  11:5
commission
  19:25 38:1
  63:22 84:2,6
  123:24

commissioned
  123:6
communicate
  25:14 32:15
  34:12 35:1
  51:23
communicated
  28:15,18 29:2
  29:7 30:7
  41:11
communication
  26:6 40:12
  57:16 111:22
communicatio...
  32:20 38:24
  44:13,17 56:5
  57:20
comp 89:18 90:9
  91:2,13
company 7:12
  7:13 17:23
  18:13 22:12
  23:14 25:3
  29:14 30:7,12
  34:12,13,15,24
  35:1,24 36:6
  36:10 37:25
  44:12 59:21,22
  60:15 61:3,6
  61:13,17 63:11
  64:1 76:16,22
  77:16 79:4,5
  84:11 86:25
  97:23 101:20
  104:18,21,23
  105:3,6 107:11
  115:11
company's 30:4
  39:14,15 65:23
  89:5 104:17
compensated
  78:1 98:5
compensation
  38:1,9
complained

36:16
complaint 32:16
  42:11 98:21
complaints
  43:25 105:22
  114:12
complete 9:20
  48:20 55:5,13
  55:17,20 72:21
  72:22 75:17
  81:10 82:14
  87:7 118:24
completed 6:8
  9:10,19
completely 9:25
  16:25 88:25
completion 9:11
  80:16 84:17
  88:17
computer 47:4
  50:19 51:1,13
  51:24 59:2,23
  59:25 60:20
  61:5,10,11,13
  61:15,17 75:7
computers 49:16
comradery
  44:19
concern 112:15
concerned
  114:23
concerns 114:13
concluded 122:7
conditions 19:15
  19:17,22 20:20
conference
  39:13
confused 103:1
connection 4:14
  66:5 73:15
  79:21
conscious 5:2
considered 11:7
  23:22 26:16
  27:1 109:4

5/22/2017                                    Kristine A. DuPont

consistent 30:11
41:25 42:2
consisting 52:10
constant 109:11
114:14
constantly 36:20
72:9
construction
67:6
consultant 7:11
consulting 10:24
11:3
contact 18:12
106:8
contacted 17:11
contest 5:13
continuation
94:8
continue 96:22
continuously
12:8
contract 123:15
contractor 74:18
contractors
72:25
contributed
18:17
control 69:1,5
conversation 5:1
22:9 25:20
33:14 37:23
39:7 40:5 52:4
67:14 98:4
conversations
22:3 23:6
29:19 32:16
33:10 39:11
41:8,12,21
42:22 44:19
52:2 55:16
78:8 95:22,23
corporate 58:25
117:4
correct 9:12
13:4,23 14:1

15:4 16:22
17:10 24:8
25:10 26:3
27:12,23 28:1
30:20 32:5
33:12,24 34:1
34:5,6,8,9,14
35:1,19 36:5
36:12 38:4
41:19 46:12,16
47:19 48:6,12
48:17,21 49:4
49:9,10,12
50:16 51:5,22
53:7 54:1,2,6
55:2,11 56:1
59:10,20 61:21
63:4,23 76:23
76:24 77:2,3
79:16 80:15
81:13 82:11,12
82:21 86:2
89:22,23 90:23
92:4,21 93:11
93:12,25 94:1
94:13 95:13
96:14 97:25
98:3,18,19,24
99:7,8,14,15
99:19 104:24
107:8,9 109:15
110:16 111:17
112:5 113:16
113:17 116:3,6
116:9 117:20
118:23
correctly 99:3
113:4
correlate 82:1
counsel 1:17
123:12
County 123:3
couple 8:4 9:2,6
51:15 55:22
56:4 63:1

77:17
course 7:7,24
21:8 32:3
41:10 42:6
47:5 49:20
58:20
courses 9:1
17:22
coursework 9:25
court 1:2,20
4:15,19
cover 86:8,15
105:13
covered 86:10
covering 101:7
create 68:7
created 24:3
cross-examina...
1:11 3:4 4:3,7
cross-trained
86:23
crossed 90:16,21
CRR 123:5
cupboard 68:6
current 6:2
currently 10:15
10:16
curtail 106:22
customer 16:2,3
16:6,12,18
65:16 66:19
69:22 74:17
85:10 96:17
100:12 106:12
107:19 117:22
customer's
68:16 70:14
97:17
customers 15:20
15:22 16:1,25
65:19,21 73:2
74:20
cut 80:3,6 82:9
82:11 103:18
105:15 106:2

cutoff 47:16,16
52:5
cutoffs 56:11
Cynthia 2:15

**D**
D 3:2,6
daily 117:14
damages 121:8
121:15
damaging
105:24
Danko 76:13
date 7:3 21:18
39:10 41:22
123:12
dated 19:10
89:12,17 90:7
90:12,15,25
91:16,18 92:18
108:17 115:25
dates 41:9 77:12
77:20,20,22
daughter 73:11
day 23:2 38:10
45:24 48:21
49:3,9,11
69:20 80:8,10
80:18,21 81:23
89:14 90:17
91:2,6,7 93:7
105:22 106:8
109:23 110:20
114:5,10 115:6
117:18 123:17
days 8:19,25,25
9:6 45:19 53:6
53:13,24 65:7
70:13 82:22,23
85:1,16 87:12
87:15,18,19
112:20
deadline 57:14
deadlines 57:22
dealt 65:19

decide 110:25
111:12,19
decided 97:19
111:7
deciding 44:21
Defendant 1:8
1:18 2:13 4:2
Defendant's 3:8
3:10,11,13,14
3:16,17,19,20
18:19,21 19:1
82:25 83:2
88:6 92:9,17
94:3 101:24
108:12 113:8
115:20
defined 123:15
degree 6:17
deliver 50:16
Dentistry 6:16
department
63:15 64:19
86:14
deposed 4:5
deposition 1:10
4:14 5:23,25
119:2 120:17
122:2,7 123:11
depositions
123:7
describe 26:12
38:15 62:2
described 41:13
description 15:4
34:2
design 6:24,25
7:1,13 10:1,2,6
10:24 11:3
63:11 65:11
67:12,14,20
75:4 76:9
93:21 107:3
designer 12:5,6
27:15 35:8
42:20 62:12

5/22/2017                                                            Kristine A. DuPont

63:13,16 64:6
65:4 86:12
95:8 104:21
118:4
**designers** 23:20
42:11 44:2,7
86:20 105:9
106:17
**designing** 11:10
**Designs** 10:19
10:23 11:14
12:2 13:1,13
14:13,16 15:2
15:7,13 16:18
16:24 58:11
62:10 73:5
**desk** 40:22 114:8
**Despite** 98:1
109:12
**detail** 80:4,6,18
82:20
**detailing** 77:5
**details** 13:11
82:4
**determine** 38:16
45:5
**dictate** 103:7
**dictated** 68:9
**differences**
20:15
**different** 20:6
41:11,23 47:10
99:7
**differentiate**
85:12
**differently** 44:7
**difficult** 85:4
**Dining** 11:8
**direct** 104:5
**directed** 107:2
109:12,13
**direction** 123:10
**directly** 32:25
63:6 72:14
**discourage**

105:13,15
**discouraged**
69:18 78:13
86:7 96:12
**discuss** 33:18
39:12 100:25
107:10,15,22
108:7
**discussed** 55:19
103:20,22,23
103:24,24
104:4
**discussing** 41:7
**discussion** 57:13
78:23 108:2
110:1 113:23
114:4 115:10
116:16 120:1
**discussions**
42:21 95:14,25
99:23
**disk** 119:19,21
**dispute** 26:10
**disputes** 33:21
**DISTRICT** 1:2
1:3
**DIVISION** 1:3
**document** 3:10
37:25 83:3,7
83:11 92:3
**documentation**
77:1,5,14,15
84:22,24 87:11
87:23
**documents**
118:20
**doing** 8:24 12:1
12:8 13:3,6,7
15:9,13,17,20
16:17,19 19:4
35:25 45:18
66:14 74:4
106:10 117:15
**door** 69:3
103:10,11

**double** 88:22
**double-check**
120:8
**drafted** 24:3
**drain** 71:8
**drawings** 74:7
**drive** 27:19 54:7
101:4
**drop** 38:20
**dropped** 74:11
**drove** 47:5
**due** 48:3,14
107:21
**duly** 4:4 123:6,8
**DuPONT** 1:4,10
3:4 4:1,7,10,11
10:19,22 11:14
12:2 13:1,13
14:13,16 15:2
15:7,12 16:17
16:24 58:11
62:9 73:4
122:13
**Dworken** 1:14
2:9

_____

**E**

**E** 3:2,2,6,6
123:1,1
**e-mail** 21:14
27:6 30:18
32:17 46:3
51:7,7 57:4,14
58:19 61:6,7,8
92:18,19,22
93:1 94:9,12
94:22 96:22
98:1,8,9 100:1
101:17 102:5,7
102:10,12,13
102:13 108:17
108:22 109:14
109:16,24
111:16 112:2
112:11,14,15

112:18 113:13
115:13,25
**e-mailed** 50:16
50:17
**e-mails** 23:7
56:11,13 59:21
59:21,22 60:2
60:7,12,16,18
85:4 87:24
92:15 94:9
110:8
**earlier** 40:25
85:24 91:22
112:12
**early** 39:4 63:14
**easily** 73:25
**EASTERN** 1:3
**easy** 4:25 95:4
**echelon** 89:5
117:4
**Edgewater** 63:7
63:9
**Edison** 6:13
**educate** 9:25
**educational** 6:7
**effectively** 10:3
**eight** 68:14 72:4
72:7,17 73:17
73:18,20,24
74:1,23,25
**either** 6:17
69:12 82:12
**electrical** 10:2
**eligible** 39:6,18
39:18 109:10
**elusive** 113:3
**Elyria** 35:9
79:10
**email** 3:13,14,16
3:17,19,20
92:10 94:4
101:25 108:13
113:9 115:20
**emphasis** 103:16
**employed** 10:16

14:21 17:6
24:9 58:17
**employee** 13:23
21:7,12 23:5
39:19 44:19
64:25 104:13
123:13,14
**employees** 20:14
23:9 64:10,13
64:17
**employer** 7:16
**employment** 3:9
7:15 10:14
17:4 18:22
19:3,5,15
20:22 21:8
24:5 27:20
32:3 38:7
41:10 42:6
44:12 45:7
61:22,24 62:2
64:3 68:11
86:13,22 112:1
**enamored** 68:3
**enclosed** 93:10
**ended** 62:2
**ends** 49:9
**endurance** 5:13
**enhanced** 8:10
**enhancements**
8:23,25
**entire** 36:9
107:3
**entitled** 21:7,12
23:13 40:8
41:17 110:14
114:1
**envelope** 78:13
**environment**
36:17 97:16
**equal** 20:8 70:2
**equivalent** 82:2
**Esq** 2:2,8,8
**essentially**
102:24

establish 15:8
estimate 25:4
    118:7
estimation 75:3
et 76:9 114:17
    114:18,18
evening 105:20
evenings 105:12
evenly 105:10
event 121:13
    122:2
events 120:24
    121:1
eventually 26:18
    27:11
everybody 22:10
    35:5 57:10
everybody's
    36:11 80:3
    86:23
evidence 21:23
exact 7:3 13:11
    21:18 22:14,25
    29:19 36:8
    39:9 41:9,22
    42:14 62:7
    75:1 77:19,20
    86:25 115:13
exactly 8:18
    17:17 18:8,17
    40:14 45:11
    49:21 50:23
    55:22 56:3
    64:4 77:11,13
    108:23 110:16
    115:7
example 48:1
    50:15 54:22
    59:22 89:24
Examples 92:2
exceed 21:2
excess 24:12,20
    38:3 40:10
exchange 111:17
exempt 21:6,12

23:5,9 27:7
    32:18 36:18
    37:7 39:17
    41:17 43:23
    44:10 109:4
    110:4
exempted 33:23
exh.5 3:16
    101:25
exhibit 3:7,8,10
    3:11,13,14,16
    3:17,19,20
    18:19,21 19:2
    82:25 83:2
    88:4,6 92:7,9
    92:17 94:3
    101:24 108:12
    111:8 113:8
    115:20
existed 71:13
existing 66:6
expand 120:11
expanded
    120:10
expansion 120:6
expansions
    120:9
expectations
    23:16 100:13
expected 21:1
expenses 20:3
experience
    24:18
expires 123:24
explain 22:20
    43:2 102:14,20
    106:11
explained 23:16
    23:18
explanation
    22:17,21 43:19
    104:11 119:11
expressed
    114:13
exterior 11:10

extra 39:23 53:6
    53:25 54:3
    55:1,8 77:1
    90:17

_____

**F**

F 123:1
fact 19:21 42:23
    51:1 68:4 98:1
    105:15
fair 10:13 84:9
    112:2 118:16
    120:19,20
    121:22
fairly 70:8
fall 4:25
fantastic 58:3
far 24:5 25:7
    34:18
father 62:16
February
    123:24
Federal 4:15
    58:15
feel 18:7 20:18
    106:25 110:2
    111:6
fell 114:21
felt 106:20,24
field 6:10
fight 78:15
figure 55:9
    75:12 113:4
figured 79:25
file 14:17
filed 4:15 83:9
fill 26:22 27:12
    36:14 37:1
    45:5 48:19,22
    117:19,23
filled 44:25
    89:13 90:7
finalized 75:17
finally 5:21
financial 111:14

financially
    123:14
find 13:8 65:21
    67:21
fine 9:8 16:12
    64:5 65:3
finish 53:16
    66:18
finishes 73:9
fire 72:18,22
Firm 2:2
first 4:4,19 6:11
    8:1 17:6,22
    18:11 19:16
    24:9 25:8,9,17
    25:25 26:1
    27:22,22,23
    32:4 39:2
    40:11 55:18
    58:15 62:1
    67:21 68:12
    69:21 88:14,15
    94:10,24 97:13
    98:9 99:10
    108:25 117:25
    118:2,4 123:8
fit 71:6
five 21:2 35:6
    68:14 73:22
    116:13
flimsy 111:12
Florida 106:14
FLSA 33:23
focus 100:15
follow 20:1
    65:14 105:7
    106:20
follow-up 38:21
    57:2 98:8
    116:20
following 65:17
    72:19 93:6
follows 4:6
form 26:22
    27:11,14,18

28:1,3,6 36:13
    36:15,25 37:5
    37:12,14 44:23
    45:1,6 48:20
    48:22 49:12,22
    50:14 51:24
    91:23,25 93:10
    110:11
forms 33:7
    37:18 45:4
    52:5 88:11
    110:23
formulating
    60:14
forth 50:23
    60:21,21 61:15
    83:9 117:1
    123:9
forward 45:14
    95:5,5,12 97:7
    102:12 113:18
forwarded 102:7
found 15:21
four 22:5 40:10
    68:20 70:22
    73:22 89:7
    112:23
fourth 88:19,24
    88:25
Friday 52:8 57:7
    68:14 92:18,25
    112:22 115:25
front 84:8 86:10
    103:11 106:13
fruition 20:5
full 82:3 119:10
full-time 12:20
further 121:4
    123:13

_____

**G**

geared 33:1
general 44:19
    72:25
generalities

5/22/2017                                         Kristine A. DuPont

121:11
**generally** 21:1
**generated** 14:5
  18:14
**generating**
  14:12
**getting** 22:10
  26:11 27:5
  28:22 57:15
  74:6 78:10
  98:5,16 110:2
  111:23
**give** 4:13 5:22
  5:25 27:23
  37:13 41:9
  50:4 67:9
  100:14 107:19
  120:18
**given** 23:24 24:6
  27:12 28:8
  40:9 41:18
  123:11
**giving** 5:9
**Gmail** 61:3,7
**go** 4:16,18 6:6
  6:20 8:8 9:4
  10:14 14:19,25
  17:23 19:3
  26:4 29:24
  34:3 35:11,15
  35:24 36:1,4
  54:8,15 58:8
  61:22 62:5
  65:11,11 67:18
  68:4,16 69:13
  70:16,24 71:2
  78:20 81:7
  82:24 83:20,21
  87:25 100:5
  113:15 118:22
  119:15,22,24
  120:8,11
**goal** 23:14 38:9
  97:13
**goals** 22:18,21

23:12,17 38:2
  110:17
**going** 4:16 7:4
  8:24 9:6 12:6
  17:3 22:13,20
  25:15 29:21
  35:17 40:10,18
  45:5 46:6 49:6
  53:3,20 56:15
  58:4 71:6,6,7
  72:5,16 74:5
  74:22 76:2
  78:8 87:25
  93:7 94:18
  95:5,12 97:7
  98:6 111:22,24
  114:7 117:21
  119:3 120:8
  121:7
**good** 75:3
  101:19 107:19
  121:5
**gotten** 39:8 87:5
**graduate** 6:11
**great** 73:13
**Green** 6:15,20
**Greenville** 10:9
**greet** 65:8
**Greg** 20:13
  28:15 30:10
  31:8,13,16,19
  32:12 42:3,8
  43:4 51:18
  62:3 64:20,22
  86:19
**Greg's** 42:10
  43:5
**grid** 91:18
**gross** 83:9,23,24
**ground** 4:17
  72:23
**grow** 66:12
**guess** 19:14
  29:25 73:3
  114:7

**gutted** 72:22
**guy** 59:2

---

## H

**H** 3:6
**half** 23:13 34:24
  35:17,21,22
  38:3 70:4
**hand** 49:25
  50:14,21
  123:17
**handbook**
  104:20 107:20
**handing** 82:2
**handle** 56:18
  66:15 75:24,24
**handwriting**
  44:16 89:8,11
  89:15,19 90:10
  90:14,20 91:1
  91:11,12,14,17
  91:20
**handwritten**
  49:22
**happen** 16:20
  40:20 49:19
  66:4
**happened** 24:22
  25:17 27:25
  41:9 77:10
**happy** 121:16
**head** 4:22 13:9
  21:14 76:19,20
  90:5 112:6
**hear** 5:7
**heard** 42:1
**heavy** 11:19,20
  11:23 86:4
**held** 25:3
**help** 16:3 34:3
  65:8 67:24
  114:17
**helpful** 5:3
  30:21
**hereinafter** 4:5

**hereunto** 123:16
**Hey** 97:21 106:9
**high** 6:8,12,13
**hired** 19:16,19
  19:22 20:22
  25:11 52:12,16
  68:12,13
**hiring** 52:14
**history** 10:14
  17:4 61:23
  86:22
**hold** 88:20 119:2
**holiday** 88:23
  93:2 98:10
  99:11
**holidays** 20:17
**home** 11:1,2
  68:17 69:13
  70:14,24,25
  75:10
**homeowner**
  74:18
**Homeworks**
  74:19
**honestly** 27:21
  40:5 41:8
  67:17 79:19
**hope** 67:10
**hoped** 102:16
**hopefully** 4:17
  66:23 118:2
**hospitality** 11:5
  11:7
**hostile** 78:12
**hotel** 8:19
**hour** 34:25
  35:17,21,22
  46:5 72:3
  82:23 110:23
  114:11,19
**hour-and-a-half**
  101:4
**hourly** 23:21
  42:12,24,25
  43:3,8,11,13

43:22 44:3,10
  63:22
**hours** 9:2 11:13
  11:20,24 12:17
  15:8 20:25
  21:2 22:1,22
  23:18 24:12,13
  24:20,25 25:10
  25:20 26:2,5
  26:11,13,16,19
  28:7 29:10,12
  29:17,18 30:2
  30:3,6,8,16,17
  32:14,15,21,22
  32:25 33:4,11
  33:15,16,18,22
  33:25 34:7,10
  34:13,25 35:18
  35:22,23 36:16
  36:18,19,21
  37:7 38:3,13
  38:16 39:14,20
  39:22,25 42:9
  42:22 46:2,4
  46:21,25 47:2
  47:5 52:1,2,10
  52:21 53:6,10
  53:21 54:1,3
  54:19,23 55:1
  55:4,5,7,17,20
  56:10,15 57:15
  57:17,22,24
  65:6 68:11,13
  68:25 69:14,17
  69:20,23,24
  70:1,6,6,7,15
  70:18 71:18,22
  71:25 72:4,5,6
  72:7 73:18,20
  73:22,23,24,25
  74:1,23 75:5
  75:18,21 76:10
  76:22 77:1,6,7
  78:2,18 79:15
  79:25 80:1,8

Kristine A. DuPont

81:1,8 83:13
83:17,19 84:6
84:12,15,19,23
85:1,13,14,20
85:22,25 86:1
86:11 87:4
89:14 91:19,24
92:3 93:11
94:19,20 95:7
95:9,19,21
96:2,3,16 97:5
97:9,11,11,14
97:18,22 98:15
98:21,23 99:6
99:18 101:6
102:21 103:4
103:10,18
104:14,22
105:17 106:19
106:23 107:24
108:9 111:14
111:16,23
112:1,23,23,24
114:16 118:13
118:18 119:5
120:17,22
**house** 54:15
58:21 70:5
71:2,13,24
80:13 118:1
**houses** 80:5
**HR** 21:14 27:4
30:18 112:6
**huge** 60:14
74:10,10,10,15
**huh-huh** 4:24
**hundred** 76:3
113:21
**Huron** 6:3

_____

**I**
**idea** 70:11
101:18
**identification**
18:23 83:4

88:8 92:12
94:5 102:2
108:14 113:10
115:22
**identified** 33:10
40:12 44:24
110:24
**identify** 65:21
77:22 84:15
87:2
**ill** 62:16
**illness** 5:23
**immediate**
31:23 32:4,9
**important** 4:21
**impossible** 12:22
**inappropriate**
93:14
**included** 80:21
93:15,23
**includes** 109:14
**including** 92:20
**inclusive** 80:11
**income** 13:2,13
13:15,15,22
14:4,11
**incomplete**
80:17 81:17,18
81:19 82:7
87:9 119:12
**Incompletely**
84:18
**inconsistency**
43:1 44:21
**incorrect** 99:1
**independent**
12:5 115:1
**indicate** 85:7
87:4
**indicated** 36:13
41:16 42:3
44:23 57:4,15
79:12 116:21
118:10
**indicates** 108:19

**indicating** 21:3
21:5 77:25
113:14
**individually**
116:3
**information**
67:15,19 68:24
81:10 82:8,9
82:13,16,19
96:25 117:3,24
**inhibited** 51:2
**initial** 8:16
67:13
**input** 116:24
117:3
**inquiry** 120:21
**Institute** 9:17,21
9:24
**instructed** 50:4
78:9 106:24
**instruction**
106:21
**instructions**
105:8
**insurance** 20:7
**intercompany**
24:1 50:22
80:2
**interested**
123:14
**interfere** 5:22
**interior** 7:1
10:24 11:3
**internal** 116:21
**interoffice** 50:25
51:4
**interpret** 109:1
**interrogatory**
118:17
**interview** 17:22
18:3
**interviewed**
17:18,25
**interviews** 17:24
**intimidating**

104:15
**introduction** 8:1
**involve** 72:20
**involved** 58:23
**involving** 71:3
**Irwin** 74:18
**Island** 59:17
**issue** 53:3
109:11 120:7
**issues** 23:21 96:8
99:24

_____

**J**
**Jim** 16:13 74:19
79:3,5
**Jo** 2:8
**job** 14:15,17
15:4 16:14
18:10,12 34:2
49:6 60:15
62:10,23 63:3
64:22,24 66:18
72:22 97:3
101:19
**jobs** 11:15 12:9
12:24 15:1
34:3 63:11,16
76:7,12
**Joe** 10:5
**Jones** 66:21,24
67:1,24 68:3,6
106:15
**jtatarko@dw...**
2:12
**JUDGE** 1:5
**July** 123:17
**June** 17:7 19:10
62:1 108:17

_____

**K**
**k.dupont** 3:10
3:12,15,16
83:3 88:7 94:4
101:25
**keep** 13:5 14:15

15:6 33:25
35:8,25 37:6
69:7
**keeping** 8:8
29:12
**Kelsey** 27:16
28:18 42:18
44:20 51:18
64:9
**Kelsey's** 27:17
**Kentucky** 10:7
**kept** 34:15 45:18
47:4 80:20
85:13,14
116:22
**kind** 43:25 62:7
67:9 68:9 73:1
86:23 111:5
118:5,7
**kitchen** 63:14
65:10 67:5,15
73:7 118:4
**kitchens** 62:12
73:10
**knew** 35:5 38:20
53:5 54:4
**know** 8:18 13:21
18:16 19:4
25:16 27:25
29:20 33:7
34:13,24 35:16
36:4 41:22
42:10,13,23
43:6 51:9
56:15 68:3
77:12 79:8,20
79:24 81:20,23
81:23 83:12
84:10 85:20
86:22 89:3
91:13 93:17
98:10 104:13
111:10 114:24
117:17,18,21
118:6,7,17

5/22/2017                                          Kristine A. DuPont

120:15 122:3
**knowing** 105:18
**knowledge** 38:8
  44:11 53:1
  65:2 75:3
**known** 53:20,24
  55:1 103:17,20
**Konitsky** 1:11
  123:5,23
**krissydupont0...**
  102:8
**Kristine** 1:4,10
  3:4 4:1,7,10
  10:19,22 11:14
  12:1 13:1,13
  14:12,16 15:1
  15:7,12 16:17
  16:24 58:11
  62:9 73:4
  122:13

————————
          **L**
**L** 2:2
**L.P.A** 2:9
**label** 74:13
**laid** 74:6
**Lake** 123:3
**Lakewood** 58:15
**laptop** 59:3,4
  60:20,23,24
**large** 59:13
**lasted** 35:11
  72:7,17
**late** 12:6
**Law** 2:2
**lawful** 4:1
**laws** 27:7 33:23
**lawsuit** 4:15
  83:8
**layers** 99:2
**laying** 104:16
**layouts** 10:3
**Lazzaro** 2:2
**leaders** 100:6
**leadership** 22:13

25:24 104:6
  114:15,22
**leading** 53:24
**learn** 17:8
**learned** 23:20
**leave** 49:22 51:9
  69:10 70:16
  101:4 114:13
  114:17
**leaving** 49:3,11
  69:19
**left** 25:23 32:10
  44:12 47:18
  48:5,15 109:2
  114:5 115:11
**let's** 6:11 10:14
  10:15 11:17
  13:2 17:3
  25:25 35:9
  36:1 78:20
  82:24 88:3,20
  92:6 115:18
  119:16
**letter** 20:21
  105:11
**levels** 6:24 7:20
  7:20
**liaison** 66:1
**licenses** 9:13,13
**life** 20:7
**light** 11:5
**lighting** 9:17,20
  9:24 10:1,2,5
  16:3
**limited** 120:21
**line** 20:16 90:16
**lineage** 90:21
**list** 15:1 87:15
  93:19
**little** 4:18 6:6
  15:15 23:9
  78:11 87:14
  89:18 104:15
  115:1
**Litts** 62:12

**lived** 47:1
**LLC** 2:2 10:20
**loads** 10:2
**located** 62:13
**location** 10:25
  34:4,23 38:11
  63:23,25 64:11
  85:10
**log** 16:4
**logistics** 101:1
**logs** 16:4
**long** 6:4,20 7:23
  8:5,17,20 12:1
  12:4 24:24
  25:6 27:20
  35:11 36:5
  55:9 62:15
  63:19 71:15,17
  71:19 72:11
  74:22 75:15
  86:24,24 118:7
**longer** 71:18
**look** 13:8 19:1
  20:17 47:8
  56:14 66:24
  71:12 76:15
  77:15,16 91:8
  96:24 98:7,9
  102:20 106:3
**looked** 87:11
  118:5
**looking** 19:13
  76:5 77:13
  81:18 92:25
  95:16 99:4
**looks** 89:13 90:7
  91:11 98:6
**lot** 25:24 34:1
  76:17 104:6
  105:12,22
**love** 87:24
**Lynn** 1:11 123:5
  123:23

————————
          **M**

**mail** 24:1 50:22
  50:25 51:4
**main** 45:12
**maintain** 15:6
**maintained**
  49:17
**majority** 64:2
  65:22 69:25
  75:23 76:14
**making** 18:16
  65:13,17
  102:15 104:14
**man** 35:7 59:6
**management**
  95:15
**manager** 20:13
  25:18 28:12,14
  28:16 42:17
  64:23
**managers** 32:23
  95:17
**manned** 103:19
**marathon** 5:13
**March** 115:25
**Marge** 31:24
  32:4
**Margie** 17:20
**Marjorie** 18:12
  25:18,19,25
  26:4 28:12,14
  29:7,16 30:3,3
  30:9,24 32:13
  33:9 43:21
**mark** 18:18
  82:25 88:3
  92:6 101:22
  113:6 115:18
**marked** 3:7
  18:22 19:1
  83:3 88:7
  92:11 94:5
  102:1 108:14
  113:10 115:21
**materials** 65:12
  65:17 72:21

76:3
**matter** 14:7
  121:18
**matters** 17:5
**mean** 14:16
  41:16 62:23
  85:19 107:4
  108:22 115:8
  119:3
**meaning** 113:1
**means** 123:9
**meant** 115:7,7
**measure** 34:2
  65:11 71:4
**medication** 5:23
**meet** 16:3,10
  69:8 97:5,12
  106:7,9
**meeting** 62:4
  117:22 118:1,4
**meetings** 70:14
**members** 44:1,2
**memo** 40:24
  50:22 86:2
**Memorial** 93:7
**memory** 5:24
**men** 86:13
**mentioned**
  43:12 51:18
  52:4 91:22
  96:4
**message** 41:25
  42:2
**messages** 110:3
  110:10 113:25
**met** 18:2 62:3
  110:17
**Milan** 6:13
**mileage** 82:21
  82:22 84:25
  85:5,7,11,16
  85:17 87:2,3
  118:11
**miles** 85:9
**mind** 75:11

mine 89:18
  90:13,14,16,17
  90:18,20,22
minute 14:14
minutes 47:1
  114:11 116:13
mixed 110:2,9
  113:25
moment 29:4
Monday 1:16
  45:24 46:14
  47:6,20 48:8
  48:14,23 49:23
  50:2,3,5 52:5,7
  52:11,25 56:14
  57:7 70:19
  72:9 73:17
  89:25 91:5,12
  93:2,7 94:15
  98:11,18 99:12
  100:2,21
  101:12,15
  108:17,20,21
  108:24,25
  109:9,21
  112:18,22,25
Mondays 46:11
  47:9 53:5
  73:22 85:15
  96:23 98:15
  99:7,18,22
  100:5,15,18
  101:3
month 25:5,8,9
  26:1 27:22,23
months 63:1
  64:4 72:12,17
  73:18 75:1
  115:12
morning 108:24
  109:22
mornings
  108:20
multiple 3:13,21
  92:10 115:21

**N**

N 3:2,2,6
name 4:9,11
  10:18 27:17
  36:6,8 44:14
  80:7 85:10
  89:2 90:4
  118:3
name's 89:10
naturally 9:4
nature 85:6
  86:17
necessarily 23:4
  37:22 38:12
  39:24 49:5,13
  53:11 110:22
necessary 58:22
need 5:12 47:3
  77:15 81:10
  84:11 95:17
  96:5 97:21
  106:7 107:17
  108:20 112:16
  112:19 116:6
needed 13:19
  59:4 65:15
  67:19,20 97:16
  97:18 100:6,15
  101:5 102:14
  108:6,8 109:1
  111:9,11 118:8
needing 95:23
needs 8:10 66:24
  66:25 67:22
  69:10,22 97:17
  106:9 107:21
never 24:22
  31:18 32:20
  50:10 51:11
  60:2,2,4 69:24
  94:23 97:23
  103:9 106:3
  109:9
new 8:12 66:22
  67:24

night 96:6
  106:10,10
  117:23
nine 20:17 52:9
  57:8 68:14
nineties 12:7
nod 4:22
non-showroom
  70:1
non-working
  85:1
nonactive 73:14
Nope 73:16
normal 5:1
  89:21 97:18
  103:4
North 10:10
NORTHERN
  1:3
Notary 1:12
  123:5,23
notation 90:17
  91:13
notations 91:20
note 49:23 88:23
  89:18 90:13
notes 47:3 88:17
  88:22
notice 1:16
  123:12
NUGENT 1:5
number 29:17
  78:2 79:15
  81:8 83:13,17
  84:11,12,15
  90:22,23 92:19
  102:5 118:3,13
  120:22
numbers 87:3
  121:21

**O**

oaths 123:6
object 121:4
objection 98:25

99:20 105:4
  119:9
objections
  103:25
obtain 6:17 7:2
  7:5,15
obviously 29:2
  71:5
occasion 16:16
  39:12
occasional 20:25
occasionally
  17:4 40:9
  41:18 117:9
occasions 21:6,9
  41:6 44:25
  51:6,7,16
  76:25 77:4,9
  78:5,6 89:24
occurred 94:9
off-hour 29:15
off-site 34:1
offer 3:8 15:18
  15:19 18:13,21
  19:3,5 24:14
  50:5 104:11
offered 7:7 10:4
  10:8 18:9,12
  104:12
offers 8:23,24
  18:16
office 10:25 11:6
  46:7 47:18
  48:5,16 59:3
  59:24 60:8
  61:20 79:8
  99:11 109:3
  114:8 122:4
  123:17
offices 1:13
Oh 12:10 55:11
  75:9
Ohio 1:3,13,15
  1:21 2:4,10 6:3
  123:3,6,17,23

123:24
OK 94:16 98:2
  98:18 99:13
  100:3,21
  101:13 104:3
  112:19
okay 6:2 11:9
  12:21 13:10
  14:23 15:12
  16:5,12,21
  19:18 20:9,15
  21:17,19,22,24
  23:23 24:2,5
  24:15 25:22
  27:1 29:11
  30:13,23 33:6
  33:20 34:17
  36:3 37:8
  40:20 42:3
  45:8 50:11
  51:23 53:17,22
  53:23 54:21,22
  55:18 56:2
  57:9,11 59:1
  60:13,16,25
  61:2 62:23
  65:1 70:9 72:2
  72:24 78:16
  80:14,17 82:6
  82:19 83:21
  84:1,3 86:5
  88:20 89:16
  90:3,6 91:9,15
  91:22 92:5
  94:11,24 95:4
  96:8,9,22 97:1
  97:15 98:20
  100:20 101:21
  104:4 106:1
  107:22 108:4
  111:3 113:5
  118:17 121:23
old 85:3
on-call 72:9
once 49:20 56:3

5/22/2017                                    Kristine A. DuPont

Page 134

71:20 119:10
120:15
**one-and-a-half**
22:23 23:19
110:18
**ones** 20:24 71:17
72:7 80:22
81:1 85:14,15
88:13
**ongoing** 26:10
42:11
**online** 8:23 9:1
17:10,12,13
**open** 49:8 65:7
66:3 69:7
119:2
**operation** 69:20
**opportunity**
4:14 17:8 46:8
119:6 120:18
121:9
**opposed** 4:22
96:2
**order** 34:12
39:10 53:15
81:10
**ordered** 65:18
122:3
**organization** 7:7
**original** 89:17
90:8,14,15,20
**OT** 93:3,18,24
98:11 108:20
**outline** 19:17
**outlined** 19:20
20:21
**Outlook** 61:3
**outside** 12:18
16:9 34:10
54:17 70:7,15
70:18,21 73:24
74:2,24 75:5
75:22,23 76:9
76:14 80:5,12
80:22 81:1

82:23 85:14,21
86:1 94:19
95:7,9,19 96:2
96:15 97:10,18
97:22 105:16
106:23 107:24
108:8
**overseeing**
113:24
**overtime** 21:1,7
21:13 22:22
23:18,21 24:12
24:16,19 25:12
25:17,21 26:5
26:8,17,19,25
27:8,18 28:7
28:19,21 29:8
30:6,8,17 31:2
31:5,9,12,15
31:18,21,23
32:14,22 33:2
33:4,11 37:10
37:21 39:3,6
39:14,18,20,22
39:24 40:8
41:25 42:4,9
44:18,22 45:2
45:9,15 48:1
48:18 52:8
57:24 76:22
77:6,7,25 78:1
78:9,10,11
79:11,13,15
83:13,17,19
84:4 87:4
88:22 92:23,23
98:4,23 99:5,6
99:6,18,24
100:9 104:14
107:21 108:19
108:23 109:2,8
109:10,18
110:4,7,10,14
110:18 111:9
111:23,25

112:3,4,7,8,16
112:17,23,25
113:19 114:1
114:14,25
115:2,3 116:5
118:13
**ownership** 24:3

_____
**P**
**p.m** 93:4 116:1
122:7
**package** 58:24
**page** 3:3 5:5
19:8 88:14,15
88:18,19,20,24
88:25 89:6,7
89:17 90:7,12
90:15,19,25
91:10,16,18
92:2 94:10
120:12
**paid** 7:17,19
13:19 20:17
22:1,2,10,22
23:19 24:19
25:11,15,16,21
26:7,11 27:5,9
28:19,22 29:10
29:18 30:5
32:21,23 33:2
33:12,16 36:19
36:21 37:21
38:12,16 39:20
39:22,23 44:7
44:22 45:2
46:21,22 63:21
63:22 76:22
77:6,19 78:10
78:18 79:13
82:22 83:14,18
84:25 98:21
110:11,18
114:14,16,25
**paint** 73:12
**Pajewski** 7:9,10

**pallets** 74:11,15
**paper** 23:14
82:3,4 110:20
115:9
**papers** 119:21
**paperwork**
21:20 37:20
38:9 78:6
**parentheses**
90:9
**Parma** 62:14
**part** 11:13 14:3
16:7,9 23:12
34:2 46:2
48:25 88:21
90:19 114:23
115:13
**partially** 118:12
**particular** 66:18
100:18 102:12
118:15
**particularly**
11:8 83:11
101:10 103:15
**parties** 123:13
**parts** 64:19
74:15 75:13
86:14
**Patrick** 28:21,23
44:15,16,18
51:19 64:21
**Patrick's** 64:24
**pay** 3:10 7:18
13:18,20,22
37:10 48:8,25
78:3,11 79:16
83:3,9,23,24
89:14 90:13
112:3,7,15
115:2,2
**paycheck** 40:1
83:19
**paychecks** 45:4
77:17 83:23,24
**paying** 30:4

51:21 52:1
**payroll** 45:19,22
45:24 46:5
53:1,4,6,25
55:13 56:9
93:3 99:24
108:21,25
109:8 113:14
**payrolls** 56:12
**pending** 5:15
**Pennsylvania**
7:6
**people** 3:13,21
17:23,25 18:2
18:5,11,15
31:22 33:3
34:18,19 42:25
43:3,3,22
45:12 51:20
65:18 66:11
69:4 74:9
76:17 80:9
86:8,18 92:11
92:20 93:18,19
96:5,6 97:4
100:12 105:18
106:6,23
107:11,23
108:18 111:4
114:16 115:21
116:2
**people's** 117:13
**percent** 113:21
**percentage**
118:16
**perform** 68:17
121:14
**period** 25:6 48:8
48:25 53:7,25
62:18 72:15
89:3 90:13
**periodic** 8:20
**periods** 31:25
32:1,2 76:21
78:3 79:12,16

5/22/2017

Kristine A. DuPont

79:24
**permission**
107:18
**person** 9:5 26:22
28:24 40:15,17
40:20 50:1,14
67:7 101:7
103:19 106:9
113:24 116:24
**personal** 60:23
102:10,13
**phone** 21:25
22:9 23:6 39:7
39:11,13 40:16
40:19 41:8
59:23 60:17,19
114:6,10 118:3
**pick** 65:24 67:24
**picked** 27:2 73:9
**piece** 82:3
110:20
**pin** 115:5
**pinpoint** 25:1
**Pittsburgh** 7:6
**place** 59:16
70:14 72:23
123:12
**Plaintiff** 1:5 2:6
**plan** 87:22
**please** 4:9 5:11
41:14 49:23
93:3 94:15
98:11,17 99:12
100:2,20 103:2
**plumber** 16:13
66:1,7 67:23
73:1 74:19
**plumber's** 74:14
**plumbers** 65:24
74:5
**plumbers'** 75:13
**plumbing** 1:7
4:12 12:13,14
12:16,18 14:8
14:11,21 15:3

15:14,17,18,19
15:21 16:1,2,7
16:7,19 17:1,6
17:9 19:6
26:16 58:17
61:8,9,24 62:9
62:11 63:12
66:15 67:2
72:21 73:7,11
73:14 74:2,6
74:24 79:6
95:15
**Plumbing's**
96:17
**plus** 11:21 63:22
**point** 18:12
23:25 28:1
29:19 41:13
45:7,19 49:9
50:24,24 52:4
93:13 95:5,15
106:12 109:24
110:6,8 111:21
113:18 121:10
**policy** 20:7
39:14,16 43:25
44:6 94:23
97:8,23 102:20
102:25 103:9
104:17,18
105:3,6 106:17
107:12,14,16
**Pompeii** 76:13
**position** 31:20
42:16,19 110:5
114:21
**positive** 115:17
**possession** 84:14
85:5
**possible** 40:18
81:6,6
**possibly** 10:9
15:5 29:3
32:11 40:14
76:4

**post** 35:2,4
**powers** 24:4
117:5
**practice** 60:5
**pre-approval**
103:14
**present** 2:14
41:2
**presented**
115:25
**pressed** 78:12
**pretty** 42:14
70:2 71:14
115:14
**preventing** 48:4
**previous** 78:8
111:8
**previously** 83:10
96:10 98:23
100:17,23
101:14 110:24
**printouts** 82:9
82:11,14,15
**prior** 28:6 38:24
38:25 48:18
63:5,6 83:8
94:8,16,20
95:9 98:2,18
99:13,19,21
100:2,21
101:12 104:3,4
104:21 106:4
111:10 112:19
**privy** 117:12
**probably** 9:22
18:14 22:6
70:22 71:20,22
72:5 73:23
75:18 109:22
111:18 118:19
**problem** 44:3
50:18
**procedure** 4:4
108:5
**process** 26:12,15

35:20 44:21
50:10 65:12
66:13,16 87:13
108:5
**processing** 93:2
**produce** 119:10
**produced** 23:14
79:21,22 80:15
83:8 118:20
119:21 120:6
**products** 65:9
75:18
**professional**
9:13 65:23
66:6 106:7
**professionals**
69:4 105:21
**professor** 10:6
**program** 7:1,13
8:17 36:7
**progress** 8:9
9:17,20,24
10:5
**project** 58:20,22
59:5,12,14,15
59:18 60:14
65:10 71:3
72:8,11,17,20
73:20,23 74:10
74:17,21,25
75:9,25 76:4
76:13 100:4,12
100:16,18
101:8 103:15
**project's** 100:25
**projects** 13:7
72:12 105:20
**proper** 25:1
**properly** 19:14
**proprietorship**
10:21
**provided** 4:3
7:17 23:23
87:12
**public** 1:12 66:3

66:4,10 69:7
123:6,23
**Puchalski** 17:20
25:19 28:12,14
29:8,17 30:9
30:24 31:24
43:21
**punch** 34:19
**purchaser's**
69:10
**purchasing**
71:10
**purpose** 4:2,12
**purposes** 18:22
83:4 88:8
92:11 94:5
102:1 108:14
113:10 115:22
121:17
**pursuant** 1:16
123:12
**put** 13:2 14:25
35:12,14 59:9
75:15 84:12
87:15 99:17
101:17 112:13
117:8,24
118:17,22
**putting** 25:21
66:22 75:8
76:8

---

**Q**

**qualified** 123:6
**question** 5:15,16
20:12 33:5
34:22 35:3
52:18 75:6
96:4 98:15
112:9 113:25
120:18
**questioned**
20:10 21:9,25
**questioning** 39:5
104:8 121:4

**questions** 4:21
5:6,10 15:24
30:22 33:1
38:21 65:15
74:6 77:19
105:20 115:5
116:20 119:3
120:24
**Quinton** 28:21
28:23 30:10
44:13,17 51:19
64:20,24 86:19
**Quinton's** 44:14
**quit** 62:17
**quite** 68:18,19
81:6
**quote** 42:15
57:10 60:11,14
75:16 76:1
**quotes** 59:9 75:8
75:10
**quoting** 33:24
58:21 75:19
76:8

**R**
**R** 123:1
**raised** 77:19
94:24 112:9
**ran** 45:24 48:8
**ranges** 11:17
**rate** 22:22,25
**Rathburn** 18:6
**rattling** 30:14
**reaction** 98:3
100:8,11
111:10
**read** 19:3 44:16
109:22 122:1
**really** 26:14 27:5
60:11 69:9
109:19 115:8
119:8
**Realtime** 1:12
**reason** 97:22

**recall** 7:3 8:18
13:9 14:14
17:18 18:4,8,9
19:15 20:7,14
21:18 22:25
25:7 26:14
29:4,5 36:8
37:1 39:9
40:14,17 41:6
41:22 43:20
45:11 47:24
48:7 50:20
55:22 62:7,16
62:18,22 63:18
76:7,15,18
77:9,11,17
90:3 109:21,25
**receive** 38:2
94:20
**received** 14:7
18:13 19:6
40:24 57:4
83:23 99:19
**receiving** 24:12
**recollection** 8:3
9:22 14:10
20:4,16 22:5
39:4 41:5
45:23 56:25
**recommend**
34:3 68:7
**recommended**
65:8
**reconstruct**
79:23 118:13
**reconstructed**
120:16
**reconstruction**
118:23 119:4
**reconvene**
120:17
**record** 4:9 58:6
58:9 78:21,24
79:1 116:17
119:23 120:2

123:10
**recorded** 85:17
**recordkeeping**
34:18
**records** 13:5
14:4,20 15:6,6
15:9 25:2 76:6
77:21 79:21,22
80:14 83:16
84:11,14 85:5
85:7 87:1,7,10
115:15 116:22
118:11,12,21
119:10 120:5
120:13 121:16
**recreate** 87:25
**redoing** 67:5
**reduced** 123:9
**referenced**
112:12
**referral** 72:13
**referrals** 66:10
**referred** 44:23
84:10
**reflect** 19:14,21
78:2 82:21
**reflected** 13:13
79:14 81:2,21
118:14
**reflection** 115:2
**reflects** 83:12
**regarding** 20:12
29:8 42:8
44:18 99:23
100:4 108:19
111:17 113:14
113:25 116:25
**Regardless**
48:10
**regular** 60:4
68:11 70:6,15
70:18 75:21
76:9 78:18
80:22 84:6
86:11 95:7

96:2,3,16 97:9
97:22 107:24
108:8 117:9
**regularly** 42:6
94:19 95:21
**reiterate** 115:7
**relate** 47:17
120:5,24
**related** 42:22
58:12 120:25
**relation** 37:24
**relative** 123:13
123:14
**relatively** 63:3
79:17
**remember** 60:10
**remind** 5:2
**Remington** 6:15
**remodel** 66:14
71:4
**remodeler** 68:2
71:4
**remodeling** 67:7
**remote** 58:19
**remotely** 47:2
59:8,19 60:3
60:10
**repeat** 5:7
**rephrase** 5:7
99:1 103:2
**replaced** 61:13
**report** 28:4,9,11
32:18 35:21
36:18 49:1
51:15 102:23
**reporter** 1:12
4:20
**Reporters** 1:20
**reporting** 1:20
52:2 123:23
**reports** 48:14
85:12 108:20
108:23 109:2,8
110:4 116:6
**reproduce**

120:21
**request** 32:15
52:15 74:14,14
96:18
**requested** 21:20
31:21,22 52:13
52:20 110:11
**requesting**
32:25 93:24
98:23
**requests** 30:17
31:1,5,9,13,16
31:18 45:9,15
113:15,20
**require** 99:21
**required** 101:1
107:20
**research** 75:1
**resided** 6:4
**residential** 11:4
11:5
**resolve** 121:18
**respect** 13:12
15:7 22:12
31:4,8 33:9
37:9 42:18
54:3 75:4
79:11 87:1,9
89:20 110:23
120:22 121:15
**respond** 30:21
56:13 109:17
109:24
**responded** 17:15
33:21 56:19,21
56:23 93:9,14
98:12 105:11
**response** 3:16
22:7,9 43:5,16
57:19 92:20
98:16,20,22
99:16 101:11
102:1,6 107:5
107:7
**responses** 22:8

5/22/2017                                                    Kristine A. DuPont

29:20 52:6
118:19
**responsibilities**
65:5
**responsibility**
117:16
**responsible**
51:20,25
**rest** 65:22 91:20
**Restaurants**
11:8
**restroom** 5:17
**resubmit** 120:12
**resume** 17:14
**retaliatory**
106:24,25
**retrieved** 82:10
**returns** 13:12,14
**review** 122:5
**reviewed** 83:10
**reviewing** 45:3
65:12 74:9
**reviews** 33:7
**Rey-Barreau**
10:6
**Ric** 4:11 92:14
**Richard** 2:8
**right** 11:11
14:22 20:2
22:19,24 23:15
26:24 34:4
45:21 63:18
65:13 66:8
67:3 74:12
75:14 90:22
92:25 104:9,25
117:7,11 121:2
**right-hand**
90:11
**RMR** 123:5
**Road** 1:21
123:24
**rock** 46:18
**Rockefeller** 2:3
**role** 31:20

104:23
**rooms** 11:8
74:13
**rselby@dwor...**
2:11
**Rule** 123:15
**rules** 4:3,17
105:9

___

## S

**S** 3:2,2
**salaried** 42:11
43:3,22 44:10
**salary** 19:25
20:8 23:22
33:23 42:23,25
43:13 111:5
**sale** 65:14,14
**sales** 22:18,21
23:12,14
**Sandy** 74:18
**Saturday** 45:20
45:25 46:1
47:19 48:6,9
48:12,16,19,21
48:24 52:8,11
52:25 53:3,5
53:10,19,23
54:3,5,20,25
55:8 57:8
68:15 85:19
89:22 109:3
112:23 116:8
**Saturday's**
48:25
**Saturdays** 54:10
54:12 85:17
86:3
**saw** 81:19
**saying** 32:17
33:21 37:2
46:3 53:18
56:11 81:4
104:3 105:11
117:4

**says** 37:21 94:15
104:2 107:20
108:23 112:18
116:8
**scanned** 50:20
**schedule** 3:11
45:20 46:11
48:11 52:7,9
52:13,19,20,23
55:21 57:5,6
57:18 68:22,23
69:14,16,21,24
88:7 89:21
95:6,18 96:11
96:18,23 97:21
102:21 103:4
107:13,23
112:19,21
117:17,18
**scheduled** 69:15
70:19,20 94:19
95:21 96:19
**schedules** 38:1
**scheduling** 96:1
96:12,15 117:8
**school** 6:8,12,13
6:16
**Schultz** 28:13
30:10 31:4,24
44:5,6 47:14
114:5
**scratched** 89:15
**screen** 80:2
**seal** 123:17
**second** 5:4 19:8
29:6 32:7
63:18
**secondary** 86:12
**see** 4:19 77:17
80:9 91:8 96:5
96:7 97:8,10
97:10,13,18
105:19 106:15
111:18,25
117:15 120:9

**seeing** 20:7,18
97:2 102:16
106:22
**seek** 97:20
**seeking** 79:11
**seen** 88:11,13,16
88:18,19,21
**Selby** 2:8 3:5 4:8
4:11 18:18,25
58:1,8,10
78:20 79:1,2
82:24 83:6
88:3,10 92:6
92:15,16 94:7
101:22 102:4
108:16 113:6
113:12 115:18
115:24 116:11
116:19 118:25
119:14,19,24
120:4 121:2,6
121:19,23,25
**seldom** 27:1
**selections** 65:25
67:1
**sell** 75:14
**selling** 66:1
**seminars** 9:5
**send** 57:13
59:22 60:7
67:10 116:9
**sending** 60:12
65:24 93:17
99:17 100:1,8
111:19
**sense** 78:17
111:14 114:24
**sent** 17:14 30:18
48:23,24 56:11
60:2,8 68:2
86:2 93:1
94:13 99:16,25
100:10 105:11
109:21,23
**separate** 14:6,17

15:22 16:21
**service** 65:16
107:19
**services** 1:20
16:9 123:23
**set** 10:20 20:1
58:20 59:12
83:9 105:9
118:6 123:16
**setting** 38:9
**seven** 72:17
73:18
**share** 121:17
**shared** 27:19
36:9
**sheet** 51:13 82:3
90:2,5 92:24
93:9,15 98:12
98:14,22 99:5
99:6,6,17,25
107:6,7
**sheets** 47:22
77:24 78:2
79:13 80:14
82:21
**Sherwin-Willi...**
68:5
**short** 62:4 69:18
86:4
**short-term** 63:3
63:12
**shortly** 25:23
**shots** 80:2
**show** 13:6 36:11
39:25 67:1
80:4,12 83:16
84:19,22,25
102:16,18
119:13
**showed** 27:18
80:3,7 98:14
115:6
**shower** 66:22,25
**showing** 77:1
**shown** 26:18

92:17
**showroom** 3:18
3:19 34:8,10
49:7 50:1,2
52:22 59:6,7,7
64:2,11,12
65:6 66:17
67:9 68:5,13
68:24 69:7,10
69:11,15,17,19
69:23,24 70:6
70:7,15,18
73:12 75:21,24
80:8,22,23
81:1 85:14,20
85:22,25 86:1
86:6,8,15,20
93:21 94:20
95:7,19,21,24
96:3,13,20
97:9,14,17
101:4,7 103:18
103:19 105:17
107:11,23,24
108:9,13,18
109:13 113:9
114:9,22,24
116:2
**showrooms**
25:18 54:11
**shows** 29:14
**shrug** 4:23
**shut** 49:17
**sic** 7:9
**sick** 84:7 91:3,10
91:11
**side** 90:11
100:14
**sides** 88:17
**sidetracked** 17:5
61:23
**sign** 103:9
**signature** 19:8
122:9
**signed** 19:10

110:15
**similar** 44:19
**single** 50:1 95:24
101:6 103:19
**sink** 71:7
**sir** 19:12 61:19
82:18 83:11
**sit** 69:12 71:7
**site** 64:18 74:5
**sitting** 58:3
106:13
**situation** 38:19
86:6
**six** 74:25 110:21
**size** 100:16
101:1 103:17
**Sizemore** 27:18
28:18 42:18
51:18 64:9
**sizes** 16:4
**slow** 11:18,20,22
88:20
**smaller** 68:2
**Smearman** 18:7
18:15 21:16
29:2 44:9
**Smearman's**
37:17
**smoothly** 4:18
**software** 7:11
8:8,11 36:7
58:24 59:8,19
60:24 61:14
**software's** 8:9
8:14
**sold** 76:2
**Sole** 10:21
**somebody** 37:14
37:14 51:9
97:21 104:14
111:2
**somebody's**
66:13 69:13
70:5,24 71:24
**someone's** 71:2

**soon** 55:9
**sorry** 21:16
55:24 65:2
77:20 81:15
84:7 95:3
**sort** 37:25 61:23
66:17 74:13
76:8 87:12
105:2 120:15
**sounds** 119:5
**source** 13:1
**South** 10:9
**space** 68:7
**spanned** 7:24
**speak** 5:11 84:5
86:25 91:7
111:2,4
**special** 102:23
**specialized** 6:9
6:22
**specialty** 8:13
**specific** 26:9
31:1,5,9 32:14
33:15 56:12
58:11,24 59:12
70:10 81:23
87:19 119:5
120:19,25
121:7
**specifically**
15:11 29:6
33:4,10 40:18
54:19 71:5
93:24 95:10
97:2 118:18
**spelled** 37:25
107:17
**spend** 73:20
**spending** 74:23
**spent** 75:20,22
**spoke** 8:4 28:12
28:13,21 30:9
39:6 42:3
110:19
**spoken** 42:5

**Sporadically**
76:24
**spread** 43:25
**SS** 123:3
**staff** 44:1,2 65:6
93:21 95:23
107:3
**staffed** 63:25
69:18 95:24
**staffing** 64:7
65:16 86:4
97:17 114:24
**start** 7:25 10:15
45:8 62:21
66:17 67:12
104:6 111:19
111:23,25
113:18
**started** 4:16
24:9,19 25:23
39:5 60:23
72:16,17 87:12
87:13 115:1
**state** 1:13 4:9
123:3,6,23
**stated** 22:21
104:20 110:17
110:19,21
**statement** 13:25
82:13
**statements**
13:22 29:9
84:25
**states** 1:2 24:16
**stating** 21:14
**status** 109:20
**stay** 4:24
**stayed** 49:7
61:20
**staying** 8:24
**stenotypy** 123:9
**stink** 46:9
**stipulations** 1:17
123:12
**stop** 29:11 97:2

105:19
**store** 35:6,7
40:24 54:7,10
**straight** 66:20
**Street** 1:14 2:9
**Strike** 65:20
**strongly** 107:1
**structure** 19:25
20:3,19 37:20
110:16
**stub** 83:19
**stuff** 46:8 74:11
77:18 90:10
111:8 116:25
**submit** 26:13,15
26:18 27:2
28:7 37:4 45:6
45:14 48:15,20
76:25 95:8
113:19
**submitted** 31:12
31:15,18 33:8
45:1 48:5
49:12 77:5,24
91:24 93:15
116:6
**submitting**
29:16 32:24
33:4,15 45:8
98:22 110:25
113:19
**subsequently**
39:9
**substance** 26:6,7
**suite** 1:15 2:10
**summer** 63:8
**Sunday** 52:11
53:19 56:15
70:20
**Sundays** 53:13
73:21 85:16
**sunset** 59:16,16
**Superior** 2:3
**supervisor** 32:4
32:9 104:5

supervisors
  31:24
supplied 61:14
  74:8 84:24
Supply 1:7
  63:13
supporting
  121:21
suppose 47:6
  54:9
supposed 26:5
  26:13,20 96:13
  96:19 107:12
  107:18 109:7
  113:15
sure 5:4,9,11
  14:22,24 17:17
  22:14 49:23
  51:10 53:9
  65:13,17 71:5
  71:9 84:4 89:2
  99:3 109:18,19
  113:1 115:14
  116:14 117:5
  121:6
sworn 4:4 123:8
system 25:3
  47:10 50:19
  51:1,7,13 56:9
  58:25 60:11
  82:8,14,17
  116:22,25
systematically
  30:19

T

T 3:2,6 123:1,1
T-i-f-f-i-n 6:3
table 18:3
take 4:14 5:12
  5:16,17 13:15
  13:17 19:11
  58:1 60:21
  61:15 75:15
  81:25 109:5

114:22 116:13
118:21 123:7
taken 1:10
  123:11
talk 6:11 17:3
  22:14 25:25
  43:17 47:8,12
  97:20 119:16
talked 39:2
  40:25 47:13,13
  91:23 114:6,10
  116:21
talking 32:2
  67:12 92:1
  101:8 112:11
tasks 68:17
Tatarko 2:8
  92:14
taught 10:5
tax 13:12,14
  14:3
taxes 13:18
Taylor 20:13
  28:15 31:8,13
  31:16,19 42:4
  43:4 51:18
  62:3 64:20
Taylor's 64:22
tell 22:7 26:9
  27:21 30:2
  39:15 40:4,7
  47:15 50:8,23
  51:8,12,17
  56:2,8 57:3
  64:4 76:16
  95:25 96:5,6
  101:13 108:4
  110:13 121:12
telling 23:12
  92:22 102:24
  103:3 105:1
  110:3
tells 103:10
ten 9:23 73:24
  74:1,23

terms 19:14,17
  19:21 20:20
  56:3
testify 123:8
testimony 91:23
  123:9,11
theory 10:1 51:4
thing 5:14 16:10
  23:5 24:8 74:7
  83:20 99:10
  108:21,25
  118:5
things 4:17,23
  15:16,17,19,20
  22:15 24:4
  34:3 36:24
  41:23,24 50:21
  67:13 70:12,25
  71:8,9 73:12
  74:8 85:6
  105:2 117:8
  120:10
think 8:3 17:16
  23:25 24:7
  43:20 52:5
  57:5 63:7 76:6
  77:17 79:7,10
  79:17 89:1
  96:8 105:6
  109:7 114:10
  116:11,20
thinking 67:4
third 88:18,20
thought 54:10
  85:24
three 6:24 7:20
  7:22 22:5
  34:25 35:17,22
  35:23 40:19
  63:20 68:20
  70:22 71:17,22
  71:25 72:4,6
  73:21 89:7
  115:12
three-and-a-h...

71:17
Thursday 54:22
  55:1
Tiffin 6:3
tile 73:10 74:9,9
till 54:14
time 8:2 12:11
  12:19,24 13:5
  13:7 14:20
  15:2 16:20
  20:21 23:13,25
  25:7,17,19
  27:6,24 28:13
  31:25 32:1,1
  34:18 36:2
  37:13 38:3,25
  39:2,10,21
  40:11,11,14,23
  43:24 45:14
  46:3,21,25
  48:4,5,14,15
  49:12 51:13,15
  53:3 55:18
  57:17 58:16
  59:23 60:10
  62:18 63:25
  64:2 70:4
  71:24 72:15
  75:20,22,25
  76:21 77:23
  79:24 80:14
  86:24 88:22
  89:3,18 90:9
  91:1,2,13 93:9
  93:15 94:24
  98:12,13,22
  99:17,25,25
  106:12 107:5,7
  107:25 109:2,5
  110:17 114:19
  118:2,2 120:16
  123:11
timelines 75:1
times 16:21 22:3
  26:25 27:1

32:24 39:22
  40:7 46:10
  47:21 49:16,18
  49:19 53:19
  56:2,4,12 60:7
  68:20 70:6,23
  77:18,24 84:11
  85:7 90:4
  96:18
title 22:14
titles 86:25
today 4:13 5:23
  5:25 93:4
  118:10 119:8
  121:25
toilet 67:25
told 20:10 21:6
  21:10,11 24:11
  25:10 26:23
  30:11 36:17,19
  36:21 37:4,6
  37:10,11 39:23
  40:2 41:16,24
  42:8 45:8,10
  46:17 50:10,11
  50:13 51:11
  55:12,15,24
  57:23 62:6
  67:2 78:16
  85:21 93:13
  94:18 95:8,10
  95:11 96:7,10
  97:3,5 100:5
  101:2 103:13
  105:23 106:3,4
  110:4,6 112:8
Tom 7:9,10
  66:22,23
tomorrow
  106:15
top 13:8 76:18
  76:20 89:10
  90:4 94:10
total 78:2
totally 15:22

5/22/2017

Kristine A. DuPont

Page 140

| | | | | |
|---|---|---|---|---|
| **tough** 47:9 | **Tuesday** 45:20 | 69:14 71:16 | **upper** 89:5 | **walk-in** 66:4 |
| **tour** 67:10 | 48:11 52:10,25 | 72:1 117:25 | 117:4 | 69:1 75:24 |
| **track** 27:8 29:12 | 68:14 89:21 | _____ | **upset** 27:5 100:9 | **want** 5:4,7,9 6:6 |
| 33:25 35:25 | 90:1 94:13 | **U** | 104:14,16 | 23:9 27:10 |
| 37:6 78:9 | 99:10 | **uhm-hum** 4:23 | **use** 28:3 36:15 | 32:19 46:9,18 |
| **tracked** 39:24 | **turn** 28:6 37:12 | 38:5 74:3 93:5 | **usually** 43:17 | 52:19 56:18 |
| **Tracy** 18:6,14 | 37:18 46:4,8 | 94:14,17 95:1 | 71:3 | 61:22 69:5 |
| 21:16 27:6 | 46:15,25 47:2 | 102:9 103:5 | | 71:22 89:20 |
| 29:2 32:17,20 | 47:4,22 51:7 | **ultimately** 76:1 | **V** | 96:5,6 97:4,6 |
| 32:25 33:1,14 | 51:24 55:17,19 | **unable** 25:1 | **vacation** 46:6 | 99:2 103:3 |
| 37:7,17 39:7 | 57:24 78:17 | 51:15 | 84:7 | 105:1 110:5 |
| 40:13 44:9 | 93:18,24 97:4 | **uncomfortable** | **vague** 26:23 | 111:25 112:3 |
| **Tracy's** 44:11 | 99:5 109:1,4,8 | 38:20 78:12 | 60:6 | 119:6,11 121:6 |
| **train** 8:14 | 110:3 111:3,6 | **understand** 5:6 | **varied** 67:17 | 121:20 |
| **training** 6:9,22 | 111:7,13,13 | 13:20 18:4 | **varies** 8:22 | **wanted** 8:14 |
| 6:23,24,25 7:2 | 114:20 | 24:17 30:1,7 | 11:15 | 52:24 71:10,11 |
| 7:5,8,15,17,23 | **turned** 45:23 | 32:19 34:22 | **verbal** 30:16,17 | 75:14 |
| 7:25 8:2,5,7,12 | 46:20 49:24 | 43:1,12 44:20 | 31:2,6,10 56:6 | **wants** 67:24 |
| 8:16,17 9:4 | 53:4,9 54:5 | 49:2 52:17 | 56:7 57:1,12 | **wasn't** 13:1 22:1 |
| 103:13 | 55:4,13 56:10 | 53:14,18 67:16 | 57:16,20 | 28:19 39:5,24 |
| **transactions** | 77:18 78:5 | 70:11 82:5 | **verbally** 4:22 | 46:7 49:25 |
| 118:15 | 79:13 92:23 | 103:12 108:22 | 18:11 21:25 | 51:12 60:4,11 |
| **transcribed** | 98:13 99:5,9 | 120:7 121:9,19 | 28:9 40:19 | 70:10 73:14 |
| 123:10 | 106:18 107:8 | 121:20 | 56:20,21 57:3 | 98:20 103:3 |
| **transcribing** | 111:9,16 112:1 | **understanding** | 101:13 112:8 | 104:5,18 |
| 4:20 | **turning** 57:22 | 108:4 | **verify** 30:18 | 105:23 106:17 |
| **transfer** 24:1 | 107:5 109:18 | **understood** | 71:7 74:12 | 107:17 112:15 |
| **travel** 85:8 | **twice** 49:21 | 107:11 | 76:5 79:19 | **water** 5:19 |
| **tried** 37:13 | **two** 7:4 12:24 | **undertaken** 85:8 | 96:24 115:15 | **Waters** 1:20 |
| 66:12 87:2 | 15:23,24 47:22 | **Unfortunately** | **versus** 74:7 | 123:23 |
| 105:18,24 | 47:24 48:7 | 85:9 | **view** 95:16 | **way** 13:2 26:18 |
| **truck** 74:11 | 89:7 96:8,21 | **UNITED** 1:2 | **viewed** 81:18 | 26:20 27:8 |
| **true** 38:11 58:16 | 98:14 99:7 | **University** 10:7 | **visit** 37:19 | 28:6 32:18 |
| 123:10 | 100:6,10 | **unlock** 54:8 | **visits** 80:13 | 33:24 34:11 |
| **truth** 123:8,8,8 | **two-fold** 66:9 | **unquote** 57:10 | **voiced** 114:12 | 36:4 37:6 51:2 |
| **try** 4:23 11:17 | **type** 10:22 11:3 | **unrelated** 16:25 | **vs-** 1:6 | 57:21 67:10 |
| 35:8 47:10 | 14:11 15:9,12 | **untouched** | | 78:9 101:5 |
| 79:23 87:25 | 15:16 24:8 | 91:17 | **W** | 107:1 |
| 97:13 102:21 | 52:3 60:20 | **updated** 49:18 | **W** 2:3,9 3:2 | **we'll** 10:15 52:6 |
| 103:18 106:2 | **typewriting** | 61:14 | **W-2** 13:20,25 | 57:11 103:7 |
| **trying** 29:25 | 123:10 | **updates** 8:12,20 | 14:7 | 111:6 120:11 |
| 30:6,19 32:22 | **typical** 11:19,22 | 8:21 | **Wait** 53:16 | 120:12,20 |
| 69:9 70:11 | 20:25 71:21 | **upgraded** 8:11 | **Waived** 122:9 | **we're** 17:3 66:22 |
| 101:19 105:13 | 73:19 | **upgrades** 8:7,15 | **walk** 66:13,16 | 101:8 120:8 |
| 113:3,3 | **typically** 12:17 | **upkeep** 117:14 | 67:4 | **we've** 104:4 |

5/22/2017                                                         Kristine A. DuPont

Page 141

| | | | | |
|---|---|---|---|---|
| 120:4 | whatsoever | 73:21 75:4,10 | 42:23 49:23 | **Yacht** 63:8,9 |
| **wealth** 93:20 | 55:25 | 75:11 76:9 | 60:10 62:8 | **yeah** 9:3 17:13 |
| **Wednesday** 48:2 | **WHEREOF** | 79:3 80:12 | 65:7 67:6,22 | 19:24 41:15 |
| 48:2 | 123:16 | 85:23 88:7,23 | 67:23 68:1 | 55:11 63:17 |
| **week** 11:13,18 | **wholesale** 76:4 | 91:5 92:3 | 81:8 82:23 | 71:14,14 75:7 |
| 11:19,19,20,21 | **wholesaler** | 94:15,18 95:18 | 84:16,20,23 | 75:9 87:20 |
| 11:22,23 12:17 | 65:22 | 95:20 96:2 | 100:18 101:15 | 102:11 108:3 |
| 20:25 21:2 | **willing** 52:22 | 98:17 99:12,22 | 112:24 | 111:18 118:16 |
| 24:13,24,25 | **Willoughby** | 100:2,20 | **workload** 11:15 | **year** 6:21 23:17 |
| 25:5 26:2,3 | 1:21 123:24 | 101:12 102:21 | **works** 112:22 | 24:7 25:5 |
| 28:4 46:21 | **Wilson** 16:13 | 103:4 104:2 | **world** 117:15 | 27:22 38:6,23 |
| 47:23 48:2,22 | 74:19 79:3,5 | 106:23 107:20 | **worth** 75:18 | 49:20 115:14 |
| 52:9 55:6 62:1 | **win** 109:5 | 110:23 111:12 | 76:3 | **year-and-a-half** |
| 68:21 69:20 | **winter** 72:18 | 112:4,17,18,20 | **wouldn't** 13:25 | 6:5 |
| 70:13 71:20 | **witness** 123:7,11 | 112:21 114:17 | 35:16 46:15,25 | **yearly** 22:17 |
| 73:19,24 74:24 | 123:16 | 116:8 | 51:1 53:20 | 23:14 |
| 87:13,19 91:4 | **Wolff** 63:13,19 | **worked** 12:11 | 85:11,19 | **years** 6:16 7:4 |
| 93:9 98:12 | **wondering** 58:3 | 21:3,5 24:12 | **write** 100:21 | 7:24 8:4 9:23 |
| 99:25 118:6 | **Wood** 1:21 | 24:20,24,25 | 117:12 | 12:3 62:24 |
| 119:16 | 123:24 | 25:6,9 28:24 | **write-offs** 13:17 | 63:20 |
| **week's** 46:2 | **word** 26:23 | 28:25 29:17 | 14:6 | |
| **week-to-week** | **wording** 23:1 | 30:3 33:11,16 | **writer** 7:11 | **Z** |
| 11:16 | **words** 7:16 | 33:22 34:1,10 | **writing** 23:11,23 | **zero** 111:14 |
| **weekend** 93:3,7 | 24:18 26:9 | 38:3 39:21 | 56:5,19,24 | |
| 99:11 | 56:4 57:25 | 42:7 45:15 | 89:17 90:8,16 | **0** |
| **weekends** 49:18 | 62:7 91:5 97:7 | 48:1,11,18 | 101:14 112:13 | |
| **weekly** 48:7 | **work** 3:11 10:15 | 50:2,5 53:5,13 | 112:13 123:9 | **1** |
| **weeks** 12:25 | 10:17,22,25 | 53:19,25 54:4 | **written** 18:13 | **1** 3:8 18:19,21 |
| 47:22,25 48:8 | 11:2,6 12:1,25 | 54:4,11,20 | 19:5 23:3 | 19:2 89:14 |
| 81:9 98:14 | 13:6 15:12,25 | 55:1 59:19 | 31:12 37:24 | 93:4 |
| **went** 10:9 23:18 | 16:17,19,23 | 63:6,6,7,23 | 77:1,5 88:25 | **1/22/15** 89:13 |
| 25:13 35:13,13 | 20:25 22:11,20 | 64:1 72:8,25 | 89:1 91:19 | **1:00** 46:1 54:13 |
| 35:16 50:21,23 | 25:5 26:2 | 76:16,21 77:2 | 100:24 105:5 | 85:17 |
| 71:24 72:13 | 27:15 36:16 | 77:25 78:3,18 | 110:21 | **1:16CV2363** 1:6 |
| 74:25 86:9,15 | 39:24 46:10 | 79:15,25 84:13 | **wrote** 50:21 | **1:50** 122:7 |
| **weren't** 32:13 | 47:1,10 50:3 | 86:20 89:25 | 91:10 98:17 | **10:05** 1:15 |
| 36:14 37:4,18 | 52:7,8,19,23 | 105:21 110:17 | 99:11 | **10:53** 93:1 |
| 40:8 41:17 | 52:24 53:20 | 120:23 | | **101** 3:16 |
| 44:4 46:17 | 56:14 57:7 | **working** 11:11 | **X** | **108** 3:17 |
| 50:8 54:10 | 58:22 60:18,22 | 11:13 12:5,16 | **X** 3:2,6,6 29:17 | **113** 3:19 |
| 55:12,15 57:23 | 61:16 62:3,15 | 12:17 13:16 | 90:10 97:22 | **115** 3:20 |
| 59:24 69:14 | 63:19 67:11,20 | 14:11 15:3,8 | **Xing** 90:13 | **12/10** 91:18 |
| 96:11,19 111:1 | 68:13 69:6,22 | 22:12 26:11 | **XYZ** 67:2 | **12:35** 116:1 |
| **west** 1:14 100:14 | 70:20,21 71:10 | 28:22 29:10,13 | | **130,000** 76:3 |
| **whatnot** 66:7 | 73:2,4,8,11,14 | 30:6,8 33:19 | **Y** | **135** 1:15 2:10 |
| | | | | **1468** 1:14 2:9 |

**18** 3:8
**1st** 108:21

---
**2**

**2** 3:10 82:25
  83:2 92:2
**2000** 8:1 12:7
**2000s** 63:14
**2011** 62:19
**2012** 62:19,19
**2013** 62:19,19
**2014** 17:7 19:2
  19:11
**2015** 37:21 38:9
  92:18 94:10
  108:17 110:16
  112:10 113:13
  115:6,12,14,16
**2016** 116:1
**2017** 1:16
  123:17
**2020** 6:24,25
  7:11,12 8:1
  123:24
**216** 2:4,11
**22** 1:16
**22nd** 19:2 92:18
  93:1,6
**269-198022** 1:22
**26th** 94:10,13
**28(D)** 123:15

---
**3**

**3** 3:11 88:4,6
**3/29** 90:19
**3/4/16** 3:20
  115:20
**3:00** 91:12
**30** 11:20
**31st** 113:13
**327** 6:3
**38385** 1:21
  123:24
**3rd** 19:11

---
**4**

**4** 3:5,13 92:7,9
  92:17 98:8
**4/16** 90:15,25
  91:10
**4/2** 89:17 90:7
  90:12,17
**40** 11:20,24
  20:25 24:13,20
  24:25 25:10
  26:2 29:17
  38:4 47:1
  52:10 112:22
  112:24
**440** 1:22
**44094** 1:21
  123:24
**44113** 2:4,10
**45** 114:11
**4th** 116:1

---
**5**

**5** 3:14 89:7
  90:16 94:3
  102:5
**5/22/14** 3:9
  18:22
**5/22/15** 3:13
  92:10
**5/23** 93:10 98:13
  100:1
**5/26/15** 3:14
  94:4
**5/28/15** 91:16
**5:30** 35:9 69:6
  106:15
**50** 11:24
**50/50** 85:25

---
**6**

**6** 3:16 69:6
  101:24
**6/8/15** 3:17
  108:13
**60** 11:21 75:18
**614** 2:3

**696-5000** 2:4

---
**7**

**7** 3:17 108:12
**7:00** 117:22
**70** 75:18

---
**8**

**8** 3:19 90:16
  113:8 123:24
**8/31/15** 3:19
  113:9
**8:00** 91:12
**8:30** 36:1,2
**8:37** 109:21
**8:45** 99:10
**83** 3:10
**861-4211** 2:11
**88** 3:11
**8th** 108:17
  123:17

---
**9**

**9** 3:20 115:20
**92** 3:13
**920** 2:3
**94** 3:14
**9th** 1:14 2:9

# <u>Transcript of the Testimony of</u>

# Kristine A. DuPont

_____

**Date:** July 14, 2017

**Case:** Kristine DuPont v. Active Plumbing Supply Co.

**Waters Reporting Services**
**(440) 269-1980**
lk@watersreporting.com

Page 124

```
        IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF OHIO - EASTERN DIVISION
KRISTINE DuPONT,
          Plaintiff,
                              JUDGE NUGENT
     -vs-                     CASE NO. 1:16CV2363
                              VOLUME II

ACTIVE PLUMBING SUPPLY CO.,

          Defendant.
              - - - -

     Continued Deposition of KRISTINE A. DuPONT,
taken as if upon cross-examination before
Lynn A. Konitsky, a Certified Realtime Reporter
and Notary Public within and for the State of
Ohio, at the offices of Chastity L. Christy,
Esq., 920 Rockefeller Building, 614 W. Superior
Avenue, Cleveland, Ohio, at 10:55 a.m. on Friday,
July 14, 2017, pursuant to notice and/or
stipulations of counsel, on behalf of the
Defendant in this cause.
              - - - -
          WATERS REPORTING SERVICES
              Court Reporters
              38385 Wood Road
            Willoughby, Ohio 44094
              (440) 269-198022
```

Page 125

```
1 APPEARANCES:
2     Chastity L. Christy, Esq.
      The Lazzaro Law Firm, LLC
3     920 Rockefeller Building
      614 W. Superior Avenue
4     Cleveland, Ohio  44113
      (216) 696-5000,
5     chastity@lazzarolawfirm.com
6
          On behalf of the Plaintiff;
7
8     Richard Selby, Esq.
      Jo A. Tatarko, Esq.
9     Dworken & Bernstein Co., L.P.A.
      1468 W. 9th Street
10    Suite 135
      Cleveland, Ohio  44113
11    (216) 861-4211,
      rselby@dworkenlaw.com
12    jtatarko@dworkenlaw.com
13
          On behalf of the Defendant.
14
ALSO PRESENT:
15    Cynthia Barber
16
17
18
19
20
21
22
23
24
25
```

Page 126

```
1
2          W I T N E S S   I N D E X
3                                      PAGE
4  CROSS-EXAMINATION
   KRISTINE A. DuPont
5  BY MR. SELBY                        127
6
           E X H I B I T   I N D E X
7
   EXHIBIT                          MARKED
8
   Defendant's Exhibit 10            128
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 127

```
1        KRISTINE A. DuPont, of lawful age, called by
2   the Defendant for the purpose of
3   cross-examination, as provided by the Rules of
4   Civil Procedure, being by me first duly sworn, as
5   hereinafter certified, deposed and said as
6   follows:
7        CROSS-EXAMINATION OF KRISTINE A. DuPont
8   BY MR. SELBY:
9   Q. Ms. DuPont, we are here for the continuation of
10     your deposition that we had done a couple months
11     ago.  I will remind you, you are still under
12     oath.
13        The same instructions that I gave you before,
14     yes or no, or verbal responses and if you have
15     any questions or you're not sure what I'm asking,
16     please make sure and I'll clarify.
17        Again, there's no medical problem,
18     medications, anything else that would interfere
19     with your ability to give a deposition today,
20     correct?
21  A. No.
22            MR. SELBY:  Let's mark -- I think
23        we're at Defendant's Exhibit 10.
24            MS. CHRISTY:  Are you going to use
25        any of the previous ones?
```

1 (Pages 124 to 127)

Page 128

1    MR. SELBY:  I might.  I'm going to
2  look back at them.  I may.  If I do --
3    MS. CHRISTY:  Give me a heads-up
4  and I'll go get them.
5    MR. SELBY:  Okay.
6    - - - -
7    (Thereupon, Defendant's Exhibit 10
8  was marked for purposes of identification.)
9    - - - -
10  BY MR. SELBY:
11  Q.  So, Ms. DuPont, when we ended your deposition the
12    last time the understanding you were going to
13    go back and go through all of the records that
14    had been provided so far to be able to recreate,
15    as best as you could, the hours that you believed
16    that you had worked that you had not been
17    compensated for.  Correct?
18  A.  Yes.
19  Q.  Okay.  And I believe Exhibit 10 is the result of
20    those efforts on your behalf?
21  A.  It's the result of the mileage charts that I had
22    available to me and the daily planner.
23  Q.  Okay.  Can you go through and just describe for
24    me the process that you went through in putting
25    this together, how did you do this, and then I'll

Page 129

1    probably have a few questions on some of the
2    things in here.  But if you could explain to me
3    how you put this together.
4  A.  I looked at the daily planner that was expanded
5    with more detailed information and the
6    appointments that were listed on there, and
7    included those in here and I also went through my
8    mileage reimbursement paper that I had -- I
9    didn't have every one -- but the ones that I had,
10    which showed appointments on completely closed
11    days, Sundays, Mondays, and things like that.
12    Both of those articles supplied me with
13    appointment information that I put this together
14    with, listed by day, so it would be easy to read.
15  Q.  Okay.  As I look at some of these -- on most of
16    these, you have a category that is listed as the
17    Reason.  I take it that's the appointment and so
18    forth, like whoever's house you were going to,
19    the name of the ultimate customer, that type of
20    thing.
21  A.  Yeah.  When it was listed on those items, I
22    transferred it to this column, so there was some
23    type of relationship.
24  Q.  Okay.  Now, how about the ones that were blank?
25  A.  The blank -- there were some days on the daily

Page 130

1    planner that could not be expanded, therefore,
2    the time that I had on the planner was there, but
3    the detail of it was not.
4  Q.  Okay.
5  A.  There were times, on the daily planner, where I
6    had come in early to get things prepared for
7    something, they didn't necessarily involve me
8    traveling to a house off site, they were just
9    hours in the showroom preparing for a meeting or
10    that day, sometimes coming in early would help me
11    keep up.
12  Q.  How did you determine how long -- and I assume
13    most of these are visits where you had some
14    appointment outside of the showroom?
15  A.  Correct.
16  Q.  Okay.  How did you determine, with respect to
17    these, how long you were at the particular site
18    or the visit?
19  A.  On some of the planner entries, the actual hours,
20    I kind of adjusted to remind myself.
21    Recollections, a lot of it just based on what the
22    appointment was and recalling, oddly enough, when
23    you do -- when you go through this, you start
24    remembering, like, that visit was a long one and
25    I remember what we went over.

Page 131

1    So 90 percent of it is based on the planner
2    and the mileage, obviously supplemented
3    appointments that I didn't have on it; if I've
4    answered you correctly.
5  Q.  And maybe, you know, this might help.
6    MR. SELBY:  It might help if you
7    go grab the exhibits because I think I know
8    what she's talking about, but I want to
9    make sure we're on the same page.
10    MS. CHRISTY:  Okay.
11  Q.  So I'm looking at Plaintiff's Exhibit 28 which is
12    the planner and I'll just start with the first
13    one because it's the easiest.
14    So I'm looking here at 6/28 and that lists
15    that as a Saturday.  The hours, this would have
16    shown -- you're saying that you worked from 9 to
17    3:30?
18  A.  That's correct.
19  Q.  And this was a Saturday.  So your normal hours
20    would have been 9 to 1?
21  A.  That's correct.
22  Q.  And you were going to this house visit and so
23    this lasted till 3:30.  There's 2.5 hours.
24    When I look at the expanded schedule, I see
25    1:45, Andreadelporte, site visit and measure.  So

2 (Pages 128 to 131)

## Page 132

1  this would have been -- and I'll show you -- this
2  would have been one where you would have just
3  estimated knowing how long it took you to drive
4  there and where it was, how long it would have
5  taken to get it done?
6  A. I actually remember this particular lady.
7       Yes. The 1:45 appointment was made because
8  the showroom closed at 1.
9  Q. Okay.
10 A. Her location was in Sandusky which was proximal
11  to where I lived.
12 Q. Okay.
13 A. So I just took it at the 3:30 when we concluded
14  our appointment because I was done for the day,
15  instead of driving back to Active.
16 Q. So when you would do these off-site visits and
17  you're calculating the amount of overtime, would
18  you include, as part of -- for example, if this
19  appointment was at 1:45, you were including the
20  travel time from Active Plumbing to wherever you
21  were going?
22 A. That's correct.
23 Q. When the appointment was over, were you including
24  any travel time after the appointment or would
25  have this just been, like, 3:30's when the

## Page 133

1  appointment is over, then you went home?
2  A. That's typically how I kept track. I didn't
3  charge for hours spent for me to go home --
4  Q. Okay.
5  A. -- because you go home at the end of the day.
6  Q. Did you ever have any off-site appointments that
7  resulted in overtime where you would have gone
8  back to Active Plumbing?
9  A. I can't recall in detail, but that would not have
10  been abnormal in some cases, if the appointment
11  were located in an area by Active and I needed to
12  go back and possibly drop off samples before I
13  went to my home.
14 Q. Were there any circumstances, you can remember in
15  putting this together, where you included any
16  travel time going back to Active?
17 A. I can't answer that, I don't recall specifically.
18 Q. So I'm looking at the entry here for 7/12/14 and
19  this shows that you worked from 7 till 1,
20  correct?
21 A. Correct.
22 Q. So that would have been two hours early?
23 A. Correct.
24 Q. Was that two hours in the shop or at --
25 A. It would have been at the shop.

## Page 134

1  Q. Okay. And I'm looking here at the entry, you
2  would have gotten that because, as I'm looking at
3  this here, this would be the 7/12 entry, you had
4  written over here 7 to 1?
5  A. Uhm-hum.
6  Q. So that would have indicated to you that you had
7  worked from 7 to 1?
8  A. Yes.
9  Q. I know that we had discussed during your first
10  deposition that at the time you were working for
11  Active Plumbing, you were still doing the
12  occasional side job in your own personal design
13  business for things that were unrelated to Active
14  Plumbing business, correct?
15 A. Yes.
16 Q. Did you ever put any of those appointments on
17  this planner, just so you'd know that you had
18  them planned?
19 A. No.
20 Q. So none of those -- none of the things that
21  showed up on this planner would have been related
22  to your personal business and the work that you
23  were doing there, correct?
24 A. Not related to my personal business.
25 Q. Okay. These would have all been -- everything

## Page 135

1  that shows up on this list, would have been an
2  Active Plumbing project?
3  A. Yes.
4  Q. Okay. Did all of these result in an actual job
5  or were there occasions where you would go out,
6  do the measurements, put together a bid and then
7  people would end up not buying anything?
8  A. These are not a hundred percent materialized
9  projects. A very, very, very large portion of
10  them are.
11 Q. Okay. As far as identifying these -- and I want
12  to make sure I understand things right, and I
13  want to sort of categorize some of these
14  customers differently.
15      There would be some customers who were just,
16  you know, the homeowner who walked in off the
17  street who wanted to buy something to put in
18  their bathroom or their kitchen or so forth,
19  where they would buy things directly from Active
20  Plumbing, correct?
21 A. Correct.
22 Q. There would also be situations where a contractor
23  was hired to do a bathroom or kitchen remodel for
24  a customer, and they were a contractor who would
25  buy their materials or would work through Active

Page 136

1  Plumbing.  So there were also jobs that you would
2  get through those contractor customers of Active
3  Plumbing?
4  A.  Correct.
5  Q.  When you would list, you know, the reason out
6  here, were you listing who might ultimately be
7  the customer or were you listing the house you
8  would go to?
9  A.  The project I was going to.
10 Q.  Okay.  So if, you know, Acme Contracting hired
11 you to do something at the Jones house, you would
12 probably list this as, like the Jones visit?
13 A.  Correct.
14 Q.  But the internal records of Active Plumbing would
15 probably show a bill going to Acme Contracting,
16 as opposed to the Joneses?
17 A.  If that's the way the contractor had it set up.
18 Q.  There were some times where the contractors would
19 have the homeowners billed directly?
20 A.  There were times, yes.
21 Q.  And some times that would just go through the
22 contractor and then they'd rebill it?
23 A.  Yes.
24 Q.  So the names on this list aren't necessarily
25 going to coincide with necessarily an invoice?

Page 137

1  A.  In some cases that's correct.
2  Q.  And, obviously, in situations where they ended up
3  not buying anything, there wouldn't be an
4  invoice?
5  A.  That is correct.  We did institute some fees for
6  kitchen design work when nothing was purchased.
7  Q.  Okay.
8  A.  Because that was a necessary thing to control
9  people from trying to get free design work --
10 Q.  Right.
11 A.  -- so that was helpful.
12 Q.  When you put together, you know, a proposal or a
13 bid to go out to somebody and they ended up not
14 buying it, what did you do with those?  How were
15 those maintained?  Was there a separate file?
16 Did you hold on to those, did you throw them
17 away, how did that work?
18 A.  They typically were all kept in Active's system.
19 Q.  Okay.
20 A.  I think it's called eclipse or E-term.
21    So you would create it and then if the client
22 came in -- whoever it is -- and you would show
23 them their total of their parts or whatever they
24 were buying and then at that point in time, they
25 would make a deposit or whatever their

Page 138

1  transaction would be.
2     So if it was not purchased that day, there
3  would be some follow-up to see if there was still
4  interest in them purchasing it and then I'm not
5  quite sure how bids were cleared out of the
6  system, I don't recall what that process was.
7  Q.  What were your normal hours on Tuesday through
8  Friday?
9  A.  8 to 5.
10 Q.  Okay.  Without a lunch or with a lunch?
11 A.  Correct, without.
12 Q.  Did you ever take lunch?
13 A.  No.  Not go out and have lunch.  I would eat
14 through my lunch at my desk.
15 Q.  So looking back at the exhibits that we had
16 talked about last time, it looks like, from your
17 pay records, the first time that you turned in
18 any overtime would have been in connection with
19 the August 7th pay date, which it looks like it's
20 this pay sheet.
21    So I'm looking down here, that would have
22 been -- there were a number of entries here in
23 the first, sort of month-and-a-half or two months
24 that you worked there, where you hadn't turned in
25 any overtime.

Page 139

1     Do you recall what prompted you to turn in
2  overtime in connection with that August 7th, 2014
3  payroll whereas you hadn't turned it in for some
4  of these earlier June and July dates?
5  A.  To the best of my recollection there had been
6  discussions about whether I was available, or
7  able to receive overtime pay.
8     So at this time period, there was a very
9  large project that went on and I believe Brenda
10 Schultz was my supervisor at that time and it was
11 understood, through the customer, that I would be
12 available to basically be very, very hands-on
13 through the process of this project as it was
14 very detailed and involved with several trades
15 that were customers of Active as well as the
16 homeowner who was buying major portions of it
17 directly herself.  And that may have been that
18 week that I turned that in.
19    And to the best of my recollection, that is
20 what prompted the very first overtime.  It would
21 have been become impossible to manage that
22 project, as far as making sure everyone got the
23 materials and it was understandable to them.
24 Q.  What was that large project?
25 A.  It was The Sunset -- Our Sunset Place, I'm sorry.

4 (Pages 136 to 139)

Page 140

1    It was a bed and breakfast on Catawba Island.
2  Q.  I think that's one we had talked about at your
3    previous deposition?
4  A.  Correct.
5  Q.  Looking at this list that you had put together as
6    Defendant's Exhibit 10, which of these would have
7    related to that?
8  A.  Which appointments?
9  Q.  Yeah.
10  A.  Anything labeled as Erwin would have been
11    directly related to that project.
12  Q.  Okay.
13  A.  There would have been hours spent at suppliers,
14    as well, where it shows some times coming in
15    early.  There was a lot of work to do for that
16    project.
17    At one point I was working at home to get the
18    initial bid for the products list together and
19    was given an external way to link to our system
20    from my house.
21  Q.  Okay.
22  A.  I don't remember the name of that program, but it
23    was so large, I dedicated an entire weekend just
24    to coming up with a bid for the parts for this
25    thing.

Page 141

1    I actually had to contact Cindy, who was at a
2    baseball game for one of her grandchildren
3    because I couldn't log into Active's E-term
4    system some from my house, therefore, I would
5    have had to try to do this all through the work
6    hours and not do the bid properly and/or take
7    care of the customers in the showroom properly.
8  Q.  So when I'm looking at Defendant's Exhibit 10,
9    the overtime you have listed here, the entry for
10    7/8 -- I assume that's supposed to be 2014,
11    rather than 2011?
12  A.  Yes.
13  Q.  Erwin Catawba Island project visit.  That would
14    have been related to this one, correct?
15  A.  Correct.
16  Q.  And then as I go down, there's a -- on 7/15,
17    there's "Gorey Present Avon, Erwin Pricing."
18    Would that have been related to it?
19  A.  Correct.
20  Q.  Would any of these others on this first page have
21    been related to that?
22  A.  There are none labeled related to that.  There
23    were a lot of hours that weren't -- how do I
24    explain this correctly -- that weren't
25    appointments at the project, that were work hours

Page 142

1    for them.
2    So I took exactly how my planner was labeled
3    and my mileage sheet was labeled to formulate
4    this spreadsheet.
5  Q.  And when you came in early, you reflected that on
6    your planner, correct?
7  A.  Most of the time.
8  Q.  And I see some more on Erwin.
9    If you look at the second page, in March and
10    April of '15, it looks like there's some time --
11  A.  Correct.
12  Q.  -- through into May.
13    And would have these all been site visits out
14    to the location?
15  A.  A good portion of them.
16    On 4/20, however, there were Homeworks and
17    Erwin.  There were times where I would have to
18    meet the contractor at his office as well, in
19    Vermilion.
20    So when I listed this on the planner, it was
21    more for me to know I visited with Homeworks, I
22    visited with Erwin.  It wasn't that it was always
23    at a specific location.  Homeworks met me at the
24    project or at his office sometimes, it was very
25    large.

Page 143

1  Q.  So when you would go to the project site or when
2    you would go to the contractor's office, what
3    were you doing?
4  A.  Answering questions that they needed to be
5    answered.  It could vary on what part of the
6    process they were in.
7  Q.  What type of questions did they have for you,
8    that you were answering?  I'm not asking for any
9    specific question.
10  A.  Can you meet us out there with the plumber, we
11    wanted to make sure that the shower head
12    locations are where they're supposed to be.
13    Can you meet us out there and go through the
14    two pallets of plumbing trims and separate them,
15    by room, with us and make sure that the plumber
16    does a walk-through and understands what trims go
17    where.
18    It was always related to -- or can you meet
19    the carpenter with the kitchen prints, he wants
20    to do an on-site walk-through verbally, as far as
21    the kitchen cabinet installation would go.
22  Q.  So looking at your payroll, it looks like on
23    12/11, you turned in, or the 12/11 payroll, you
24    had $303 in overtime earnings.  Then for the
25    12/26, you didn't have any.

5 (Pages 140 to 143)

Page 144

1    The 1/8/15, you didn't have any.
2    Then the 1/22/15, you had $180.
3    And when I look back through this, that seems
4    to not coincide with, sort of hours that you have
5    in here where, you know, you have hours in
6    between those.
7    For example, you didn't turn anything in for
8    the 1/8 payroll and you have time here on 1/7 and
9    1/8.
10    And then on 1/22, you know, you have some
11    time here that you did turn in and then the next
12    one, 2/5 here, there's time after the 1/22 and
13    before the 2/5 that you're claiming here.
14    How were you deciding when to turn overtime
15    in and when not to?
16  A.  Throughout my employment I was told by several
17    different people that I was not eligible for
18    overtime and to stop keeping track of it and then
19    I would get tired of that and go back around and
20    try to turn it in.  And I was told we don't pay
21    over time, we will pay extra monies in the form
22    of bonuses when extra work is performed.
23    At times there is no overtime category on my
24    paychecks.
25    At times I was paid bonus hours for the time

Page 145

1    I painted the showroom, on my own time, and other
2    showroom activity that was to improve the square
3    footage of the showroom and that did not have
4    interactions to do with clients.
5    Also bonus hours -- or bonus monies -- on my
6    paycheck were shown for achievement goals that
7    were made, I believe, possibly by the branches.
8    A $500 bonus, at one point, on my payroll, is
9    related to a goal achievement for either the
10    company or our branch, I don't remember exactly
11    what that is.
12  Q.  Well, these sheets that you turned in, these
13    would be for where you were requesting overtime,
14    correct?
15  A.  That's correct.
16  Q.  How would you decide when you were going to turn
17    in a sheet and when you weren't going to turn in
18    a sheet?
19  A.  I would ask why I wasn't getting paid.  I would
20    be told that we don't pay overtime, therefore,
21    you would not turn it in.
22    Then I would get tired of it and I would turn
23    it in, and sometimes it would be okay, sometimes
24    the temperature of people's tempers or their
25    reactions would get very agitated, so you would

Page 146

1    back off; I needed my job.
2  Q.  Well, there were no times you ever turned in any
3    of these slips that you didn't get paid for them,
4    the time you turned in, correct?
5  A.  I can't say that for sure.
6  Q.  Okay.  Have you gone back and looked at that?
7  A.  No, I have not.
8  Q.  Do you ever remember having one of these turned
9    in and not being paid the amount that you had
10    requested?
11  A.  I could not say specifically that I researched
12    that.
13  Q.  But as we sit here --
14  A.  I know I turned in mileage that I didn't get paid
15    for.
16  Q.  But with respect to extra hours, as we sit here
17    today, do you recall any occasions where you
18    turned in extra hours and you weren't paid for
19    them?
20  A.  I do know that I questioned a deduction on my
21    paycheck, as related to the amount of time I had
22    worked that week versus what the salary amount
23    would have been.
24    I cannot say I specifically remember looking
25    at the overtime request I made and versus what

Page 147

1    was paid on the paycheck that following week.
2    It was a constant discussion.
3  Q.  And I understand it was a constant discussion,
4    what I'm asking you specifically is, do you
5    recall ever turning in one of those sheets and
6    saying, Look, I have three overtime hours and not
7    getting, for example, those three overtime hours?
8  A.  As it relates to the three overtime hours or the
9    supposed sheets, the sheets that I turned in, I
10    did not go back and check those sheets against my
11    payroll stubs.
12    But I did check pay checks that vacation time
13    was taken out, when I was actually working that
14    day, and other things.
15    But, no, I did not go back and say This sheet
16    said I had 2.5 hours of overtime and I didn't get
17    paid.
18  Q.  And I'm not asking you to identify them
19    specifically or whether you looked back at your
20    payroll slips during this case.
21    I'm asking you, do you remember an occasion
22    when -- and even if you can't specifically
23    identify it -- do you remember thinking, oh, I
24    turned in these hours and they didn't pay me for
25    them?

6 (Pages 144 to 147)

Page 148

1  A.  Yes.  I do remember at points going, I had this
2     overtime, I'm not getting paid for.
3        And I believe there may have been a couple of
4     occasions where sheets were turned in that
5     related to that.
6  Q.  Okay.  But you haven't identified which those
7     sheets are?
8  A.  That would be correct.
9  Q.  Okay.  So I'm looking back, this is Exhibit 7
10    that we had talked about at your last deposition.
11       This was an e-mail from Cindy Barber dated
12    June 8th, 2015, she had said "I will need all OT
13    reports before Monday morning.  Payroll will be
14    done first thing Monday."
15       And this was sent to all the showroom people
16    and the subject was OT.
17       So I'm looking down here and in the week
18    before that, you have listed time on 6/3 and 6/5.
19    You actually have time on this Catawba project,
20    on 6/8 and more time on 6/9 and 6/13.
21       I guess my question is: Having received this
22    e-mail, which seems to explicitly say the
23    showroom people, you know, will be paid OT if
24    they turn in these OT reports; why didn't you
25    turn in this overtime here in the early part of

Page 149

1     June around the time of these bills?
2  A.  Do you mind if I look at that?
3  Q.  Yes.  Absolutely.
4  A.  This obviously was sent out on a Monday at 8:37
5     in the morning.
6        I don't work on Mondays, so I would have
7     gotten it on Tuesday and it says Payroll will be
8     done first thing on Monday.
9  Q.  Okay.
10 A.  So it may be -- and I'm going to say "may" only
11    because -- well, the timing is, I wasn't there
12    when the e-mail went out on the Monday and the
13    payroll will be done first thing on Mondays.
14 Q.  So you would have gotten it this though, when you
15    got to work on Tuesday, though, correct?
16 A.  Yes.
17 Q.  And so let's assume you felt it was too late to
18    turn in time for the earlier; you have time
19    listed here on Exhibit 10, for 6/9 and 6/13 and
20    6/15, 6/16, 6/18, 6/19, those are all in the two
21    weeks immediately after this; why didn't you turn
22    any of that time in for the next couple of
23    payrolls?
24 A.  I can't answer that specifically why.
25       When I would ask about overtime, I was

Page 150

1     discouraged from turning it in, regardless of
2     what that e-mail says.
3  Q.  Who would have discouraged you from turning in
4     overtime?
5  A.  When we got our 2015 compensation goals setting
6     things that we had to sign, it said all overtime
7     will be paid 1.5 times an hourly rate.
8        And I questioned Bryce about it and called
9     him and the very next day, Cindy and Bryce both
10    came in and I was told that that was on there but
11    it did not necessarily apply.
12 Q.  And they both came out to --
13 A.  To Avon, the following day.
14 Q.  -- Avon, to tell you that?
15       So that would have been -- I think these had
16    been marked as Plaintiff's Exhibits 16 and 13, I
17    want to make sure we're talking about the same
18    thing.
19       This is the one for 15.  It looks like you
20    would have signed it on 2/16/15.  Is this the one
21    we're talking about?
22 A.  Yes.
23 Q.  Okay.  And then the one for 16 isn't signed or
24    dated.
25       Do you recall getting that one in 16 as well?

Page 151

1  A.  Yes, I do.
2  Q.  Was it done around the same time, in February?
3  A.  I can't say for sure, but I would assume
4     everything was done in the first quarter.
5  Q.  It would have been within a month, plus or minus,
6     of February?
7  A.  That would be a safe assumption.
8  Q.  Okay.  So you signed this on 2/16/15.  You're
9     saying sometime, was it the very next day or so
10    forth that Bryce and Cindy came in to tell you
11    that, though that's in here, they weren't
12    actually going to pay that overtime?
13 A.  I believe I received that through an intercompany
14    memo, mail system.
15       I know that when I read it, I called Bryce
16    and said, something to the effect of -- See, it
17    even says on here, overtime was paid over 40
18    hours.
19       And he was, I'll get back to you.
20       The very next day, whether it's the 17th,
21    16th or the 15th, they came to Avon and I was
22    told that, Yes, that's on there, but that does
23    not necessarily apply.
24 Q.  Okay.
25 A.  I'm exempt.

7 (Pages 148 to 151)

Page 152

1  Q.  So it would have been within a few days of this
2      2/16/15 date where you signed it?
3  A.  That's a reasonable assumption.
4  Q.  Okay.  So after they told you that, despite the
5      fact we put that in writing there, we don't
6      actually pay that; why did you continue to
7      periodically turn in requests for overtime?
8  A.  I would get to a point where I was disgusted
9      about not getting paid my overtime and I would
10     turn it in and see what happened.
11         At times I would get that some of it was
12     covered as comp. time, I still don't know what
13     that means.
14         And at times it seemed like it would go
15     through and then at times I would be told you're
16     not eligible for overtime, et cetera, et cetera.
17     Or we will change your schedule and you will work
18     Monday through Friday and Saturdays will be
19     overtime every week.
20  Q.  I'm at -- this was on Page 2 of this on 3/31/15,
21      you have "Slyder out."  S-l-y-d-e-r.
22         Do you recall what that project was?
23  A.  Yes.  It was a large remodel of a master suite,
24      bathroom specific.
25  Q.  Did you do any work through DuPont Design or was

Page 153

1      this purely an Active Plumbing project?
2  A.  Purely Active.
3  Q.  There's something listed on here, Costillo?
4  A.  Yes.
5  Q.  What was that?
6  A.  Costillo was a project for a bathroom for their
7      main family bathroom.
8  Q.  Okay.
9  A.  It was a remodel.  The homeowner was doing his
10     own labor, so they bought their products
11     directly.
12  Q.  And did you do any design work for them through
13      DuPont Design?
14  A.  After their bathroom was done, they asked me to
15     design a design for their daughter's bathroom, or
16     bedroom, as in paint colors and things like that.
17     She was special needs and she liked me and after
18     the bathroom was done, they asked if I would do
19     that.
20  Q.  Okay.  Was that while you were still working at
21      Active Plumbing or after?
22  A.  No, I was still there.
23  Q.  Do you know whether any of the appointments you
24      have listed on here related to that, as opposed
25      to the Active Plumbing?

Page 154

1  A.  Only Active Plumbing's work is on there.
2  Q.  I want to ask about a couple of these listed on
3      here.
4         On the first page, on 7/22/14, there's
5      something called the Braddock Presentation.
6         Do you recall what that was?
7  A.  I don't.
8  Q.  How about down a few, on 7/30, there's Ford,
9      Fairview Park.  Do you remember that one?
10  A.  I don't.  There were several Fords that I worked
11     with during the course of my employment there, so
12     specifically, no.
13  Q.  Then 8/9.  Patton.  I'm assuming that's Olmsted
14      Falls?
15  A.  That is Olmsted Falls, and I cannot specifically
16     give details of that.
17  Q.  That's fine.
18         Next one, Belak in Chagrin Falls.  Do you
19      remember that one?
20  A.  I do remember that one, yes.
21  Q.  What was that project?
22  A.  One of our clients -- I believe, it was
23     Mr. Rudder, possibly, asked me to come out to
24     these folks' home and look at a redesign for
25     their master bathroom suite.

Page 155

1  Q.  Okay.
2  A.  And I remember because there was some -- I was
3      curious as to why it wasn't going through one of
4      the branches closer to that location since I was
5      the most west branch and the plumber wanted it to
6      go through me and go through that branch for the
7      design.  So that's why I remember that one.
8  Q.  How about Golman?
9  A.  Yes.  I do remember that.
10  Q.  What was that one?
11  A.  I believe that was a kitchen remodel in Huron and
12     I believe -- if it's the right Golman -- that
13     Huttman, Mr. Huttman was the contractor that was
14     Active's client there.
15  Q.  Harp?
16  A.  I don't remember details of that one.
17  Q.  10/4, Phillips.
18  A.  I believe that the Phillips -- if this is the
19     right Phillips -- were looking for a design for
20     an office suite for cabinets.  I can't say that
21     100 percent.
22  Q.  Do you know whether we ever did the project with
23      them?
24  A.  I don't recall.
25  Q.  Parrish on 11/7?

8 (Pages 152 to 155)

Page 156

1  A. I don't remember details of that one.
2  Q. Klepper on 1/7.
3  A. I don't remember the details of that.
4  Q. Jones on 1/8.
5  A. I don't remember the details.
6  Q. Lucas on 1/24.
7  A. I do not remember the details.
8  Q. Prumo on 1/27.
9  A. I don't remember the details.
10  Q. Carol on 2/12.
11  A. I don't remember the details.
12  Q. Mauk on 3/9.
13  A. I do not positively remember the details of that.
14  Q. Would it have been something that was possibly
15      done through a contractor?
16  A. Most of these were.
17  Q. Okay.
18  A. Because if I had, like, the client's name slash
19      the contractor, bells would go off.
20  Q. Right.
21  A. I believe this was in Independence. I believe
22      that job did get done as well, but I can't say, I
23      can swear to it.
24  Q. Mazze. There's a couple on there.
25  A. I'm not 100 percent sure, but I believe a

Page 157

1      contractor brought this person to us and I'm not
2      sure if he did that project or not. He was newer
3      to me, so I'm not sure what happened to him.
4  Q. Do you remember who the contractor was?
5  A. Oh, I knew you were going to ask. Tom was his
6      first name, if I'm 100 percent correct on this.
7  Q. There are a couple more Mauk.
8      Did I ask you about that one?
9  A. Yeah, I'm pretty sure Rick, the plumber, that was
10      his client and it was a full bathroom redesign
11      and I'm positive that was a project in
12      Independence.
13  Q. Legleise?
14  A. Legleise?
15  Q. Yeah.
16  A. That was a walk-in client that was doing their
17      own work and it was a decent-sized kitchen
18      remodel.
19  Q. Did it get done?
20  A. Yes. And I believe it was maybe in like Lorain
21      area.
22  Q. Barranchinni.
23  A. Yes. Barranchinni I remember to be a residential
24      walk-in client that lived in the Westlake area
25      that was wanting to systematically go through the

Page 158

1      entire house, replacing flooring and whatever.
2      I don't know if that project got done. That
3      was a homeowner that came in directly, not
4      through a contractor.
5  Q. Royale?
6  A. I can't say I remember details of that one
7      specifically.
8  Q. Smelko.
9  A. Yes. That was a bathroom remodel brought in
10      through Paul Cedar Construction and that project
11      did get done.
12  Q. Smith.
13  A. Smith?
14  Q. I'm looking at 3/6.
15      No. I'm sorry, I must have the wrong date.
16      Oh, it's 8/6.
17  A. I can't tell you that I know the details of that.
18  Q. There's a couple in September and October, a
19      Stock.
20  A. Yes.
21  Q. What are those?
22  A. Mr. and Mrs. Stock was a client that lived in
23      Westlake. They did a very large scale glamour
24      bathroom. They had brought their own contractors
25      in.

Page 159

1      They came in as residential clients and I
2      sold directly to them; did their design work and
3      then met with their contractors that they brought
4      to the table and went over the plan and the
5      project process with them.
6      We sold them everything in that room.
7  Q. Byers. 11/27.
8  A. I can't say I remember the details of that.
9  Q. 12/22, Wochna.
10  A. I do not remember the details of that.
11  Q. On 12/26 it's listed as showroom.
12      Would that have been time you spent in the
13      showroom?
14  A. I'm going to assume that I was in the showroom
15      working.
16  Q. As opposed to a customer named showroom?
17  A. Correct. Yes.
18  Q. You never know.
19  A. Right.
20  Q. 1/15/16, Roxanne. I think there's another one on
21      1/13.
22  A. Yes. That was a customer that lived in Avon Lake
23      and she was somewhat of a do-it yourselfer and
24      was looking for a redesign for her master suite
25      and I believe, unfortunately, she found someone

9 (Pages 156 to 159)

---

**Page 160**

1  to make her cabinetry for her, versus buying it
2  through us. I believe she had someone come from
3  southern Ohio and make them, with the best
4  certainty, that I can say.
5  **Q. On 1/9, Bruegger.**
6  A. That was another design for -- actually Roxanne
7  and Bruegger are the same.
8       A readjustment design, I really thought this
9  lady was going to buy all her stuff, I was
10  shocked that she didn't.
11      I can't say for sure, she may have bought
12  some facets from us, I don't remember any every
13  details. That was a design, redesign, go back,
14  check measurement, redesign kind of thing.
15  **Q. On 1/18 there were four different ones listed.**
16  A. Yes.
17  **Q. Are those all four different ones or are they**
18  **related to each other?**
19  A. Those are the four locations I went to.
20  **Q. So each of these is a separate project?**
21  A. Solid Source is the distributor or a vendor of
22  ours. So I may have had to go pick up samples or
23  something, that's what I do when I go to one of
24  those.
25      Design Surfaces is a vendor of ours as well

---

**Page 161**

1  that we supply and source tile from. Sometimes I
2  actually had to go pick up client product there
3  if our guys couldn't get it.
4       Gorecki was a client and Stock was a client.
5  **Q. Right. We had talked about Stock.**
6       **1/27, Biscup. What was that?**
7  A. Yes. Biscup was a client brought to me through
8  Paul Cedar Construction.
9       She had a very large master suite, bedroom
10  and bathroom area, that she wanted redesigned.
11  And she actually wound up taking the project
12  which was a nice, nice budgeted project and I was
13  let go in the course of that, so Active contacted
14  her, refunded her money and didn't want to keep
15  on with that work.
16  **Q. 2/17, Veith.**
17  A. Veith.
18  **Q. Veith.**
19  A. The name is super familiar, but I cannot tell you
20  the details of it.
21  **Q. 3/19, Bromerly?**
22  A. The name is super familiar. Again, but I can't
23  sit here and recall exactly what I did with them
24  and where they lived and all of that stuff.
25  **Q. 4/7, Hynuiak?**

---

**Page 162**

1  A. I believe -- no, I don't. I can't say
2  specifically I remember that.
3  **Q. Next one, Weilnau. I don't even know how to --**
4  A. Weilnau.
5       These folks lived somewhere, I believe, in
6  Avon and they wanted their kitchen updated with
7  new countertops, I'm almost positive.
8       And then also after that, they had asked me
9  to look at their half bath off their entry to go
10  forward with that.
11      I was not so employed at the half bath,
12  although they had liked the project, I was let go
13  during that process.
14      But the kitchen, new quartz, I believe they
15  were quartz tops, and I believe they bought their
16  backsplash tile, too.
17      That project did go forward. That was
18  brought in by Rick Hammond, for me to go see
19  those folks.
20  **Q. How about St. Jude?**
21  A. St. Jude, we were encouraged to bring in more
22  business, builder business and obviously spread
23  our name so that we would grow, which is logical.
24      I had met the contractor, I think it's
25  Cleveland Home Builders -- I can't remember their

---

**Page 163**

1  name -- but they were building the St. Jude dream
2  home in Avon.
3       And I asked him if we could be involved in it
4  and he asked me to come out and go through the
5  place and look at what their needs were and at
6  that point, we had a shower door company -- with
7  our company -- that supplied us, that was very,
8  very, very anxious and willing to participate in
9  this charity thing and I was trying to build a
10  relationship with them, so that's the St. Jude.
11  **Q. How about McConnell?**
12  A. McConnell is a -- was a new construction project
13  brought in by, I believe, Jim Wilson, a plumber.
14      They were building a log cabin home and
15  needed complete design work for their plumbing,
16  their shower layouts, footprints, everything.
17      They did buy everything through Active. They
18  already had somebody making their cabinets, I
19  tried to get that business.
20      And then they asked me separately if I would
21  consult on things, like the size of the chinking,
22  the size of the logs that were being milled to
23  make it, lighting, paint colors and things of
24  that nature; that stuff was done outside of
25  Active.

---

10 (Pages 160 to 163)

## Page 164

1  I think McConnell wound up spending quite a
2  bit of money actually.  They were a nice customer
3  with Active.
4  MR. SELBY:  Give me a few minutes
5  with Jo and Cindy.  I think we're close.
6  - - - -
7  (Off the record.)
8  - - - -
9  MR. SELBY:  I don't have any
10  further questions.
11  MS. CHRISTY:  She'll read.
12  - - - -
13  (Deposition concluded at 12:17 p.m.)
14  (Signature Not Waived.)
15
16
17  _____
18  KRISTINE A. DuPONT
19
20
21
22
23
24
25

## Page 166

1  DEPOSITION ERRATA SHEET
2
3  Case Caption:  Kristine DuPont
4  vs. Active Plumbing Supply Co.
5
6  DECLARATION UNDER PENALTY OF PERJURY
7  I declare under penalty of perjury
8  that I have read the entire transcript of
9  my Deposition taken in the captioned matter
10  or the same has been read to me, and
11  the same is true and accurate, save and
12  except for changes and/or corrections, if
13  any, as indicated by me on the DEPOSITION
14  ERRATA SHEET hereof, with the understanding
15  that I offer these changes as if still under
16  oath.
17  Signed on the _____ day of
18  _____, 20___.
19
20
21  _____
22  KRISTINE A. DuPONT
23
24
25

## Page 165

1
C E R T I F I C A T E
2
3  The State of Ohio, )  SS:
   County of Lake.)
4
5
6  I, Lynn A. Konitsky, RMR, CRR, Notary
   Public within and for the State of Ohio, duly
7  commissioned and qualified to administer oaths
   and to take and certify depositions, do hereby
8  certify that the above-named witness was by me
   first duly sworn to testify the truth, the whole
9  truth, and nothing but the truth: that the
   testimony as above-set forth was reduced to
10  writing by me by means of stenotypy, and was
    later transcribed into typewriting under my
11  direction: that this is a true record of the
    testimony given by the witness: that said
12  deposition was taken at the aforementioned time,
    date and place, pursuant to notice or
13  stipulations of counsel.
    I further certify I am not a relative or
14  employee or attorney of any of the parties,
    or a relative or employee of such attorney
15  or financially interested in this action:
    that I am not under a contract as defined in
16  Civil Rule 28(D).
17  IN WITNESS WHEREOF, I have hereunto set my
    hand and seal of office, at Cleveland, Ohio, this
18  1st day of August, A.D. 2017.
19
20
21
22  Lynn A. Konitsky, Notary Public, State of Ohio
    Waters Reporting Services
23  38385 Wood Road, Willoughby, Ohio 44094
    My commission expires February 8, 2020
24
25

## Page 167

1  DEPOSITION ERRATA SHEET
2  Page No.____Line No.____Change to:_____
3  _____
4  Reason for change:_____
5  Page No.____Line No.____Change to:_____
6  _____
7  Reason for change:_____
8  Page No.____Line No.____Change to:_____
9  _____
10  Reason for change:_____
11  Page No.____Line No.____Change to:_____
12  _____
13  Reason for change:_____
14  Page No.____Line No.____Change to:_____
15  _____
16  Reason for change:_____
17  Page No.____Line No.____Change to:_____
18  _____
19  Reason for change:_____
20  Page No.____Line No.____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:____
25  KRISTINE A. DuPONT

Page 168

1        DEPOSITION ERRATA SHEET
2   Page No.____Line No.____Change to:_____
3   _____
4   Reason for change:_____
5   Page No.____Line No.____Change to:_____
6   _____
7   Reason for change:_____
8   Page No.____Line No.____Change to:_____
9   _____
10   Reason for change:_____
11   Page No.____Line No.____Change to:_____
12   _____
13   Reason for change:_____
14   Page No.____Line No.____Change to:_____
15   _____
16   Reason for change:_____
17   Page No.____Line No.____Change to:_____
18   _____
19   Reason for change:_____
20   Page No.____Line No.____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25      KRISTINE A. DuPONT

Kristine A. DuPont

**A**

**A.D** 165:17
**a.m** 124:17
**ability** 127:19
**able** 128:14
139:7
**abnormal**
133:10
**above-named**
165:7
**above-set** 165:9
**Absolutely**
149:3
**accurate** 166:11
**achievement**
145:6,9
**Acme** 136:10,15
**action** 165:14
**Active** 124:7
132:15,20
133:8,11,16
134:11,13
135:2,19,25
136:2,14
139:15 153:1,2
153:21,25
154:1 161:13
163:17,25
164:3 166:4
**Active's** 137:18
141:3 155:14
**activity** 145:2
**actual** 130:19
135:4
**adjusted** 130:20
**administer**
165:6
**aforementioned**
165:11
**age** 127:1
**agitated** 145:25
**ago** 127:11
**amount** 132:17
146:9,21,22
**and/or** 124:18

141:6 166:12
**Andreadelporte**
131:25
**answer** 133:17
149:24
**answered** 131:4
143:5
**answering** 143:4
143:8
**anxious** 163:8
**APPEARAN...**
125:1
**apply** 150:11
151:23
**appointment**
129:13,17
130:14,22
132:7,14,19,23
132:24 133:1
133:10
**appointments**
129:6,10 131:3
133:6 134:16
140:8 141:25
153:23
**April** 142:10
**area** 133:11
157:21,24
161:10
**articles** 129:12
**asked** 153:14,18
154:23 162:8
163:3,4,20
**asking** 127:15
143:8 147:4,18
147:21
**assume** 130:12
141:10 149:17
151:3 159:14
**assuming**
154:13
**assumption**
151:7 152:3
**attorney** 165:13
165:14

**August** 138:19
139:2 165:17
**available** 128:22
139:6,12
**Avenue** 124:17
125:3
**Avon** 141:17
150:13,14
151:21 159:22
162:6 163:2

**B**

**B** 126:6
**back** 128:2,13
132:15 133:8
133:12,16
138:15 144:3
144:19 146:1,6
147:10,15,19
148:9 151:19
160:13
**backsplash**
162:16
**Barber** 125:15
148:11
**Barranchinni**
157:22,23
**baseball** 141:2
**based** 130:21
131:1
**basically** 139:12
**bath** 162:9,11
**bathroom**
135:18,23
152:24 153:6,7
153:14,15,18
154:25 157:10
158:9,24
161:10
**bed** 140:1
**bedroom** 153:16
161:9
**behalf** 124:19
125:6,13
128:20

**Belak** 154:18
**believe** 128:19
139:9 145:7
148:3 151:13
154:22 155:11
155:12,18
156:21,21,25
157:20 159:25
160:2 162:1,5
162:14,15
163:13
**believed** 128:15
**bells** 156:19
**Bernstein** 125:9
**best** 128:15
139:5,19 160:3
**bid** 135:6 137:13
140:18,24
141:6
**bids** 138:5
**bill** 136:15
**billed** 136:19
**bills** 149:1
**Biscup** 161:6,7
**bit** 164:2
**blank** 129:24,25
**bonus** 144:25
145:5,5,8
**bonuses** 144:22
**bought** 153:10
160:11 162:15
**Braddock** 154:5
**branch** 145:10
155:5,6
**branches** 145:7
155:4
**breakfast** 140:1
**Brenda** 139:9
**bring** 162:21
**Bromerly**
161:21
**brought** 157:1
158:9,24 159:3
161:7 162:18
163:13

**Bruegger** 160:5
160:7
**Bryce** 150:8,9
151:10,15
**budgeted** 161:12
**build** 163:9
**builder** 162:22
**Builders** 162:25
**building** 124:16
125:3 163:1,14
**business** 134:13
134:14,22,24
162:22,22
163:19
**buy** 135:17,19
135:25 160:9
163:17
**buying** 135:7
137:3,14,24
139:16 160:1
**Byers** 159:7

**C**

**C** 165:1,1
**cabin** 163:14
**cabinet** 143:21
**cabinetry** 160:1
**cabinets** 155:20
163:18
**calculating**
132:17
**called** 127:1
137:20 150:8
151:15 154:5
**Caption** 166:3
**captioned** 166:9
**care** 141:7
**Carol** 156:10
**carpenter**
143:19
**case** 124:6
147:20 166:3
**cases** 133:10
137:1
**Catawba** 140:1

141:13 148:19
**categorize**
  135:13
**category** 129:16
  144:23
**cause** 124:20
**Cedar** 158:10
  161:8
**certainty** 160:4
**certified** 124:13
  127:5
**certify** 165:7,7
  165:13
**cetera** 152:16,16
**Chagrin** 154:18
**change** 152:17
  167:2,4,5,7,8
  167:10,11,13
  167:14,16,17
  167:19,20,22
  168:2,4,5,7,8
  168:10,11,13
  168:14,16,17
  168:19,20,22
**changes** 166:12
  166:15
**charge** 133:3
**charity** 163:9
**charts** 128:21
**Chastity** 124:15
  125:2
**chastity@lazz...**
  125:5
**check** 147:10,12
  160:14
**checks** 147:12
**chinking** 163:21
**Christy** 124:15
  125:2 127:24
  128:3 131:10
  164:11
**Cindy** 141:1
  148:11 150:9
  151:10 164:5
**circumstances**

133:14
**Civil** 127:4
  165:15
**claiming** 144:13
**clarify** 127:16
**cleared** 138:5
**Cleveland**
  124:17 125:4
  125:10 162:25
  165:17
**client** 137:21
  155:14 157:10
  157:16,24
  158:22 161:2,4
  161:4,7
**client's** 156:18
**clients** 145:4
  154:22 159:1
**close** 164:5
**closed** 129:10
  132:8
**closer** 155:4
**coincide** 136:25
  144:4
**colors** 153:16
  163:23
**column** 129:22
**come** 130:6
  154:23 160:2
  163:4
**coming** 130:10
  140:14,24
**commission**
  165:23
**commissioned**
  165:6
**comp** 152:12
**company** 145:10
  163:6,7
**compensated**
  128:17
**compensation**
  150:5
**complete** 163:15
**completely**

129:10
**concluded**
  132:13 164:13
**connection**
  138:18 139:2
**constant** 147:2,3
**construction**
  158:10 161:8
  163:12
**consult** 163:21
**contact** 141:1
**contacted**
  161:13
**continuation**
  127:9
**continue** 152:6
**Continued**
  124:11
**contract** 165:15
**Contracting**
  136:10,15
**contractor**
  135:22,24
  136:2,17,22
  142:18 155:13
  156:15,19
  157:1,4 158:4
  162:24
**contractor's**
  143:2
**contractors**
  136:18 158:24
  159:3
**control** 137:8
**correct** 127:20
  128:17 130:15
  131:18,21
  132:22 133:20
  133:21,23
  134:14,23
  135:20,21
  136:4,13 137:1
  137:5 138:11
  140:4 141:14
  141:15,19

142:6,11
  145:14,15
  146:4 148:8
  149:15 157:6
  159:17
**corrections**
  166:12
**correctly** 131:4
  141:24
**Costillo** 153:3,6
**counsel** 124:19
  165:12
**countertops**
  162:7
**County** 165:3
**couple** 127:10
  148:3 149:22
  154:2 156:24
  157:7 158:18
**course** 154:11
  161:13
**Court** 124:2,22
**covered** 152:12
**create** 137:21
**cross-examina...**
  124:12 126:4
  127:3,7
**CRR** 165:5
**curious** 155:3
**customer** 129:19
  135:24 136:7
  139:11 159:16
  159:22 164:2
**customers**
  135:14,15
  136:2 139:15
  141:7
**Cynthia** 125:15

———————————
        **D**
———————————
**D** 126:2,6
**daily** 128:22
  129:4,25 130:5
**date** 138:19
  152:2 158:15

165:12 167:24
  168:24
**dated** 148:11
  150:24
**dates** 139:4
**daughter's**
  153:15
**day** 129:14
  130:10 132:14
  133:5 138:2
  147:14 150:9
  150:13 151:9
  151:20 165:17
  166:17
**days** 129:11,25
  152:1
**decent-sized**
  157:17
**decide** 145:16
**deciding** 144:14
**DECLARATI...**
  166:6
**declare** 166:7
**dedicated**
  140:23
**deduction**
  146:20
**Defendant** 124:8
  124:20 125:13
  127:2
**Defendant's**
  126:8 127:23
  128:7 140:6
  141:8
**defined** 165:15
**deposed** 127:5
**deposit** 137:25
**deposition**
  124:11 127:10
  127:19 128:11
  134:10 140:3
  140:10 164:13
  165:11 166:1,9
  166:13 167:1
  168:1

depositions 165:7
describe 128:23
design 134:12
 137:6,9 152:25
 153:12,13,15
 153:15 155:7
 155:19 159:2
 160:6,8,13,25
 163:15
desk 138:14
despite 152:4
detail 130:3
 133:9
detailed 129:5
 139:14
details 154:16
 155:16 156:1,3
 156:5,7,9,11
 156:13 158:6
 158:17 159:8
 159:10 160:13
 161:20
determine
 130:12,16
different 144:17
 160:15,17
differently
 135:14
direction 165:10
directly 135:19
 136:19 139:17
 140:11 153:11
 158:3 159:2
discouraged
 150:1,3
discussed 134:9
discussion 147:2
 147:3
discussions
 139:6
disgusted 152:8
distributor
 160:21
DISTRICT

124:2,3
DIVISION
 124:3
do-it 159:23
doing 134:11,23
 143:3 153:9
 157:16
door 163:6
dream 163:1
drive 132:3
driving 132:15
drop 133:12
duly 127:4 165:6
 165:8
DuPONT 124:4
 124:11 126:4
 127:1,7,9
 128:11 152:25
 153:13 164:18
 166:3,21
 167:25 168:25
Dworken 125:9

E
E 126:2,2,6,6
 165:1,1
e-mail 148:11,22
 149:12 150:2
E-term 137:20
 141:3
earlier 139:4
 149:18
early 130:6,10
 133:22 140:15
 142:5 148:25
earnings 143:24
easiest 131:13
EASTERN
 124:3
easy 129:14
eat 138:13
eclipse 137:20
effect 151:16
efforts 128:20
either 145:9

eligible 144:17
 152:16
employed
 162:11
employee 165:13
 165:14
employment
 144:16 154:11
encouraged
 162:21
ended 128:11
 137:2,13
entire 140:23
 158:1 166:8
entries 130:19
 138:22
entry 133:18
 134:1,3 141:9
 162:9
ERRATA 166:1
 166:14 167:1
 168:1
Erwin 140:10
 141:13,17
 142:8,17,22
Esq 124:16
 125:2,8,8
estimated 132:3
et 152:16,16
exactly 142:2
 145:10 161:23
example 132:18
 144:7 147:7
exempt 151:25
Exhibit 126:7,8
 127:23 128:7
 128:19 131:11
 140:6 141:8
 148:9 149:19
exhibits 131:7
 138:15 150:16
expanded 129:4
 130:1 131:24
expires 165:23
explain 129:2

141:24
explicitly 148:22
external 140:19
extra 144:21,22
 146:16,18

F
F 165:1
facets 160:12
fact 152:5
Fairview 154:9
Falls 154:14,15
 154:18
familiar 161:19
 161:22
family 153:7
far 128:14
 135:11 139:22
 143:20
February 151:2
 151:6 165:23
fees 137:5
felt 149:17
file 137:15
financially
 165:14
fine 154:17
Firm 125:2
first 127:4
 131:12 134:9
 138:17,23
 139:20 141:20
 148:14 149:8
 149:13 151:4
 154:4 157:6
 165:8
flooring 158:1
folks 162:5,19
folks' 154:24
follow-up 138:3
following 147:1
 150:13
follows 127:6
footage 145:3
footprints

163:16
Ford 154:8
Fords 154:10
form 144:21
formulate 142:3
forth 129:18
 135:18 151:10
 165:9
forward 162:10
 162:17
found 159:25
four 160:15,17
 160:19
free 137:9
Friday 124:17
 138:8 152:18
full 157:10
further 164:10
 165:13

G
game 141:2
getting 145:19
 147:7 148:2
 150:25 152:9
give 127:19
 128:3 154:16
 164:4
given 140:19
 165:11
glamour 158:23
go 128:4,13,13
 128:23 130:23
 131:7 133:3,5
 133:12 135:5
 136:8,21
 137:13 138:13
 141:16 143:1,2
 143:13,16,21
 144:19 147:10
 147:15 152:14
 155:6,6 156:19
 157:25 160:13
 160:22,23
 161:2,13 162:9

162:12,17,18
163:4
**goal** 145:9
**goals** 145:6
150:5
**going** 127:24
128:1,12
129:18 131:22
132:21 133:16
136:9,15,25
145:16,17
148:1 149:10
151:12 155:3
157:5 159:14
160:9
**Golman** 155:8
155:12
**good** 142:15
**Gorecki** 161:4
**Gorey** 141:17
**gotten** 134:2
149:7,14
**grab** 131:7
**grandchildren**
141:2
**grow** 162:23
**guess** 148:21
**guys** 161:3

**H**

**H** 126:6
**half** 162:9,11
**Hammond**
162:18
**hand** 165:17
**hands-on** 139:12
**happened**
152:10 157:3
**Harp** 155:15
**head** 143:11
**heads-up** 128:3
**help** 130:10
131:5,6
**helpful** 137:11
**hereinafter**

127:5
**hereof** 166:14
**hereunto** 165:16
**hired** 135:23
136:10
**hold** 137:16
**home** 133:1,3,5
133:13 140:17
154:24 162:25
163:2,14
**homeowner**
135:16 139:16
153:9 158:3
**homeowners**
136:19
**Homeworks**
142:16,21,23
**hourly** 150:7
**hours** 128:15
130:9,19
131:15,19,23
133:3,22,24
138:7 140:13
141:6,23,25
144:4,5,25
145:5 146:16
146:18 147:6,7
147:8,16,24
151:18
**house** 129:18
130:8 131:22
136:7,11
140:20 141:4
158:1
**hundred** 135:8
**Huron** 155:11
**Huttman** 155:13
155:13
**Hynuiak** 161:25

**I**

**identification**
128:8
**identified** 148:6
**identify** 147:18

147:23
**identifying**
135:11
**II** 124:6
**immediately**
149:21
**impossible**
139:21
**improve** 145:2
**include** 132:18
**included** 129:7
133:15
**including**
132:19,23
**Independence**
156:21 157:12
**indicated** 134:6
166:13
**information**
129:5,13
**initial** 140:18
**installation**
143:21
**institute** 137:5
**instructions**
127:13
**interactions**
145:4
**intercompany**
151:13
**interest** 138:4
**interested**
165:14
**interfere** 127:18
**internal** 136:14
**invoice** 136:25
137:4
**involve** 130:7
**involved** 139:14
163:3
**Island** 140:1
141:13
**items** 129:21

**J**

**Jim** 163:13
**Jo** 125:8 164:5
**job** 134:12 135:4
146:1 156:22
**jobs** 136:1
**Jones** 136:11,12
156:4
**Joneses** 136:16
**jtatarko@dw...**
125:12
**Jude** 162:20,21
163:1,10
**JUDGE** 124:5
**July** 124:18
139:4
**June** 139:4
148:12 149:1

**K**

**keep** 130:11
161:14
**keeping** 144:18
**kept** 133:2
137:18
**kind** 130:20
160:14
**kitchen** 135:18
135:23 137:6
143:19,21
155:11 157:17
162:6,14
**Klepper** 156:2
**knew** 157:5
**know** 131:5,7
134:9,17
135:16 136:5
136:10 137:12
142:21 144:5
144:10 146:14
146:20 148:23
151:15 152:12
153:23 155:22
158:2,17
159:18 162:3
**knowing** 132:3

**Konitsky** 124:13
165:5,22
**Kristine** 124:4
124:11 126:4
127:1,7 164:18
166:3,21
167:25 168:25

**L**

**L** 124:15 125:2
**L.P.A** 125:9
**labeled** 140:10
141:22 142:2,3
**labor** 153:10
**lady** 132:6 160:9
**Lake** 159:22
165:3
**large** 135:9
139:9,24
140:23 142:25
152:23 158:23
161:9
**lasted** 131:23
**late** 149:17
**Law** 125:2
**lawful** 127:1
**layouts** 163:16
**Lazzaro** 125:2
**Legleise** 157:13
157:14
**let's** 127:22
149:17
**lighting** 163:23
**liked** 153:17
162:12
**Line** 167:2,5,8
167:11,14,17
167:20 168:2,5
168:8,11,14,17
168:20
**link** 140:19
**list** 135:1 136:5
136:12,24
140:5,18
**listed** 129:6,14

129:16,21
141:9 142:20
148:18 149:19
153:3,24 154:2
159:11 160:15
**listing** 136:6,7
**lists** 131:14
**lived** 132:11
157:24 158:22
159:22 161:24
162:5
**LLC** 125:2
**located** 133:11
**location** 132:10
142:14,23
155:4
**locations** 143:12
160:19
**log** 141:3 163:14
**logical** 162:23
**logs** 163:22
**long** 130:12,17
130:24 132:3,4
**look** 128:2
129:15 131:24
142:9 144:3
147:6 149:2
154:24 162:9
163:5
**looked** 129:4
146:6 147:19
**looking** 131:11
131:14 133:18
134:1,2 138:15
138:21 140:5
141:8 143:22
146:24 148:9
148:17 155:19
158:14 159:24
**looks** 138:16,19
142:10 143:22
150:19
**Lorain** 157:20
**lot** 130:21
140:15 141:23

**Lucas** 156:6
**lunch** 138:10,10
138:12,13,14
**Lynn** 124:13
165:5,22

— M —
**mail** 151:14
**main** 153:7
**maintained**
137:15
**major** 139:16
**making** 139:22
163:18
**manage** 139:21
**March** 142:9
**mark** 127:22
**marked** 126:7
128:8 150:16
**master** 152:23
154:25 159:24
161:9
**materialized**
135:8
**materials** 135:25
139:23
**matter** 166:9
**Mauk** 156:12
157:7
**Mazze** 156:24
**McConnell**
163:11,12
164:1
**means** 152:13
165:9
**measure** 131:25
**measurement**
160:14
**measurements**
135:6
**medical** 127:17
**medications**
127:18
**meet** 142:18
143:10,13,18

**meeting** 130:9
**memo** 151:14
**met** 142:23
159:3 162:24
**mileage** 128:21
129:8 131:2
142:3 146:14
**milled** 163:22
**mind** 149:2
**minus** 151:5
**minutes** 164:4
**Monday** 148:13
148:14 149:4,8
149:12 152:18
**Mondays** 129:11
149:6,13
**money** 161:14
164:2
**monies** 144:21
145:5
**month** 151:5
**month-and-a-...**
138:23
**months** 127:10
138:23
**morning** 148:13
149:5

— N —
**N** 126:2,2,6
**name** 129:19
140:22 156:18
157:6 161:19
161:22 162:23
163:1
**named** 159:16
**names** 136:24
**nature** 163:24
**necessarily**
130:7 136:24
136:25 150:11
151:23
**necessary** 137:8
**need** 148:12
**needed** 133:11

143:4 146:1
163:15
**needs** 153:17
163:5
**never** 159:18
**new** 162:7,14
163:12
**newer** 157:2
**nice** 161:12,12
164:2
**normal** 131:19
138:7
**NORTHERN**
124:3
**Notary** 124:14
165:5,22
**notice** 124:18
165:12
**NUGENT** 124:5
**number** 138:22

— O —
**oath** 127:12
166:16
**oaths** 165:6
**obviously** 131:2
137:2 149:4
162:22
**occasion** 147:21
**occasional**
134:12
**occasions** 135:5
146:17 148:4
**October** 158:18
**oddly** 130:22
**off-site** 132:16
133:6
**offer** 166:15
**office** 142:18,24
143:2 155:20
165:17
**offices** 124:15
**oh** 147:23 157:5
158:16
**Ohio** 124:3,15

124:17,23
125:4,10 160:3
165:3,6,17,22
165:23
**okay** 128:5,19
128:23 129:15
129:24 130:4
130:16 131:10
132:9,12 133:4
134:1,25 135:4
135:11 136:10
137:7,19
138:10 140:12
140:21 145:23
146:6 148:6,9
149:9 150:23
151:8,24 152:4
153:8,20 155:1
156:17
**Olmsted** 154:13
154:15
**on-site** 143:20
**ones** 127:25
129:9,24
160:15,17
**opposed** 136:16
153:24 159:16
**OT** 148:12,16,23
148:24
**outside** 130:14
163:24
**overtime** 132:17
133:7 138:18
138:25 139:2,7
139:20 141:9
143:24 144:14
144:18,23
145:13,20
146:25 147:6,7
147:8,16 148:2
148:25 149:25
150:4,6 151:12
151:17 152:7,9
152:16,19

7/14/2017                                                    Kristine A. DuPont

**P**

p.m 164:13
page 126:3
    131:9 141:20
    142:9 152:20
    154:4 167:2,5
    167:8,11,14,17
    167:20 168:2,5
    168:8,11,14,17
    168:20
paid 144:25
    145:19 146:3,9
    146:14,18
    147:1,17 148:2
    148:23 150:7
    151:17 152:9
paint 153:16
    163:23
painted 145:1
pallets 143:14
paper 129:8
Park 154:9
Parrish 155:25
part 132:18
    143:5 148:25
participate
    163:8
particular
    130:17 132:6
parties 165:13
parts 137:23
    140:24
Patton 154:13
Paul 158:10
    161:8
pay 138:17,19
    138:20 139:7
    144:20,21
    145:20 147:12
    147:24 151:12
    152:6
paycheck 145:6
    146:21 147:1
paychecks
    144:24

payroll 139:3
    143:22,23
    144:8 145:8
    147:11,20
    148:13 149:7
    149:13
payrolls 149:23
penalty 166:6,7
people 135:7
    137:9 144:17
    148:15,23
people's 145:24
percent 131:1
    135:8 155:21
    156:25 157:6
performed
    144:22
period 139:8
periodically
    152:7
perjury 166:6,7
person 157:1
personal 134:12
    134:22,24
Phillips 155:17
    155:18,19
pick 160:22
    161:2
place 139:25
    163:5 165:12
Plaintiff 124:5
    125:6
Plaintiff's
    131:11 150:16
plan 159:4
planned 134:18
planner 128:22
    129:4 130:1,2
    130:5,19 131:1
    131:12 134:17
    134:21 142:2,6
    142:20
please 127:16
plumber 143:10
    143:15 155:5

157:9 163:13
plumbing 124:7
    132:20 133:8
    134:11,14
    135:2,20 136:1
    136:3,14
    143:14 153:1
    153:21,25
    163:15 166:4
Plumbing's
    154:1
plus 151:5
point 137:24
    140:17 145:8
    152:8 163:6
points 148:1
portion 135:9
    142:15
portions 139:16
positive 157:11
    162:7
positively
    156:13
possibly 133:12
    145:7 154:23
    156:14
prepared 130:6
preparing 130:9
Present 125:14
    141:17
Presentation
    154:5
pretty 157:9
previous 127:25
    140:3
Pricing 141:17
prints 143:19
probably 129:1
    136:12,15
problem 127:17
Procedure 127:4
process 128:24
    138:6 139:13
    143:6 159:5
    162:13

product 161:2
products 140:18
    153:10
program 140:22
project 135:2
    136:9 139:9,13
    139:22,24
    140:11,16
    141:13,25
    142:24 143:1
    148:19 152:22
    153:1,6 154:21
    155:22 157:2
    157:11 158:2
    158:10 159:5
    160:20 161:11
    161:12 162:12
    162:17 163:12
projects 135:9
prompted 139:1
    139:20
properly 141:6,7
proposal 137:12
provided 127:3
    128:14
proximal 132:10
Prumo 156:8
Public 124:14
    165:6,22
purchased 137:6
    138:2
purchasing
    138:4
purely 153:1,2
purpose 127:2
purposes 128:8
pursuant 124:18
    165:12
put 129:3,13
    134:16 135:6
    135:17 137:12
    140:5 152:5
putting 128:24
    133:15

**Q**

qualified 165:6
quarter 151:4
quartz 162:14
    162:15
question 143:9
    148:21
questioned
    146:20 150:8
questions
    127:15 129:1
    143:4,7 164:10
quite 138:5
    164:1

**R**

R 165:1
rate 150:7
reactions 145:25
read 129:14
    151:15 164:11
    166:8,10
readjustment
    160:8
really 160:8
Realtime 124:13
reason 129:17
    136:5 167:4,7
    167:10,13,16
    167:19,22
    168:4,7,10,13
    168:16,19,22
reasonable
    152:3
rebill 136:22
recall 133:9,17
    138:6 139:1
    146:17 147:5
    150:25 152:22
    154:6 155:24
    161:23
recalling 130:22
receive 139:7
received 148:21
    151:13

Kristine A. DuPont

**recollection**
  139:5,19
**Recollections**
  130:21
**record** 164:7
  165:10
**records** 128:13
  136:14 138:17
**recreate** 128:14
**redesign** 154:24
  157:10 159:24
  160:13,14
**redesigned**
  161:10
**reduced** 165:9
**reflected** 142:5
**refunded** 161:14
**regardless** 150:1
**reimbursement**
  129:8
**related** 134:21
  134:24 140:7
  140:11 141:14
  141:18,21,22
  143:18 145:9
  146:21 148:5
  153:24 160:18
**relates** 147:8
**relationship**
  129:23 163:10
**relative** 165:13
  165:14
**remember**
  130:25 132:6
  133:14 140:22
  145:10 146:8
  146:24 147:21
  147:23 148:1
  154:9,19,20
  155:2,7,9,16
  156:1,3,5,7,9
  156:11,13
  157:4,23 158:6
  159:8,10
  160:12 162:2

162:25
**remembering**
  130:24
**remind** 127:11
  130:20
**remodel** 135:23
  152:23 153:9
  155:11 157:18
  158:9
**replacing** 158:1
**Reporter** 124:13
**Reporters**
  124:22
**Reporting**
  124:22 165:22
**reports** 148:13
  148:24
**request** 146:25
**requested**
  146:10
**requesting**
  145:13
**requests** 152:7
**researched**
  146:11
**residential**
  157:23 159:1
**respect** 130:16
  146:16
**responses**
  127:14
**result** 128:19,21
  135:4
**resulted** 133:7
**Richard** 125:8
**Rick** 157:9
  162:18
**right** 135:12
  137:10 155:12
  155:19 156:20
  159:19 161:5
**RMR** 165:5
**Road** 124:23
  165:23
**Rockefeller**

124:16 125:3
**room** 143:15
  159:6
**Roxanne** 159:20
  160:6
**Royale** 158:5
**rselby@dwor...**
  125:11
**Rudder** 154:23
**Rule** 165:15
**Rules** 127:3

———————
**S**

**S** 126:2,2
**S-l-y-d-e-r**
  152:21
**safe** 151:7
**salary** 146:22
**samples** 133:12
  160:22
**Sandusky**
  132:10
**Saturday** 131:15
  131:19
**Saturdays**
  152:18
**save** 166:11
**saying** 131:16
  147:6 151:9
**says** 149:7 150:2
  151:17
**scale** 158:23
**schedule** 131:24
  152:17
**Schultz** 139:10
**seal** 165:17
**second** 142:9
**see** 131:24 138:3
  142:8 151:16
  152:10 162:18
**Selby** 125:8
  126:5 127:8,22
  128:1,5,10
  131:6 164:4,9
**sent** 148:15

149:4
**separate** 137:15
  143:14 160:20
**separately**
  163:20
**September**
  158:18
**Services** 124:22
  165:22
**set** 136:17
  165:16
**setting** 150:5
**She'll** 164:11
**sheet** 138:20
  142:3 145:17
  145:18 147:15
  166:1,14 167:1
  168:1
**sheets** 145:12
  147:5,9,9,10
  148:4,7
**shocked** 160:10
**shop** 133:24,25
**show** 132:1
  136:15 137:22
**showed** 129:10
  134:21
**shower** 143:11
  163:6,16
**shown** 131:16
  145:6
**showroom** 130:9
  130:14 132:8
  141:7 145:1,2
  145:3 148:15
  148:23 159:11
  159:13,14,16
**shows** 133:19
  135:1 140:14
**side** 134:12
**sign** 150:6
**Signature**
  164:14 167:24
  168:24
**signed** 150:20

150:23 151:8
  152:2 166:17
**sit** 146:13,16
  161:23
**site** 130:8,17
  131:25 142:13
  143:1
**situations**
  135:22 137:2
**size** 163:21,22
**slash** 156:18
**slips** 146:3
  147:20
**Slyder** 152:21
**Smelko** 158:8
**Smith** 158:12,13
**sold** 159:2,6
**Solid** 160:21
**somebody**
  137:13 163:18
**somewhat**
  159:23
**sorry** 139:25
  158:15
**sort** 135:13
  138:23 144:4
**source** 160:21
  161:1
**southern** 160:3
**special** 153:17
**specific** 142:23
  143:9 152:24
**specifically**
  133:17 146:11
  146:24 147:4
  147:19,22
  149:24 154:12
  154:15 158:7
  162:2
**spending** 164:1
**spent** 133:3
  140:13 159:12
**spread** 162:22
**spreadsheet**
  142:4

square 145:2
SS 165:3
St 162:20,21
   163:1,10
start 130:23
   131:12
State 124:14
   165:3,6,22
STATES 124:2
stenotypy 165:9
stipulations
   124:19 165:12
Stock 158:19,22
   161:4,5
stop 144:18
street 125:9
   135:17
stubs 147:11
stuff 160:9
   161:24 163:24
subject 148:16
suite 125:10
   152:23 154:25
   155:20 159:24
   161:9
Sundays 129:11
Sunset 139:25
   139:25
super 161:19,22
Superior 124:16
   125:3
supervisor
   139:10
supplemented
   131:2
supplied 129:12
   163:7
suppliers 140:13
supply 124:7
   161:1 166:4
supposed 141:10
   143:12 147:9
sure 127:15,16
   131:9 135:12
   138:5 139:22

143:11,15
146:5 150:17
151:3 156:25
157:2,3,9
160:11
Surfaces 160:25
swear 156:23
sworn 127:4
   165:8
system 137:18
   138:6 140:19
   141:4 151:14
systematically
   157:25

                T
T 126:2,6 165:1
   165:1
table 159:4
take 129:17
   138:12 141:6
   165:7
taken 124:12
   132:5 147:13
   165:11 166:9
talked 138:16
   140:2 148:10
   161:5
talking 131:8
   150:17,21
Tatarko 125:8
tell 150:14
   151:10 158:17
   161:19
temperature
   145:24
tempers 145:24
testify 165:8
testimony 165:9
   165:11
they'd 136:22
thing 129:20
   137:8 140:25
   148:14 149:8
   149:13 150:18

160:14 163:9
things 129:2,11
   130:6 134:13
   134:20 135:12
   135:19 147:14
   150:6 153:16
   163:21,23
think 127:22
   131:7 137:20
   140:2 150:15
   159:20 162:24
   164:1,5
thinking 147:23
thought 160:8
three 147:6,7,8
throw 137:16
tile 161:1 162:16
till 131:23
   133:19
time 128:12
   130:2 132:20
   132:24 133:16
   134:10 137:24
   138:16,17
   139:8,10 142:7
   142:10 144:8
   144:11,12,21
   144:25 145:1
   146:4,21
   147:12 148:18
   148:19,20
   149:1,18,18,22
   151:2 152:12
   159:12 165:11
times 130:5
   136:18,20,21
   140:14 142:17
   144:23,25
   146:2 150:7
   152:11,14,15
timing 149:11
tired 144:19
   145:22
today 127:19
   146:17

told 144:16,20
   145:20 150:10
   151:22 152:4
   152:15
Tom 157:5
tops 162:15
total 137:23
track 133:2
   144:18
trades 139:14
transaction
   138:1
transcribed
   165:10
transcript 166:8
transferred
   129:22
travel 132:20,24
   133:16
traveling 130:8
tried 163:19
trims 143:14,16
true 165:10
   166:11
truth 165:8,8,8
try 141:5 144:20
trying 137:9
   163:9
Tuesday 138:7
   149:7,15
turn 139:1 144:7
   144:11,14,20
   145:16,17,21
   145:22 148:24
   148:25 149:18
   149:21 152:7
   152:10
turned 138:17
   138:24 139:3
   139:18 143:23
   145:12 146:2,4
   146:8,14,18
   147:9,24 148:4
turning 147:5
   150:1,3

two 133:22,24
   138:23 143:14
   149:20
type 129:19,23
   143:7
typewriting
   165:10
typically 133:2
   137:18

                U
Uhm-hum 134:5
ultimate 129:19
ultimately 136:6
understand
   135:12 147:3
understandable
   139:23
understanding
   128:12 166:14
understands
   143:16
understood
   139:11
unfortunately
   159:25
UNITED 124:2
unrelated
   134:13
updated 162:6
use 127:24

                V
vacation 147:12
vary 143:5
Veith 161:16,17
   161:18
vendor 160:21
   160:25
verbal 127:14
verbally 143:20
Vermilion
   142:19
versus 146:22,25
   160:1

visit 130:18,24
  131:22,25
  136:12 141:13
visited 142:21
  142:22
visits 130:13
  132:16 142:13
VOLUME
  124:6
vs 166:4
vs- 124:6

**W**
W 124:16 125:3
  125:9 126:2
Waived 164:14
walk-in 157:16
  157:24
walk-through
  143:16,20
walked 135:16
want 131:8
  135:11,13
  150:17 154:2
  161:14
wanted 135:17
  143:11 155:5
  161:10 162:6
wanting 157:25
wants 143:19
wasn't 142:22
  145:19 149:11
  155:3
Waters 124:22
  165:22
way 136:17
  140:19
we're 127:23
  131:9 150:17
  150:21 164:5
week 139:18
  146:22 147:1
  148:17 152:19
weekend 140:23
weeks 149:21

Weilnau 162:3,4
went 128:24
  129:7 130:25
  133:1,13 139:9
  149:12 159:4
  160:19
weren't 141:23
  141:24 145:17
  146:18 151:11
west 155:5
Westlake 157:24
  158:23
WHEREOF
  165:16
whoever's
  129:18
willing 163:8
Willoughby
  124:23 165:23
Wilson 163:13
witness 165:7,11
  165:16
Wochna 159:9
Wood 124:23
  165:23
work 134:22
  135:25 137:6,9
  137:17 140:15
  141:5,25
  144:22 149:6
  149:15 152:17
  152:25 153:12
  154:1 157:17
  159:2 161:15
  163:15
worked 128:16
  131:16 133:19
  134:7 138:24
  146:22 154:10
working 134:10
  140:17 147:13
  153:20 159:15
wouldn't 137:3
wound 161:11
  164:1

writing 152:5
  165:9
written 134:4
wrong 158:15

**X**
X 126:2,6,6

**Y**
Yeah 129:21
  140:9 157:9,15
yourselfer
  159:23

**Z**

**0**

**1**
1 131:20 132:8
  133:19 134:4,7
1.5 150:7
1/13 159:21
1/15/16 159:20
1/18 160:15
1/22 144:10,12
1/22/15 144:2
1/24 156:6
1/27 156:8 161:6
1/7 144:8 156:2
1/8 144:8,9
  156:4
1/8/15 144:1
1/9 160:5
1:16CV2363
  124:6
1:45 131:25
  132:7,19
10 126:8 127:23
  128:7,19 140:6
  141:8 149:19
10/4 155:17
10:55 124:17
100 155:21
  156:25 157:6
11/27 159:7

11/7 155:25
12/11 143:23,23
12/22 159:9
12/26 143:25
  159:11
12:17 164:13
127 126:5
128 126:8
13 150:16
135 125:10
14 124:18
1468 125:9
15 142:10
  150:19
15th 151:21
16 150:16,23,25
16th 151:17
17th 151:20
180 144:2
1st 165:17

**2**
2 152:20
2.5 131:23
  147:16
2/12 156:10
2/16/15 150:20
  151:8 152:2
2/17 161:16
2/5 144:12,13
20 166:18
2011 141:11
2014 139:2
  141:10
2015 148:12
  150:5
2017 124:18
  165:17
2020 165:23
216 125:4,11
269-198022
  124:24
28 131:11
28(D) 165:15

**3**
3/19 161:21
3/31/15 152:20
3/6 158:14
3/9 156:12
3:30 131:17,23
  132:13
3:30's 132:25
303 143:24
38385 124:23
  165:23

**4**
4/20 142:16
4/7 161:25
40 151:17
440 124:24
44094 124:23
  165:23
44113 125:4,10

**5**
5 138:9
500 145:8

**6**
6/13 148:20
  149:19
6/15 149:20
6/16 149:20
6/18 149:20
6/19 149:20
6/28 131:14
6/3 148:18
6/5 148:18
6/8 148:20
6/9 148:20
  149:19
614 124:16
  125:3
696-5000 125:4

**7**
7 133:19 134:4,7
  148:9
7/12 134:3

7/14/2017                                          Kristine A. DuPont

Page 178

| | | | | |
|---|---|---|---|---|
| **7/12/14** 133:18 | | | | |
| **7/15** 141:16 | | | | |
| **7/22/14** 154:4 | | | | |
| **7/30** 154:8 | | | | |
| **7/8** 141:10 | | | | |
| **7th** 138:19 139:2 | | | | |
| **8** | | | | |
| **8** 138:9 165:23 | | | | |
| **8/6** 158:16 | | | | |
| **8/9** 154:13 | | | | |
| **8:37** 149:4 | | | | |
| **861-4211** 125:11 | | | | |
| **8th** 148:12 | | | | |
| **9** | | | | |
| **9** 131:16,20 | | | | |
| **90** 131:1 | | | | |
| **920** 124:16 | | | | |
| 125:3 | | | | |
| **9th** 125:9 | | | | |